**No. 23-5110**

# In the United States Court of Appeals for the Tenth Circuit

PETER POE, by and through his parents and next friends, PAULA POE and PATRICK POE, *et al.*,

*Plaintiffs-Appellants,*

v.

GENTNER DRUMMOND, in his official capacity as Attorney General of the State of Oklahoma, *et al.*,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the Northern District of Oklahoma, No. 4:23-cv-00177, Honorable John F. Heil, III, District Judge

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

Megan Lambert
AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA FOUNDATION
P.O. Box 13327
Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org

Harper S. Seldin
Chase Strangio
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hseldin@aclu.org
cstrangio@aclu.org

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005-3919
(646) 307-7406
ogonzalez-pagan@lambdalegal.org

Laura J. Edelstein
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com

*Counsel for Plaintiffs-Appellants*
(Additional counsel listed on signature block)

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS


Table of Authorities ........................................................................................ iv

Statement of Related Cases ................................................................................1

Statement of Jurisdiction ....................................................................................2

Statement of Issues ..............................................................................................3

Introduction ........................................................................................................4

Statement of the Case ..........................................................................................5

A. Medical Guidelines for Treating Transgender Adolescents with Gender Dysphoria .............................................................................5

B. Oklahoma's Ban ........................................................................................8

C. Plaintiffs' Background and Harms Imposed by SB613 .........................9

Procedural History ............................................................................................14

Standard of Review ...........................................................................................14

Summary of the Argument ................................................................................15

Argument ...........................................................................................................16

I. Plaintiffs Are Likely to Succeed on their Equal Protection Claim. ..............16

A. SB613 Triggers Heightened Scrutiny. ...............................................17

1. SB613 classifies based on sex. ...............................................17

(a) SB613 prohibits treatment based on a person's sex designated at birth. ......................................................... 17

(b) SB613 classifies based on a person's transgender status, which is a sex-based classification. .................... 21

2. Heightened Scrutiny Is Required for Classifications Based on Sex and Transgender Status. ...................................25

3. SB613 Engages in Purposeful Discrimination by Seeking to Enforce Sex Stereotypes. ...................................................28

B. Neither *Geduldig* nor *Dobbs* Forecloses the Application of Heightened Scrutiny to SB613. .........................................................31

C. Tested Under the Proper Legal Standards, SB613 Fails to Survive Scrutiny. ..........................................................................34

1. This Court should not defer to the district court's factual findings....................35

(a) The district court's factual findings were dicta. ............ 35

(b) The district court failed to properly consider and weigh the evidence proffered by Plaintiffs' experts and gave improper weight to Defendants' experts. ....... 36

(c) This Court can make independent findings as to legislative facts. .......... 39

2. None of the State's Proffered Justifications Amounts to an Exceedingly Persuasive Justification for the Law's Categorical Ban on Treatment. ..........40

(a) SB613 is not justified by claims that the prohibited treatment is "experimental." .......... 41

(b) SB613 is not justified by the existence of potential risks and side effects of the proscribed treatment. ........ 43

(c) SB613 is not justified by gender dysphoria's diagnostic process. .......... 48

(d) Gender conformity is not an important state interest sufficient for heightened scrutiny. .......... 50

D. SB613 Fails Any Level of Review..........52

II. Plaintiffs Are Likely to Succeed on their Substantive Due Process Claim..........53

III. The Other Preliminary Injunction Factors Favor Plaintiffs..........58

A. Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction..........58

B. The Balance of the Equities and Public Interest Favor Plaintiffs. ..........59

Conclusion ..........59

Certificate of Compliance ..........61

Statement Regarding Oral Argument ..........62

Certificate of Service ..........63

Certificate of Digital Submission..........64

ATTACHMENTS PURSUANT TO 10th Cir. R. 28.2(A)(1)

Opinion and Order on Plaintiffs' Motion for Preliminary Injunction
October 5, 2023 (Dist. Ct. Dkt. 138)....................................................................A001

Corrected Opinion and Order on Plaintiffs' Motion for Preliminary Injunction
October 6, 2023 (Dist. Ct. Dkt. 139)....................................................................A037

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.C. v. Metropolitan School District of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ....................23

*Adams by & through Kasper v. School Board of St. Johns County*,
318 F. Supp. 3d 1293 (M.D. Fla. 2018), *vacated on other grounds*,
57 F.4th 791 (11th Cir. 2022) ....................37

*Adams by & through Kasper v. School Board of St. Johns County*, 57
F.4th 791 (11th Cir. 2022) ....................17

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ....................27

*Allfirst Bank v. Progress Rail Services Corp.*,
521 F. App'x 122 (4th Cir. 2013) ....................39

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) ....................41, 58

*Anspach ex rel. Anspach v. City of Philadelphia*,
503 F.3d 256 (3d Cir. 2007) ....................56

*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020) ....................59

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) ....................58

*Board of Trustees of University of Alabama v. Garrett*,
531 U.S. 356 (2001) ....................53

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ....................19, 21, 24, 28

*Bowen v. Gilliard*, 483 U.S. 587 (1987) .................... 25-26, 27

*Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018) ....................29

*Brandt v. Rutledge*, 2023 WL 4073727 (E.D. Ark. June 20, 2023) ....................37

*Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) ....................18, 27

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ....................33

*Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995)....................................................26

*C.P. v. Blue Cross Blue Shield of Illinois*,
2022 WL 17092846 (W.D. Wash. Nov. 21, 2022)............................................38

*C.P. v. Blue Cross Blue Shield of Illinois*,
2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) ............................................22

*Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010).......................................33

*Citizens United v. Gessler*, 773 F.3d 200 (10th Cir. 2014) ....................................59

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985)...................26, 53

*Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008) ..........................................................56

*Dekker v. Weida*, 2023 WL 4102243 (N.D. Fla. June 21, 2023),
*appeal pending*, No. 23-12155 (11th Cir. filed June 27, 2023).............19, 29, 37

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) ......31, 55

*Druley v. Patton*, 601 F. App'x 632 (10th Cir. 2015) ............................................26

*Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) .............................54, 56

*Dulane v. INS*, 46 F.3d 988 (10th Cir. 1995).........................................................36

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ..............................................................53

*Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022),
*vacated on other grounds*, 80 F.4th 1205 (11th Cir. 2023)................................38

*Evancho v. Pine-Richland School District*,
237 F. Supp. 3d 267 (W.D. Pa. 2017)..............................................................27

*Fain v. Crouch*, 618 F. Supp. 3d 313 (S.D. W.Va. 2022) ......................................22

*Flack v. Wisconsin Department of Health Services*,
328 F. Supp. 3d 931 (W.D. Wis. 2018) ...........................................................22

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) .........................................................15, 20, 28, 58

*Frontiero v. Richardson*, 411 U.S. 677 (1973) ........................................................25

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ........................................................31, 33

*General Motors Corp. v. Urban Gorilla, LLC*,
500 F.3d 1222 (10th Cir. 2007) ........................................................14

*Globe Newspaper Co. v. Superior Court for Norfolk County*,
457 U.S. 596 (1982) ........................................................57

*Golub v. Secretary of Health & Human Services*,
243 F.3d 561 (Table), 2000 WL 1471643 (Fed. Cir. 2000) ...............................36

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) ......17, 27, 28

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023) ........................................24, 28, 33

*J.E.B. v. Alabama*, 511 U.S. 127 (1994) ........................................................21, 24

*James v. Eli*, 889 F.3d 320 (7th Cir. 2018) ........................................................36

*K.C. v. Individual Members of Medical Licensing Board of Indiana*,
2023 WL 4054086 (S.D. Ind. June 16, 2023), *appeal filed*, No. 23-
2366 (7th Cir. July 12, 2023) ........................................................18

*Kadel v. Folwell*, 2022 WL 11166311 (M.D.N.C. Oct. 19, 2022) ..........................22

*Kadel v. Folwell*, 446 F. Supp. 3d 1 (M.D.N.C. 2020) ...........................................30

*Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022) .......................................18

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ...............................................27

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) .......................................54, 56

*Koe v. Noggle*, 2023 WL 5339281 (N.D. Ga. Aug. 20, 2023) ...............................37

*L.W. v. Skrmetti*, 2023 WL 4232308 (M.D. Tenn. June 28, 2023),
*rev'd and remanded on other grounds*, 2023 WL 6321688
(6th Cir. Sept. 28, 2023) ........................................................37

*L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023)........................................... 23-24, 32

*Lawrence v. Texas*, 539 U.S. 558 (2003)....................................................................33

*Loving v. Virginia*, 388 U.S. 1 (1967) ........................................................................20

*Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122 (2023) ............................32

*Mills v. Habluetzel*, 456 U.S. 91 (1982) ....................................................................27

*Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982) ........................20

*Mojo Built, LLC v. City of Prairie Village*,
2022 WL 288139 (10th Cir. Feb. 1, 2022) ..........................................................24

*Moothart v. Bell*, 21 F.3d 1499 (10th Cir. 1994).......................................................15

*Nguyen v. INS*, 533 U.S. 53 (2001)..............................................................................20

*Nyquist v. Mauclet*, 432 U.S. 1 (1977)........................................................................27

*Obergefell v. Hodges*, 576 U.S. 644 (2015)...............................................................54

*Parham v. J.R.*, 442 U.S. 584 (1979)...................................................54, 55, 56, 57

*Peltier v. Charter Day School, Inc.*, 37 F.4th 104 (4th Cir. 2022),
*cert. denied*, 143 S. Ct. 2657 (2023)............................................................ 20-21

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979)..........28

*PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182 (10th Cir. 2010)..................... 53-54, 56

*Planned Parenthood of Kansas v. Andersen*,
882 F.3d 1205 (10th Cir. 2018) ..........................................................................39

*Powers v. Ohio*, 499 U.S. 400 (1991)..........................................................................20

*Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62 (1st Cir. 2002) ....................39

*Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio 2020) .........................................26

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..........................................................56

*Reno v. Flores*, 507 U.S. 292 (1993) ..........................................................................56

*Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181 (10th Cir. 1995)..................................35

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................................53

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017) ...........................................25, 34

*Shardar v. Attorney General of United States*,
503 F.3d 308 (3d Cir. 2007) .......................................................................36

*Smith v. Avanti*, 249 F. Supp. 3d 1194 (D. Colo. 2017) ..........................................28

*Stokes v. United States*, 967 F.3d 1034 (10th Cir. 2020)........................................51

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ..........................................................................23

*Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021)..................................................19

*Timbs v. Indiana*, 139 S. Ct. 682 (2019)..................................................................55

*Toomey v. Arizona*, 2019 WL 7172144 (D. Ariz. Dec. 23, 2019)...........................22

*Tudor v. Southeastern Oklahoma State University*,
13 F.4th 1019 (10th Cir. 2021) ...................................................................21

*United States v. Hunt*, 63 F.4th 1229 (10th Cir. 2023)..........................................40

*United States v. Iverson*, 818 F.3d 1015 (10th Cir. 2016)................................39, 40

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................16, 25, 34

*United States v. Weeden*, 117 F.3d 1429 (Table),
1997 WL 375345 (10th Cir. 1997) ................................................................35

*United States v. White*, 782 F.3d 1118 (10th Cir. 2015)..........................................56

*United States v. Wolny*, 133 F.3d 758 (10th Cir. 1998)..........................................40

*Van Garderen v. Montana*, No. DV-23-541 (Missoula Cnty. Dist. Ct.,
Mont. Sept. 27, 2023) ...................................................................................29

*Verlo v. Martinez*, 820 F.3d 1113 (10th Cir. 2016) ................................................59

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977).......................................................................................30

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) ..................................................56

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................54, 55

*Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ......................................................................... 24-25, 27, 28

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) ................................................33

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ..........................................................................26, 27

*In re Wolverton Associates*, 909 F.2d 1286 (9th Cir. 1990) ...................................39

*Zzyym v. Pompeo*, 958 F.3d 1014 (10th Cir. 2020) ................................................29

**STATUTES**

28 U.S.C. § 1292(a)(1).........................................................................................2

28 U.S.C. § 1331 .....................................................................................................2

28 U.S.C. § 1334 .....................................................................................................2

42 U.S.C. § 1983 .....................................................................................................2

Okla. Stat. tit. 63 § 2607.1(A)(1) ..............................................................................8

Okla. Stat. tit. 63 § 2607.1(A)(2)(a)...............................................9, 17, 28, 30, 51

Okla. Stat. tit. 63 § 2607.1(A)(2)(b) ..........................................................................9

Okla. Stat. tit. 63 § 2607.1(A)(2)(b)(4)...............................................................19, 51

Okla. Stat. tit. 63 § 2607.1(B) ..............................................................................8, 21

Okla. Stat. tit. 63 § 2607.1(C) ..................................................................................9

Okla. Stat. tit. 63 § 2607.1(D)...................................................................................9

**OTHER AUTHORITIES**

ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*, https://www.aclu.org/legislative-attacks-on-lgbtq-rights (Nov. 3, 2023) ..........28

American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (DSM-5-TR) ...........................48

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Plaintiffs' claims arise under the Fourteenth Amendment. Plaintiffs sought relief under 42 U.S.C. § 1983. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1334. The district court denied Plaintiffs' preliminary injunction motion in an opinion and order issued October 5, 2023, and Plaintiffs timely filed a notice of appeal on October 6, 2023. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1. Does SB613 likely violate the Fourteenth Amendment's Equal Protection Clause?

2. Does SB613 likely violate the Fourteenth Amendment's Due Process Clause?

3. Did the district court abuse its discretion in denying Plaintiffs-Appellants' preliminary injunction motion?

## INTRODUCTION

Right now, Peter Poe, Daphne Doe, Brandon Boe, Lydia Loe, and Ryan Roe–five transgender adolescents who just want to enjoy their childhoods and grow into young adults–cannot receive potentially lifesaving medical care in their home state of Oklahoma. These Minor Plaintiffs all suffer from severe, clinically significant distress without access to gender-affirming medical care to treat their gender dysphoria. Before treatment, they were withdrawn and depressed, several struggled with suicidality or self-harm, and they all struggled to envision a future for themselves. Their parents and guardians decided, after careful reflection and consultation with medical professionals, that the benefits of evidence-based treatment, which their doctors recommended and all major U.S. medical organizations support, outweighed the risks, and they provided the requisite informed consent for this treatment. With care, Peter, Daphne, Brandon, Lydia, and Ryan began to thrive.

But Oklahoma now bans all interventions "for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," including the pubertal suppression and hormone therapy prescribed to the Minor Plaintiffs. SB613 does not prohibit those medications generally, or even for all minors. Clinicians may continue to prescribe pubertal suppression and hormone therapy for any other purpose, to

anyone of any age, *except* for people like the Minor Plaintiffs: transgender adolescents with gender dysphoria. SB613 thus takes aim at one class of people who need treatment for one purpose: to align their bodies with their gender identity.

Because Oklahoma's ban classifies on the basis of an individual's sex and transgender status, it triggers heightened scrutiny. The district court erred by applying a lower standard of review and then, in dicta, making clearly erroneous factual findings based on Defendants' discredited and unqualified experts. The district court further erred by failing to recognize the Parent Plaintiffs' fundamental right to direct their children's medical care, a right not constrained by medical interventions available at the Fourteenth Amendment's ratification.

Accordingly, the Court should reverse the district court's decision and order, issue a preliminary injunction to preserve the status quo, and protect Plaintiffs from irreparable harm.

## STATEMENT OF THE CASE

### A. Medical Guidelines for Treating Transgender Adolescents with Gender Dysphoria

Gender identity refers to a person's core sense of belonging to a particular gender. J.A.(Vol.2).0179; J.A.(Vol.2).0217. Gender identity has biological roots and cannot be changed voluntarily, by external forces, or through medical or mental health intervention. J.A.(Vol.2).0179-80; J.A.(Vol.2).0217-18. A person's gender identity does not always match the sex an individual was designated at birth.

J.A.(Vol.2).0179; J.A.(Vol.2).0218. People whose gender identity aligns with their sex designated at birth are cisgender (or non-transgender), while those whose gender identity differs from their sex designated at birth are transgender. J.A.(Vol.2).0179; J.A.(Vol.2).0218.

Being transgender is not a condition to be cured. But many transgender people suffer from gender dysphoria, a serious medical condition characterized by clinically significant distress arising from the incongruence between a transgender person's gender identity and sex designated at birth. If left untreated, gender dysphoria can result in severe anxiety, depression, self-harm, and suicide. J.A.(Vol.2).0183; J.A.(Vol.2).0218-19.

Treatment for gender dysphoria is well-established and has been provided for decades using evidence-based clinical guidelines. J.A.(Vol.2).0178; J.A.(Vol.2).0219-21. The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society publish these widely used clinical practice guidelines (the "Guidelines"). J.A.(Vol.2).0184-85; J.A.(Vol.2).0222-26. Under these Guidelines, gender-affirming medical care is provided to adolescents only when an adolescent has: (i) gender incongruence that is both marked and sustained over time; (ii) a gender dysphoria diagnosis; (iii) sufficient emotional and cognitive maturity to provide informed consent; (iv) provided informed consent with their parents after being informed of the potential risks of treatment, including potential

reproductive side effects; and (v) no mental health concerns that would interfere with diagnosis or treatment. J.A.(Vol.2).0187; J.A.(Vol.2).0222-24.

For some adolescents with gender dysphoria, pubertal suppression may be medically indicated *after the onset of puberty*. Pubertal suppression is only indicated when, among other diagnostic criteria, the adolescent has "a long-lasting and intense pattern of gender nonconformity or gender dysphoria [that has] . . . worsened with the onset of puberty." J.A.(Vol.2).0223. Pubertal suppression prevents gender dysphoria from worsening by pausing the development of secondary sex characteristics that are inconsistent with the patient's gender identity. J.A.(Vol.2).0222. It is reversible and has no effect on fertility: once treatment stops, endogenous puberty resumes. J.A.(Vol.2).0222, 0226, 0231-32.

For some older adolescents, gender-affirming hormone therapy (i.e., testosterone for transgender boys and a combination of testosterone suppression and estrogen for transgender girls) may be medically indicated. J.A.(Vol.2).0223-24. Hormone therapy alleviates gender dysphoria by facilitating physiological changes consistent with an adolescent's gender identity. J.A.(Vol.2.)0227-28. Under the Guidelines, treatment is provided only after rigorous assessments of the minor's gender dysphoria and capacity to understand treatment's risks and benefits and with the informed consent of parents or guardians. J.A.(Vol.2).0187-89; J.A.(Vol.2).0225-26.

These medical interventions are provided to allow transgender adolescents to undergo puberty within the typical age range for puberty. J.A.(Vol.5).1004-05. These interventions greatly improve the health and wellbeing of transgender adolescents, as demonstrated by a substantial body of evidence, including cross-sectional and longitudinal studies and decades of clinical experience. J.A.(Vol.2).0189-90; J.A.(Vol.2).0258. Delaying treatment can result in significant distress, including anxiety and escalating suicidality, along with physical changes that can be difficult or impossible to reverse. J.A.(Vol.2).0219; J.A.(Vol.2).0258; J.A.(Vol.2).0376. Interventions in adolescence, however, can dramatically minimize gender dysphoria later in life and eliminate the need for surgery. J.A.(Vol.2).0228, 0233. By contrast, the risks and side-effects of these interventions are rare or easily managed. J.A.(Vol.2).0232-33. The evidence supporting gender-affirming medical care is comparable to the evidence supporting other pediatric care, which is often provided without randomized controlled trials. J.A.(Vol.2).0364-66.

### B. Oklahoma's Ban

On May 1, 2023, Governor Kevin Stitt signed into law SB613, categorically banning medical care for gender dysphoria for transgender adolescents in Oklahoma. SB613 prohibits any "health care provider" from "knowingly provid[ing] gender transition procedures to any child," defined as "any person under eighteen (18) years of age." Okla. Stat. tit. 63 § 2607.1(A)(1), (B).

"Gender transition procedures" are defined by an enumerated list of "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex." *Id.* § 2607.1(A)(2)(a). Prohibited procedures include "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex," and "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex." *Id.*

SB613 excludes from its prohibition, *inter alia*, "medications prescribed . . . specifically for the purpose of treating precocious puberty or delayed puberty in that patient," "services provided to individuals born with ambiguous genitalia, incomplete genitalia, or both male and female anatomy, or biochemically verifiable disorder[s] of sex development," and treating conditions "caused by or exacerbated by" "gender transition procedures." *Id.* § 2607.1(A)(2)(b).

Healthcare providers who violate SB613 can be convicted of a felony and disciplined for unprofessional conduct by their licensing board. *Id.* § 2607.1(C)-(D).

### C. Plaintiffs' Background and Harms Imposed by SB613

**Peter Poe** is a twelve-year-old transgender boy who lives in Oklahoma with his parents, Paula and Patrick Poe. J.A.(Vol.2).0283-84. Peter asked to use a boy's

name when he was seven and came out to his parents when he was ten. J.A.(Vol.2).0284. As a child and young adolescent, Peter struggled with anxiety, thoughts of self-harm, and even suicide. He hid his body and avoided engagement with the world. J.A.(Vol.2).0284. Peter's parents found him a therapist, and he was eventually diagnosed with gender dysphoria. J.A.(Vol.2).0289. For the past 18 months, Peter has been receiving pubertal suppression to treat his gender dysphoria, J.A.(Vol.2).0289-90, and because of that treatment, he has bloomed: he is happier and more excited, outgoing, and social. J.A.(Vol.2).0290. When Peter's medication was delayed for insurance reasons, his gender dysphoria worsened. J.A.(Vol.2).0290. Peter is surrounded by a supportive community, church, and family. J.A.(Vol.2).0290-91. But his parents worry that without treatment, he will once again struggle with suicidality and thoughts of self-harm. J.A.(Vol.2).0291.

**Daphne Doe** is a fifteen-year-old transgender girl who lives in Oklahoma with her grandmother and legal guardian, Donna Doe. J.A.(Vol.2).0294-95. She has always known she was a girl: she "cannot imagine trying to be a boy for the rest of [her] life." J.A.(Vol.2).0295. Before puberty, Daphne experienced severe anxiety at the prospect of undergoing changes that would make her look like a boy. J.A.(Vol.2).0302. She told her grandmother and her therapist that she did not want to go through puberty as a boy and wanted everyone to see her as a girl. J.A.(Vol.2).0301. When her endogenous puberty began, the changes in her body

made her depressed, anxious, and withdrawn, and sent her on a downward spiral. J.A.(Vol.2).0301-02. Daphne has been diagnosed with gender dysphoria for which she received pubertal suppression and later estrogen, which she has been taking for almost two years. J.A.(Vol.2).0302. Daphne has persevered through the suicidal thoughts she had before receiving this medical care; she is thriving in school and avoids harassment by not being public about being transgender. J.A.(Vol.2).0302-03. Her grandmother worries that being forced to go through male puberty will make her depressed, anxious, and suicidal again. J.A.(Vol.2).0303. Daphne is grateful she started hormones as a teenager. Not only has she experienced immediate relief from her dysphoria, but she also feels hopeful about the future and is relieved she may not have to worry about other people assuming she is transgender based on her appearance. J.A.(Vol.2).0297.

**Brandon Boe** is a seventeen-year-old transgender boy who lives in Oklahoma with his parents, Benjamin and Bethany Boe. J.A.(Vol.2).0307-08. Even as a young child, Brandon insisted he was a boy. J.A.(Vol.2).0308. Brandon's parents found him mental health counseling after he came out as transgender, and he was diagnosed with gender dysphoria. J.A.(Vol.2).0314. Brandon's parents initially wanted him to wait for hormones until he turned eighteen, but Brandon's increasing isolation made them realize that Brandon could not wait until he was an adult for medical treatment for his gender dysphoria. J.A.(Vol.2).0309, 0314-15. Still, Brandon was

in therapy for more than a year before starting testosterone. J.A.(Vol.2).0309. Brandon is much more confident after being on testosterone for over a year. He has a job and goes out with his friends, neither of which he could do before. J.A.(Vol.2).0309. Brandon's parents are cautious, conservative, and religious people: they deliberated for a long time and did extensive research before allowing Brandon to start testosterone. J.A.(Vol.2).0315-16. They are involved in this case because they believe they must do everything they can to protect their son. J.A.(Vol.2).0316.

**Lydia Loe** is a seventeen-year-old transgender girl who lives in Oklahoma with her mother, Lauren Loe. J.A.(Vol.2).0320-21. She was raised in foster care and experienced significant rejection because she is transgender. J.A.(Vol.2).0321. Lauren became Lydia's foster parent (and now mother) when Lydia was thirteen, and after a year Lydia felt comfortable enough to share who she was. J.A.(Vol.2).0321. After two years of counseling and over a year after she first talked to a doctor about hormones, Lydia started estradiol and spironolactone to treat her gender dysphoria. J.A.(Vol.2).0321-22, 0328. Lydia has been taking hormones for almost a year, and she feels better about herself and her appearance: without the constant fear of being misgendered, she can leave the house and feel confident. J.A.(Vol.2).0322. She has worked hard to be her true self, and just wants to keep being herself. J.A.(Vol.2).0323. Lydia's mental health drastically declines when

she does not have access to her medication, however, and Lauren is worried that her daughter will return to suicidality and self-harm without hormone therapy. J.A.(Vol.2).0329.

**Ryan Roe** is a fourteen-year-old transgender boy who lives in Oklahoma with his parents, Rachel and Richard Roe. J.A.(Vol.2).0338. Ryan never felt comfortable with gendered expectations, and as puberty approached, he became distressed, anxious, and uncomfortable. Even alone in his room, existing in his body felt "horrible" because of the conflict between his physiological characteristics and his identity. J.A.(Vol.2).0339. His parents found him a therapist; he was ultimately diagnosed with gender dysphoria. J.A.(Vol.2).0334, 0339. Based on his diagnosis and medical team's recommendation, Ryan started pubertal suppression, which has alleviated his gender dysphoria and allowed him to thrive. J.A.(Vol.2).0334, 0339-40. Living as a boy brings Ryan joy and happiness; he is terrified about being forced to live in a body inconsistent with his identity. J.A.(Vol.2).0340. His mother Rachel, a mental health professional, has ensured that Ryan has the support of therapists, but it is the medical treatment for her son's gender dysphoria that dramatically and positively improved his wellbeing. J.A.(Vol.2).0334. Because the family cannot leave Oklahoma, Rachel is considering sending Ryan to live on the East Coast with relatives if he cannot access medical care. J.A.(Vol.2).0335.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint and Motion for Preliminary Injunction on May 2, 2023. J.A.(Vol.1).0034; J.A.(Vol.1).0115; J.A.(Vol.1).0119. On May 18, 2023, the State Defendants agreed to "not enforce any provision of SB 613 in relation to conduct that occurs while Plaintiffs' Motion for Preliminary Injunction is pending before this Court or otherwise enforce any provision of SB 613 during the pendency of Plaintiffs' Motion for Preliminary Injunction," thereby "negat[ing] Plaintiffs' need for expedited briefing." J.A.(Vol.2).0418-19. The district court denied Plaintiffs' Motion for Preliminary Injunction on October 5, 2023 (corrected on October 6, 2023). J.A.(Vol.6).1230.; J.A.(Vol.6).1266. On October 6, 2023, Plaintiffs timely filed a Notice of Appeal. J.A.(Vol.6).1302.

## STANDARD OF REVIEW

"To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

This Court "review[s] a district court's denial of a preliminary injunction under an abuse of discretion standard," *id.*, and "examine[s] the [district] court's

factual findings for clear error and its legal conclusions de novo." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796–97 (10th Cir. 2019). The Court will disturb the trial court's decision if it "has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994) (citation omitted).

## SUMMARY OF THE ARGUMENT

The district court abused its discretion by failing to issue a preliminary injunction. The court made several legal and factual errors.

First, the district court applied the wrong level of scrutiny to Plaintiffs' equal protection claim. Heightened scrutiny applies because SB613 classifies based on sex and transgender status and seeks to enforce gender conformity. Reviewed under the appropriate standard, SB613 is unconstitutional because it is not substantially related to an important government interest. Decades of scientific study and clinical experience establish the efficacy of gender-affirming medical care to treat adolescent gender dysphoria. The treatment's benefits outweigh its risks, which are comparable to those present in many other types of pediatric medicine. And there is no legitimate state interest, let alone an exceedingly persuasive justification, in seeking to enforce gender conformity. SB613 fails any level of review.

Second, the district court erred in holding that SB613 did not impinge upon Parent Plaintiffs' fundamental right to direct their children's medical care, which is neither procedure-specific nor limited to the state of medicine in 1868.

Though the district court did not address the other preliminary injunction factors, Plaintiffs will be irreparably harmed by the deprivation of their constitutional rights and the interruption in Minor Plaintiffs' medical care. The balance of the equities and public interest both favor a preliminary injunction.

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR EQUAL PROTECTION CLAIM.

All sex classifications warrant heightened scrutiny. *See United States v. Virginia*, 518 U.S. 515, 555 (1996) ("*VMI*"). By singling out for prohibition all treatment related to "gender transition," SB613 classifies based on sex and transgender status and therefore triggers heightened equal protection scrutiny.

Under the appropriate level of scrutiny, it is evident that Plaintiffs are likely to succeed on their equal protection claim. But under any standard of review, Oklahoma has failed to explain how banning only this form of care advances the interests it claims to serve. The evidentiary support for and risk associated with this care are comparable to many other forms of pediatric treatment.

### A. SB613 Triggers Heightened Scrutiny.

SB613 is subject to heightened scrutiny for three independent reasons. First, SB613 facially classifies based on sex. Second, it facially classifies based on transgender status. And third, it purposely seeks to enforce gender conformity by singling out transgender people for disfavored treatment.

#### 1. SB613 classifies based on sex.

SB613 classifies based on sex in at least two separate ways: (a) it facially classifies based on sex designated at birth, and (b) it facially classifies based on a person's failure to identify with their sex designated at birth, i.e., their transgender status.

##### (a) SB613 prohibits treatment based on a person's sex designated at birth.

SB613 "necessarily rests on a sex classification," *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021), by prohibiting medical care when it is provided in a manner the state deems "inconsistent with the minor's biological sex." Okla. Stat. tit. 63 § 2607.1(A)(2)(a).[1] Every person to whom SB613 applies is subjected to a sex classification because their sex designated at birth determines whether they can receive the medical care.

---

[1] In this respect, SB613 is no different from the bathroom policies in *Adams by & through Kasper v. School Board of St. Johns County*, 57 F.4th 791, 803 (11th Cir. 2022) (en banc), and *Grimm*.

*See Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022); *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 2023 WL 4054086, at *8 (S.D. Ind. June 16, 2023), *appeal filed*, No. 23-2366 (7th Cir. July 12, 2023).

The district court rejected the notion that SB613 "is discriminatory on its face because it makes distinctions in 'explicit gendered terms.'" J.A.(Vol.6).1276. In its view, "[t]he use of these 'gendered terms' reflects the nature of the procedure being regulated, not an intention to discriminate between people of different sexes," and thus does not classify based on sex. J.A.(Vol.6).1276. But a law or policy that "deals in explicitly gendered terms," *Kadel v. Folwell*, 620 F. Supp. 3d 339, 375 (M.D.N.C. 2022) (cleaned up), cannot be facially neutral. Indeed, SB613's use of "gendered terms" is critical to *how SB613 operates*.

SB613 does not just incidentally mention sex. It explicitly imposes differential treatment based on an individual's sex designated at birth. Whether a specific treatment is prohibited depends exclusively on whether the treatment is deemed consistent or inconsistent with the minor's sex designated at birth. For example, an adolescent in Oklahoma designated male at birth may be prescribed testosterone because he is a "late bloomer" and feeling alienated from his peers. Brandon Boe, in contrast, cannot because he was designated female at birth. In other words, the law "penalizes" a person designated female at birth for the same "action[]" of seeking masculinizing medical treatment that it "tolerates" in persons

designated male at birth. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020).[2] If the legislature cannot "writ[e] out instructions" for determining whether treatment is permitted "without using the words man, woman, or sex (or some synonym)," the law classifies based on sex. *Bostock*, 140 S. Ct. at 1746;[3] *see also Dekker v. Weida*, 2023 WL 4102243, at *11 (N.D. Fla. June 21, 2023) ("If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex."), *appeal pending*, No. 23-12155 (11th Cir. filed June 27, 2023). SB613 necessarily classifies based on sex.

In response, Defendants argue there are physical differences between men and women and that because SB613 deals with medicine (which they contend must consider such differences), it does not discriminate based on sex. J.A.(Vol.3).0529. Defendants put the cart before the horse. Their argument goes to whether SB613 *survives* heightened scrutiny, not whether it *classifies* on the basis of sex in the first instance. The existence of "medical and biological realities" may provide reasons

---

[2] For example, SB613 contains an explicit exception allowing for irreversible, sterilizing surgery on intersex infants with differences of sex development if the purpose of the surgery is to make the infant's body conform to their sex designated at birth. *See* Okla. Stat. tit. 63 § 2607.1(A)(2)(b)(4).

[3] It does not matter that *Bostock* was a Title VII case because its reasoning applies. Lower courts are "bound by more than just the express holding of a case"; their decisions "must comport with the 'reasoning or theory,' not just the holding, of Supreme Court decisions." *Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021) (citation omitted).

why a particular classification survives heightened scrutiny, *see Nguyen v. INS*, 533 U.S. 53, 73 (2001), but it cannot be a basis for refusing to apply heightened scrutiny in the first place. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 n.9 (1982) ("While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change."). The very purpose of heightened scrutiny is "to assure that the validity of [a sex] classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions." *Id.* at 726. As this Court has explained, "in some cases, . . . such differences justify differential treatment. But not always." *Fort Collins*, 916 F.3d at 801.

The district court reasoned that "[t]he Act does not use sex as a means to distinguish between groups" because "treatments allowed by SB 613 are allowed for *all* minors, regardless of sex," and "*all* minors, regardless of sex, are prohibited from undergoing certain procedures for the purpose of gender transition." J.A.(Vol.6).1277. But there is no exception to heightened scrutiny for sex-based classifications that apply equally to men as a group and women as a group. Explicit facial classifications "do not become legitimate on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991) (citing *Loving v. Virginia*, 388 U.S. 1 (1967)). We do not compare the relative burdens the law places on people of differing sexes. *Peltier v. Charter Day Sch., Inc.*, 37 F.4th

104, 125 n.13 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2657 (2023). Indeed, the Supreme Court squarely rejected this argument when it held that peremptory challenges could not be used to strike individual jurors based on sex. *See J.E.B. v. Alabama*, 511 U.S. 127, 141–42 (1994).

SB613 facially classifies based on sex.

**(b) SB613 classifies based on a person's transgender status, which is a sex-based classification.**

SB613 also classifies based on sex because the prohibition is based on a person's transgender status—that is, the incongruence between a person's sex designated at birth and their gender identity. A transgender person, by definition, is someone whose sex designated at birth is different from their gender identity. J.A.(Vol.2).0179; J.A.(Vol.2).0218. And "discrimination based on . . . transgender status necessarily entails discrimination based on sex." *Bostock*, 140 S. Ct. at 1747; *see also Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) ("[T]ransgender discrimination . . . is discrimination 'because of sex[.]'").

SB613 explicitly bars "gender transition procedures" for minors. Okla. Stat. tit. 63 § 2607.1(B). This prohibition operates by determining whether a particular medical intervention is "inconsistent" with a person's sex designated at birth. To know whether any given procedure is "inconsistent" with a person's sex, a medical provider must know and act based on an individual's sex as designated at birth. As

such, this line is based both on a person's sex at birth, *see supra* section I.A.1.a, and the incongruence between a person's sex designated at birth and gender identity.

By prohibiting "gender transition," SB613 necessarily classifies based on transgender status: only transgender people undergo "gender transition" to treat gender dysphoria. And "a person cannot suffer from gender dysphoria without identifying as transgender." *Fain v. Crouch*, 618 F. Supp. 3d 313, 325 (S.D. W.Va. 2022); *see also C.P. v. Blue Cross Blue Shield of Ill.*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Kadel v. Folwell*, 2022 WL 11166311, at *4 (M.D.N.C. Oct. 19, 2022). SB613 therefore singles out medical care that only transgender people need or seek. *See Fain*, 618 F. Supp. 3d at 327; *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 950 (W.D. Wis. 2018); *see also* J.A.(Vol.6).1281 (finding SB613 "restrict[s] a specific course of treatment that only transgender individuals would normally request"). By doing so, it classifies based on transgender status and therefore based on sex.

The district court refused to apply the reasoning of *Bostock* (and *Tudor*) because "this case … concerns a materially different governing law, materially different language, and materially different facts." J.A.(Vol.6).1278; J.A.(Vol.3).0529. But the question is not whether to import Title VII's liability

standard to the Equal Protection Clause; it is whether *Bostock*'s reasoning as to the threshold classification question applies. It does.

*Bostock* did not say its reasoning applies only to Title VII or suggest its assessment of sex classifications could not apply in other contexts. The district court's limitation of *Bostock* "is reading quite a bit into a statement that says, in essence, 'we aren't reaching this point.'" *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023). Neither the district court nor Defendants can provide an answer for how a classification based on a failure to identify with one's sex designated at birth simultaneously can be a facially sex-based classification under Title VII and a facially sex-neutral classification under the Equal Protection Clause.

The differences between Title VII and the Equal Protection Clause center on whether sex discrimination is *permissible*,[4] not whether a sex classification exists in the first place. The district court thus erred as it cannot "explain why or how any difference in language requires different standards for determining whether a facial classification exists in the first instance." *L.W. v. Skrmetti*, 83 F.4th 460, 503 (6th

[4] Sex discrimination under Title VII is categorically prohibited, but a sex classification may be permissible under the Equal Protection Clause if it satisfies heightened scrutiny. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308-09 (2023) (Gorsuch, J., concurring) (distinguishing between Title VI and Title VII's categorical prohibitions on race and sex discrimination and the Equal Protection Clause's application of strict and intermediate scrutiny).

Cir. 2023) (White, J., dissenting). "Indeed, Supreme Court decisions under Title VII and the Equal Protection Clause imply the opposite, often citing one another." *Id.* The Supreme Court's reasoning as to the *classification* identified in *Bostock* applies in full force here.

Moreover, the district court's reliance on the "different language" of Title VII and the Fourteenth Amendment overlooks that both unambiguously focus on discrimination against individuals, not groups. *Compare Bostock*, 140 S. Ct. at 1740–41 (noting Title VII's application to "any individual"), *with J.E.B.*, 511 U.S. at 152 (Kennedy J., concurring), *and Mojo Built, LLC v. City of Prairie Vill.*, 2022 WL 288139, at *2 (10th Cir. Feb. 1, 2022) ("[I]t is well-settled the Equal Protection Clause protects persons, not groups." (cleaned up)).

Even if *Bostock*'s reasoning could be limited to Title VII (it cannot), Defendants cannot explain how to consider transgender status without considering sex. As other courts have found in the equal protection context, "discrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023). Before *Bostock*, the Seventh Circuit explained that discrimination based on transgender status discriminates based on sex under the Equal Protection Clause because it treats people "who fail to conform to the sex-based stereotypes associated with their assigned sex at birth" differently from others. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d

1034, 1051 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

The district court's observation that "Plaintiffs do not argue that the original fixed meaning of . . . the equal protection guarantee covers their claims," has no place in equal protection analysis. J.A.(Vol.6).1271. Heightened scrutiny applies to all sex classifications, regardless of whether they were commonplace at the time the Fourteenth Amendment was ratified. *See Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017); *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973) (plurality opinion). Under the district court's view of equal protection, no sex-based classification would be subject to heightened scrutiny under the Fourteenth Amendment.

**2. Heightened Scrutiny Is Required for Classifications Based on Sex and Transgender Status.**

Because SB613 discriminates based on sex and transgender status, SB613 is subject to heightened scrutiny.

First, "all gender-based classifications . . . warrant heightened scrutiny." *VMI*, 518 U.S. at 555 (quotations omitted).

Second, SB613 is independently subject to heightened scrutiny because it discriminates against transgender persons, a quasi-suspect class. Heightened scrutiny is required where the government targets a class that: (1) has been historically "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602

(1987); (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985); (3) has "obvious, immutable, or *distinguishing characteristics* that define them as a discrete group," *Bowen*, 483 U.S. at 602 (emphasis added); and (4) is "a minority or politically powerless," *id*. Not all considerations need point toward heightened scrutiny; the first two alone may be dispositive. *See Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd sub nom. United States v. Windsor*, 570 U.S. 744 (2013). All four factors are present here.

The district court refused to apply heightened scrutiny because neither the Supreme Court nor this Court have recognized transgender status as a suspect class. J.A.(Vol.6).1279-80.[5] "But the lack of binding precedent does not require this Court to only apply rational basis review, nor does it prevent this Court from relying on well-reasoned opinions of non-binding courts to inform its opinion here." *Ray v. McCloud*, 507 F. Supp. 3d 925, 938 (S.D. Ohio 2020). The failure to perform that analysis was error. This Court should join the Fourth and Ninth Circuits (as well as

---

[5] Defendants argued below that *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995), forecloses this argument. J.A.(Vol.3).0526. But *Brown* disclaimed any answer to the heightened scrutiny question because the *pro se* prisoner's allegations were "too conclusory to allow proper analysis." *Id.* at 971. *Brown* made clear the question remained open, including because of "[r]ecent research concluding that sexual identity may be biological." *Id*. *Druley v. Patton*, 601 F. App'x 632 (10th Cir. 2015), confirms this understanding, observing that this Court had not held that transgender people constitute a suspect class "[t]o date." *Id.* at 635.

the majority of district courts) in concluding that transgender persons constitute a quasi-suspect class. *See, e.g.*, *Grimm*, 972 F.3d at 608; *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *cf. Brandt*, 47 F.4th at 670 n.4.

As to the first and second factors, "[t]here is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker*, 858 F.3d at 1051. This discrimination is unrelated to transgender people's ability to contribute to society. *See Grimm*, 972 F.3d at 612.

As to the third factor, though gender identity is innate, has a biological underpinning, and cannot be voluntarily changed, *id.* at 612–13; J.A.(Vol.2).0179-80, "the test is broader" than immutability. *Windsor*, 699 F.3d at 183. It includes "distinguishing characteristics that define [individuals] as a discrete group." *Bowen*, 483 U.S. at 602.[6] Transgender people are a distinguishable and discrete group.

As to the fourth and final factor, transgender people are a politically powerless and vulnerable group. In 2023, state legislatures entertained 500+ anti-LGBTQ laws, over eighty-four of which became law, including prohibitions against mentioning transgender people in schools, accessing sex-designated facilities,

---

[6] For example, illegitimacy and alienage are quasi-suspect or suspect classifications notwithstanding that they are not immutable. *See Mills v. Habluetzel*, 456 U.S. 91, 98–99 (1982); *Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977).

obtaining corrected identity documents, and, as here, the provision or coverage of gender-affirming medical care.[7] *See also Grimm*, 972 F.3d at 612.

### 3. SB613 Engages in Purposeful Discrimination by Seeking to Enforce Sex Stereotypes.

Independently, SB613 is subject to heightened scrutiny because it was passed "because of," not "in spite of," its effect of enforcing generalizations about sex. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). "By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker*, 858 F.3d at 1048; *see also Hecox*, 79 F.4th at 1033.

SB613 explicitly enforces sex stereotypes and gender conformity by prohibiting medical care intended to "affirm the minor's perception of his or her gender or biological sex, if that perception is *inconsistent* with the minor's biological sex." Okla. Stat. tit. 63 § 2607.1(A)(2)(a) (emphasis added). In other words, SB613 purposely discriminates against transgender people by imposing traditional sex stereotypes. *See, e.g.*, *Bostock*, 140 S. Ct. at 1742–43.[8] Under SB613, a transgender

---

[7] ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*, https://www.aclu.org/legislative-attacks-on-lgbtq-rights (Nov. 9, 2023).

[8] Imposing sex stereotypes is another reason why SB613 discriminates based on sex. *See Smith v. Avanti*, 249 F. Supp. 3d 1194, 1201 (D. Colo. 2017) (agreeing that "discrimination based on applying gender stereotypes to someone who was assigned a certain sex . . . at birth, constitutes discrimination based on sex"); *Fort Collins*, 916 F.3d at 805 ("[E]qual protection law should be particularly alert to the

adolescent "is required effectively to maintain [their] natal sex characteristics." *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018).[9]

"[D]isapproving [of] transgender status," "discouraging individuals from pursuing their honest gender identities," and "[d]issuading a person from conforming to the person's gender identity rather than to the person's natal sex," are "plainly illegitimate purposes" that demonstrate a law was adopted for its "purposeful discrimination against transgender[] [people]." *Dekker*, 2023 WL 4102243, at *14; *see also* Order Granting Pls.' Mot. Prelim. Inj. at 33–34, *Van Garderen v. Montana*, No. DV-23-541 (Missoula Cnty. Dist. Ct., Mont. Sept. 27, 2023) ("It seems more likely that the SB 99's purpose is to ban an outcome deemed undesirable by the Montana Legislature veiled as protection for minors.").[10]

The district court erred in concluding that "[t]he law does not further gender stereotypes by taking adverse actions against those who fail to conform to them." J.A.(Vol.6).1279. SB613 prohibits minors from obtaining necessary medical care

---

possibility of sex stereotyping in contexts where 'real' differences are involved, because these are the contexts in which sex classifications have most often been used to perpetuate sex-based inequality." (citation omitted)).

[9] SB613 enforces the notion that gender is limited to genitalia observed at birth. But this is not universally true. *See Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020) (recognizing that while most people are male or female, "some people are neither," as in the case of an intersex person).

[10] Available at: https://www.documentcloud.org/documents/23993157-montana-order-granting-plaintiffs-motion-for-preliminary-injunction (Nov. 9, 2023).

because it is "*inconsistent* with the minor's biological sex," alters "characteristics or features that are *typical* for the individual's biological sex," or "promote[s] the development of feminizing or masculinizing features *consistent with the opposite* biological sex." Okla. Stat. tit. 63 § 2607.1(A)(2)(a) (emphasis added). SB613 "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020).

SB613 also was adopted within a broader context of Oklahoma legislation targeting transgender people, *see supra* section I.A.2, far beyond the fifteen other bills that sought to limit access to gender-affirming medical care. *Contrast* J.A.(Vol.1.)0139-40 (referring to and citing J.A.(Vol.1).0062-65) *and* J.A.(Vol.3).0447-49 *with* J.A.(Vol.6).1280-81. In addition to SB 3, which Plaintiffs also challenge (though not part of this appeal), Oklahoma passed "laws making it more difficult for transgender and nonbinary people to obtain identity documents, laws restricting transgender youth's ability to participate fully in schools, and laws banning transgender students in public and charter schools from using the restrooms and locker rooms that align with their gender identity." J.A.(Vol.1).0064.

Oklahoma legislators' "contemporary statements" also reveal an impermissible legislative purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977); J.A.(Vol.2).0139. Lawmakers claimed transgender adolescents were "delusional play acting" and "misguided children,"

J.A.(Vol.1).0064; J.A.(Vol.1).0139, and compared gender-affirming care to "starving your child to death." J.A.(Vol.1).0064. Below, the United States filed a Statement of Interest documenting the purposeful discrimination behind SB613. *See* J.A.(Vol.3).0447-49.

Given SB613's explicit terms, legislative history, and context surrounding its adoption, disapproving of transgender people and enforcing state-mandated gender conformity was not an incidental effect of SB613; it was its purpose.

### B. Neither *Geduldig* nor *Dobbs* Forecloses the Application of Heightened Scrutiny to SB613.

Relying on *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), and *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2235 (2022), the district court and Defendants say it does not matter that SB613 uses sex to prohibit treatment only transgender people need or seek. J.A.(Vol.6).1280-81; J.A.(Vol.3).0526. But neither case saves SB613 from heightened scrutiny.[11]

As to equal protection, *Dobbs* merely restated the Supreme Court's conclusion in *Geduldig* that classifications based on pregnancy do not automatically trigger heightened scrutiny even if they exclusively affect women. That conclusion does not resolve the level of scrutiny here. On its face, SB613 requires that a person's

---

[11] *Dobbs* did not create new equal protection law; it simply reiterated *Geduldig*'s holding that facially neutral regulations of medical procedures do not always receive heightened scrutiny simply because they disparately impact members of one sex.

sex at birth be known and used to determine whether treatment is prohibited. SB613 expressly "reference[s] a minor's sex and gender conformity . . . and use[s] these factors to determine the legality of procedures." *L.W.*, 83 F.4th at 502 (White, J., dissenting). For example, under SB613's express terms, an adolescent can be prescribed testosterone to affirm a male gender identity if the minor's sex designated at birth was male but not if it was female. *Dobbs* did not immunize all facial sex classifications in the healthcare context and direct that all are subject to deferential review. Nor did *Dobbs* overrule *VMI*'s command that all sex classifications warrant heightened scrutiny. Lower courts must follow controlling Supreme Court precedent "even if the lower court thinks the precedent is in tension with 'some other line of decisions.'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

The centrality of gender transition to transgender identity further distinguishes this case from *Geduldig*. Unlike *Geduldig*'s pregnancy exclusion, SB613 is purposefully drawn to reach transgender individuals only. Pregnancy is not the defining characteristic of a woman, and the line in *Geduldig* was not drawn to limit care for women. But living in accord with one's gender identity rather than sex designated at birth is the defining characteristic of a transgender person and the very thing SB613 targets: gender transition.

The Supreme Court has "declined to distinguish between status and conduct" in analogous contexts. *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010); *see also Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) (Where "the conduct targeted by th[e] law . . . is closely correlated" with the status of being gay, the law "is targeted at more than conduct," "[i]t is instead directed toward gay persons as a class."); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). As such, laws singling out "gender transition" for differential treatment treat transgender people differently "as a class." *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022).

Finally, *Geduldig* recognized that where distinctions are "mere pretexts designed to effect an invidious discrimination against the members of one [protected class] or the other," they are unconstitutional. 417 U.S. at 496 n.20; *see also Hecox*, 79 F.4th at 1025. Here, the legislature's intent to treat transgender minors differently pervades SB613's legislative history. *See supra* section I.A.3. Moreover, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Bray*, 506 U.S. at 270. Although the district court found "there is no evidence of pretext for

discrimination," J.A.(Vol.6).1281, this *legal* conclusion was in error.[12] SB613 is plain: care is prohibited only for purposes of "gender transition." That is enough to show intent without any additional finding of animus.

### C. Tested Under the Proper Legal Standards, SB613 Fails to Survive Scrutiny.

Because SB613 is subject to heightened scrutiny, Defendants must, at a minimum, provide an "exceedingly persuasive justification" for SB613's classifications. *VMI*, 518 U.S. at 531. Oklahoma must demonstrate a "close means-end fit" that does not "classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions*, 582 U.S. at 63 n.13, 68. The "burden of justification is demanding"—not "deferential"—and it "rests entirely on the State." *VMI*, 518 U.S. at 533, 555. Oklahoma cannot satisfy this standard.

The district court erred in finding that SB613 likely survives equal protection scrutiny. The record does not support the State's justifications for SB613. The district court's findings to the contrary, which were dicta given the court's application of the incorrect legal standard, were clearly erroneous.

---

[12] To the extent the Court considers that finding to be factual, which is clearly erroneous given the evidence, it is a legislative fact that this Court can assess *de novo*. *See infra* section I.C.1.

### 1. This Court should not defer to the district court's factual findings.

This Court should not defer to the district court's factual findings for three independent reasons. First, the court's discussion of the facts is dicta. Second, the district court abused its discretion by failing to properly consider the evidence. Third, this Court can independently make findings as to legislative facts without the typical deference afforded to a lower court's factfinding.

#### (a) The district court's factual findings were dicta.

The district court's factfinding is dicta because the court used the wrong legal standard. The court explained that under rational basis review, the law would be constitutional based on "nothing more than [the court's] own rational speculation." J.A.(Vol.6).1293. The district court's subsequent discussion of the facts is dicta as it was "not necessarily involved nor essential to determination of the case at hand." *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995) (citation omitted). Once the court conceded that *any* factual findings were extraneous to its ultimate holding that SB613 satisfied rational basis review, *all* its factual findings became superfluous. *See, e.g.*, *United States v. Weeden*, 117 F.3d 1429 (Table), 1997 WL 375345, at *1 n.1 (10th Cir. 1997) (determining that a statement was dicta based on the prior court's "caveat" in its decision that the approach discussed was not urged by either party).

**(b) The district court failed to properly consider and weigh the evidence proffered by Plaintiffs' experts and gave improper weight to Defendants' experts.**

In addition, the district court abused its discretion by ignoring the evidence Plaintiffs submitted and relying exclusively on the evidence Defendants presented. This error permeates the entire opinion and infects most, if not all, of the court's factual findings.

Circuit courts, including this one, have explained in a variety of contexts that failing to consider or overlooking evidence amounts to an abuse of discretion. *See*, *e.g.*, *James v. Eli*, 889 F.3d 320, 328 (7th Cir. 2018); *Shardar v. Att'y Gen.*, 503 F.3d 308, 315 (3d Cir. 2007); *Golub v. Sec'y of Health & Hum. Servs.*, 243 F.3d 561 (Table), 2000 WL 1471643, at *3 (Fed. Cir. 2000); *Dulane v. INS.*, 46 F.3d 988, 996 (10th Cir. 1995).

Plaintiffs presented ample evidence from qualified experts who have collectively worked with over a thousand youths with gender dysphoria and conducted extensive research in this area: Dr. Deanna Adkins, a pediatric endocrinologist; Dr. Aron Janssen, a child and adolescent psychiatrist; Dr. Jack Turban, a child and adolescent psychiatrist and researcher; and Dr. Armand Antommaria, a pediatrician and bioethicist. *See* J.A.(Vol.2).0173; J.A.(Vol.2).0214; J.A.(Vol.2).0253; J.A.(Vol.2).0356; J.A.(Vol.5).0980; J.A.(Vol.5).1000; J.A.(Vol.5).1019; J.A.(Vol.5).1043. These experts have been found to be qualified

and relied upon by numerous courts. *See, e.g., Dekker*, 2023 WL 4102243, at *8 (crediting the testimony of Drs. Antommaria and Janssen and finding them to be "well-qualified"); *Brandt v. Rutledge*, 2023 WL 4073727, at *27 (E.D. Ark. June 20, 2023) (finding Drs. Adkins, Turban, and Antommaria to "have deep knowledge of the subject matter of their testimony," to be "fully qualified," and to "have provided credible and reliable testimony"); *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 318 F. Supp. 3d 1293, 1298 n.12 (M.D. Fla. 2018) (finding Dr. Adkins qualified and her testimony reliable), *vacated on other grounds*, 57 F.4th 791. No court has found their testimony to lack credibility.

By contrast, Defendants provided declarations from individuals with no experience providing or even studying gender-affirming medical care for transgender minors. *See* J.A.(Vol.3).0541; J.A.(Vol.4).0727; J.A.(Vol.5).0802; J.A.(Vol.5).0882; J.A.(Vol.6).1137; J.A.(Vol.6).1169; J.A.(Vol.6).1222; J.A.(Vol.6).1227. Indeed, multiple courts have discredited or given little to no weight to several of the State's purported experts based on their lack of clinical or research experience treating gender dysphoria. *See, e.g., Koe v. Noggle*, 2023 WL 5339281, at *21 n.28 (N.D. Ga. Aug. 20, 2023) (assigning "Dr. Cantor's views less weight" in part because "[h]e is not a physician and has no experience treating gender dysphoria in youth as such"); *L.W. v. Skrmetti*, 2023 WL 4232308, at *20 (M.D. Tenn. June 28, 2023) (same), *rev'd and remanded on other grounds*, 83 F.4th

460; *id.* at *20 n.40, 25 n.48 (noting courts' skepticism about Dr. Laidlaw's testimony and finding his testimony "unpersuasive"); *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1142–43 (M.D. Ala. 2022) (giving Dr. Cantor's "testimony regarding the treatment of gender dysphoria in minors very little weight"), *vacated on other grounds*, 80 F.4th 1205 (11th Cir. 2023); *C.P. v. Blue Cross Blue Shield of Ill.*, 2022 WL 17092846, at *4 (W.D. Wash. Nov. 21, 2022) (noting it was a "close question" as to whether Dr. Laidlaw was qualified given his lack of clinical and research experience). Defendants' other purported experts (Drs. Harris and Thompson) fare no better as they similarly have no experience treating or diagnosing gender dysphoria in adolescents or adults. *See* J.A.(Vol.5).0967-68.

Despite their lack of clinical and research experience, which Plaintiffs raised below (*see* J.A.(Vol.5).0967-68), and without making any credibility determinations, the district court relied solely upon the testimony of Defendants' purported experts to make its purported factual findings and ignored the evidence Plaintiffs submitted, even after determining that no courtroom factfinding was necessary because rational basis would apply.[13] Although a court has discretion to

---

[13] The district court cited to Defendants' experts over thirty times. *See generally* J.A.(Vol.6).1266. In contrast, the district court cited to Plaintiffs' experts only four times and only for basic propositions like "gender dysphoria is a psychological diagnosis" and "being transgender or gender nonconforming is not a medical condition or pathology to be treated." J.A.(Vol.6).1295, 1299. This is not meaningful engagement with or consideration of Plaintiffs' evidence, especially

ascertain the credibility of experts and reject or accept expert testimony, it may not arbitrarily fail to engage with such testimony or ignore it. *See Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76–77 (1st Cir. 2002); *In re Wolverton Assocs.*, 909 F.2d 1286, 1296 (9th Cir. 1990) (factfinder "may not act arbitrarily in disregarding entirely probable testimony of expert witnesses whose judgments have not been discredited"); *see also Allfirst Bank v. Progress Rail Servs. Corp.*, 521 F. App'x 122, 129 (4th Cir. 2013).

In sum, the district court's approach to the evidence was "arbitrary, capricious, whimsical, [and] manifestly unreasonable." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018). As such, it abused its discretion and made erroneous factual findings, albeit in dicta.

**(c) This Court can make independent findings as to legislative facts.**

Finally, this Court can independently find or judicially notice that WPATH and the Endocrine Society promulgate guidelines supported by clinical experience and research and that every major U.S. medical association publicly supports providing such care to adolescents with gender dysphoria. J.A.(Vol.2).0220; J.A.(Vol.2).0185; J.A.(Vol.5).1021. *See United States v. Iverson*, 818 F.3d 1015, 1031 (10th Cir. 2016) (O'Brien, J., concurring). The status and reliability of certain

absent explanation as to why the court relied upon Defendants' far less qualified or experienced experts.

scientific evidence are appropriate subjects of legislative factfinding and not contested here. *See United States v. Hunt*, 63 F.4th 1229, 1250–51 (10th Cir. 2023) (noting in the context of firearm toolmark examinations' reliability, "[w]hen the resolution of a dispute turns on legislative facts, courts regularly relax the restrictions on judicial inquiry"). Legislative facts "are established truth, facts or pronouncements that do not change from case to case but apply universally." *United States v. Wolny*, 133 F.3d 758, 764 (10th Cir. 1998) (citation omitted). "[W]henever a tribunal engages in the creation of law or of policy, it may need to resort to legislative facts, whether or not those facts have been developed on the record." *Iverson*, 818 F.3d at 1030 (O'Brien, J., concurring) (quoting *United States v. Gould*, 536 F.2d 216, 219–20 (8th Cir. 1976)).

#### 2. None of the State's Proffered Justifications Amounts to an Exceedingly Persuasive Justification for the Law's Categorical Ban on Treatment.

SB613 fails heightened scrutiny because it does not substantially advance any important governmental interest. None of the Defendants' criticisms justifies singling out only gender-affirming medical treatment for transgender adolescents for categorical prohibition. The district court's citations do not support the propositions for which they are used, and the district court's findings, which are dicta in any event, are manifestly incorrect considering the full record below and Defendants' putative experts' comparative lack of credibility. To the extent the district court's

factual findings are subject to clear error review, the Court can and should conclude that "a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation omitted).

**(a) SB613 is not justified by claims that the prohibited treatment is "experimental."**

The record does not support Defendants' claim that gender-affirming medical care to treat gender dysphoria in minors is "experimental" treatment that justifies a categorical prohibition. And even if the banned care were experimental in nature (which it is not), that does not explain why Oklahoma bans *only* this treatment.

The "level of evidence supporting clinical practice guidelines recommendations regarding gender-affirming medical care for adolescents is comparable to the level of evidence supporting many other pediatric medical treatments." J.A.(Vol.2).0366. It is not "new, novel, or unproven," and it "is intended to benefit individual patients and is modified based on individual patients' responses." J.A.(Vol.2).0366-67. That is the difference between clinical practice, where the goal is to "benefit individual patients and [the] method is individualized decision-making," and research or experimentation, where the goal "is to contribute to generalizable knowledge" through "formal protocols that describe [the] objectives and procedures." J.A.(Vol.2).0361. Treatments are not considered "experimental" even if the clinical guidelines recommending those treatments are not based on randomized controlled trials: for example, the use of GnRHa to treat precocious

puberty is not considered experimental—it is FDA approved and widely used in clinical practice—but that use is based entirely on observational studies and not randomized controlled trials. J.A.(Vol.5).1046-48.

It was clear error for the district court to find that "the experimental phase has truly not yet begun" for gender-affirming care, and it is therefore not "proven" or "established." J.A.(Vol.6).1291. The district court invented a new definition of "experimental" that the record does not support. The banned care "is not experimental in either the colloquial or the technical sense." J.A.(Vol.2).0366. Defendants complain there are insufficient long-term studies documenting the evidence of efficacy of treatment. That assertion is not accurate, and the district court erred in concluding there is "scant information" about the long-term use of the banned treatment. J.A.(Vol.6).1298 (citing J.A.(Vol.4).0746, 0752; J.A.(Vol.5).0840).

Although Defendants criticize the evidence supporting the efficacy of the banned care, they offer no alternative treatment supported by any evidence, let alone evidence comparable to that supporting gender-affirming medical interventions. Doctors must make decisions today about how to treat individual patients. Defendants do not dispute that (1) every major medical association in the United States supports the banned care; (2) multiple observational and cross-sectional

studies support the care; and (3) the banned care is the only evidence-based treatment available.

**(b) SB613 is not justified by the existence of potential risks and side effects of the proscribed treatment.**

That the banned treatment carries potential side effects and risks does not materially distinguish it from other treatments and cannot justify SB613. The overwhelming weight of the evidence shows that the potential risk of harm from pubertal suppression and hormone therapy is rare when provided under medical supervision. The district court clearly erred in concluding otherwise.

The record evidence conclusively demonstrates that gender-affirming medical treatment for adolescents with gender dysphoria is not uniquely risky. Though Defendants' putative experts highlight a litany of possible side effects of treatment, they never quantify the prevalence of those risks. What is more, they lack first-hand knowledge: none have meaningful clinical experience treating youth with gender dysphoria or relevant original research experience. Plaintiffs' experts, however, have treated a thousand adolescent patients with gender dysphoria and explain that side effects are rare. *See, e.g.*, J.A.(Vol.5).1012-13. Further, that the treatments at issue carry risk is not sufficient to justify SB613. J.A.(Vol.2).0268-69; J.A.(Vol.2).0358, 0379-80. All medical care carries risks, but SB613 targets certain established treatments when used by a particular population for a particular purpose. Indeed, SB613 is grossly underinclusive in this regard because the same treatments

remain available for other purposes and carry comparable risks. J.A.(Vol.2).0230-31; J.A.(Vol.5).1009, 1013; J.A.(Vol.5).1061.

The district court's specific factual findings about risk are clearly erroneous. The court found that minors with gender dysphoria "face risks that are different and more extensive than those minors who would use the same protocols for other diagnoses." J.A.(Vol.6).1296. But the court offered no record citation in support of this finding, and there is none. Rather, the evidence demonstrates that the risks related to pubertal suppression do not vary based on the conditions they are prescribed to treat, and youth with gender dysphoria use pubertal suppression for a comparably shorter period than those treated for precocious puberty. J.A.(Vol.2).0228, 0231.

*Timing of Puberty*. The use of pubertal suppression to treat gender dysphoria does not cause puberty to occur beyond what is typical, and the medication is not used for longer periods of time to treat gender dysphoria than other conditions. There is no factual support for the conclusion that pubertal suppression for gender dysphoria is prescribed "with the intent and effect of undergoing puberty later than it would be physically appropriate to do so" or "later than the typical range." J.A.(Vol.6).1296 (citing J.A.(Vol.4).0576). Pubertal suppression is not used to delay puberty in adolescents with gender dysphoria beyond the typical age range, which already has a "very wide age variation among individuals." J.A.(Vol.5).1004.

Gender dysphoria treatment protocols would tend to put adolescents in the latter third but "nothing outside of the typical range" for puberty. J.A.(Vol.5).1004-05; J.A.(Vol.2).0227-28. The district court erred in relying on the unsupported (and incorrect) assertion that pubertal suppression is used to "push[]" adolescents with gender dysphoria "away from the mean age of the healthy population" or turn them into "very late-bloomers." J.A.(Vol.4).0576. Rather, "[m]any peers will have comparably timed or later puberty" than adolescents treated for gender dysphoria, and no data supports the assumption that there are short- or long-term social and developmental consequences for delaying puberty until the latter third of the typical range. J.A.(Vol.5).1005.

*Bone Health.* Though Defendants' putative experts suggest that using pubertal suppression to treat gender dysphoria poses a substantial risk to bone health, the record does not support such claims. To the contrary, adolescents on pubertal suppression continue to accrue bone density, just at a pre-pubertal rate, and once a patient begins endogenous puberty or hormone therapy, their bone structure and strength increases. J.A.(Vol.5).1006-07. The district court deferred to an unqualified expert's parroting of a *New York Times* article—not even a summary of an article in a medical journal—that incorrectly suggested the effects of pubertal suppression on bone density are unknown. J.A.(Vol.4).0641-43. The district court also erred in relying on another unqualified expert's speculation that pubertal

suppression uniquely predisposes adolescents with gender dysphoria to future osteoporosis. J.A.(Vol.4).0748-49. There is no evidence for this assertion. Dr. Adkins explained that "we have been using puberty blockers to treat patients with precocious puberty for over 30 years and have not observed these long-term effects" that Defendants' purported experts hypothesize. J.A.(Vol.5).1007. That during treatment, patients prescribed pubertal suppression accrue bone density at a lower rate does not justify a ban on such treatment, particularly given that there is no evidence of long-term harm from this reduced bone density accrual rate, while there is substantial evidence of the benefits of treatment and the harm from withholding treatment.

*Executive function.* The district court further erred when it found that pubertal suppression carries "a range of risks, including impaired brain development and poorer psychosocial and educational development." J.A.(Vol.6).1296 (citing J.A.(Vol.4).0639-40; J.A.(Vol.4).0751; J.A.(Vol.5).0808; J.A.(Vol.4).0641). Over thirty years of data support the safety and efficacy of using pubertal suppression to treat precocious puberty, and more than twenty years of data support treatment for gender dysphoria. J.A.(Vol.2).0229; J.A.(Vol.5).1004. No scientific evidence shows short- or long-term negative effects on patients that outweigh the benefits of treatment. J.A.(Vol.2).0229. The district court erred in relying on speculation to the contrary, such as studies of "non-transsexual males" and "adult biological women"

and correlations between naturally occurring very late puberty and some negative health metrics, J.A.(Vol.4).0640-41, or "animal models" for alleged effects on IQ and spatial memory. J.A.(Vol.5).0807-08. The district court clearly erred in relying on those suppositions instead of the decades of data showing the safety and efficacy of this treatment for patients with precocious puberty or gender dysphoria. J.A.(Vol.5).1004.

*Fertility.* Though Defendants' purported experts attempt to justify SB613 through incendiary claims about sterilization, the reality is that "[p]ubertal suppression on its own has no impact on fertility" and the argument that "treatment is automatically sterilizing . . . is not accurate." J.A.(Vol.2).0231. It was clear error to find that puberty suppression causes "immediate[] . . . infertility." J.A.(Vol.6).1298 (citing J.A.(Vol.4).0746, 0748; J.A.(Vol.5).0840). The district court clearly erred in relying on the assertion that "continuous administration of GnRHa makes the full maturation of the gametes impossible" to support its finding regarding infertility. J.A.(Vol.1).083. First, pubertal suppression is reversible. J.A.(Vol.2).0222. Second, it pauses puberty "only for the duration of the treatment," i.e., until an adolescent resumes endogenous puberty or, if medically indicated, begins gender-affirming hormone therapy. J.A.(Vol.2).0222. Third, adolescents may, even after pubertal suppression, resume their endogenous puberty if generating gametes is of particular importance. *See, e.g.*, J.A.(Vol.5).1014-15.

<u>*Desistance.*</u> The district court clearly erred in determining that the banned treatment "altered natural desistance rates, such that puberty blockers, rather than operating as a 'pause button,' are instead a 'pathway towards future sterilizing surgeries.'" J.A.(Vol.6).1298 (citing J.A.(Vol.4).0752). The only support for that clearly erroneous factual finding is the declaration of Dr. Laidlaw, who purported to rely on the de Vries, et al. studies from 2011 and 2014. J.A.(Vol.6).1298. But those studies demonstrate that "given the comprehensive biopsychosocial mental health assessment that is done prior to starting gender-affirming medical interventions under current guidelines, the adolescents who started pubertal suppression were those who were, through medical and mental health screening, determined, prior to starting pubertal suppression, to have a low likelihood of future desistence in their transgender identity." J.A.(Vol.5).1033-34. In other words, most adolescents who begin treatment continue treatment because it is prescribed to the right group of people, not because it is making people transgender.

**(c) SB613 is not justified by gender dysphoria's diagnostic process.**

The district court clearly erred when it found "there is no evidence that a diagnosis of gender dysphoria can be confirmed by any objective measurement or testing protocol." J.A.(Vol.6).1294 (citing J.A.(Vol.4).0666-67 and purporting to cite J.A.(Vol.5).1046). Psychiatric diagnoses like gender dysphoria indisputably rely on objective diagnostic criteria. Gender dysphoria is a diagnosis, like other

psychiatric diagnoses, made using objective criteria set forth in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (DSM-5-TR). J.A.(Vol.2).0181-82; J.A.(Vol.5).1045. The district court erroneously conflated gender dysphoria—a recognized diagnosis that can be ascertained by a qualified clinician using objective criteria—with gender identity, which is a person's core understanding of their gender. J.A.(Vol.2).0176-77.

To support its erroneous finding, the district court pointed to Dr. Antommaria's acknowledgement that gender dysphoria is a diagnosis in the DSM-5-TR. J.A.(Vol.6).1294 (citing J.A.(Vol.5).1045). That does not support finding a lack of objective diagnostic criteria. To the contrary, inclusion in the DSM-5-TR necessarily means that clinicians can apply diagnostic criteria in their practice. The district court erroneously relied on the assertion that psychiatric conditions lack "any measurable, physical features to distinguish it objectively from a healthy state." J.A.(Vol.4).667. Psychiatric diagnoses, like gender dysphoria, are no "less real" or "any less severe" merely because their "physical" location is the brain. J.A.(Vol.5).1045. That a psychiatric condition lacks a physical manifestation does not mean that it lacks objective criteria for diagnosis. The district court's error was compounded by the erroneous distinction between "physiological condition[s]" and "psychological one[s]." J.A.(Vol.6).1294. Although "most mental health

conditions," including gender dysphoria, rely on "patients' reports of their symptoms and [are] not confirmed by laboratory or radiographic testing," that is also true of "some non-mental health conditions," including migraine headaches. J.A.(Vol.5).1046. No laboratory test can prove whether someone suffers from gender dysphoria or migraine headaches, but a clinician can objectively diagnose gender dysphoria or migraine headaches based, *inter alia*, on a patient's report, a patient's history, and clinical interviews.

**(d) Gender conformity is not an important state interest sufficient for heightened scrutiny.**

Finally, Defendants essentially claim that the government has a legitimate interest in ensuring that adolescents assigned female at birth will develop and retain the secondary sex characteristics typically associated with women and vice versa for those assigned male. The district court erred in two separate ways by crediting this interest.

First, the district court conflated transgender identity (a naturally occurring variation in gender identity) with gender dysphoria (a serious medical condition). *Compare* J.A.(Vol.6).1299 *with* J.A.(Vol.2).0219. The court found that "[t]he legislature's decision to permit minors to have access to the Treatment Protocols for medical disorders that can be cured or corrected, but not to permit the same protocols (with greater associated risk) to <u>*treat a condition for which no "cure" is sought*</u>, is a rational one." J.A.(Vol.6).1299 (emphasis added). But the court's phrasing betrays

the flaw in its analysis. Being transgender is not a condition to be cured. But gender dysphoria, a serious medical condition that transgender people can have, can be treated or ameliorated through the banned treatment. J.A.(Vol.2).0234; J.A.(Vol.2).0186, 0191-92. That is the whole point of Plaintiffs' lawsuit: Oklahoma banned the only evidence-based interventions for gender dysphoria, a serious condition that *can be treated and even cured*.

Second, the district court impermissibly credited gender conformity as a legitimate or important state interest by finding that SB613 only permitted comparable interventions for "diseased or disordered" states, when in fact SB613 allows non-transgender adolescents to undertake "cosmetic" treatments so long as the phenotypic results are consistent with a person's assigned sex. SB613 is not rationally related to a limitation on treating physical diseases or disorders. J.A.(Vol.6).1299. SB613 contains no such limitation:[14] it does not prohibit any interventions "for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex" when that perception *aligns* with the minor's biological sex, only when it is "inconsistent." Okla. Stat. tit. 63 § 2607.1(A)(2)(a). Although SB613 contains an explicit carve-out for certain disorders of sex development, *see id.* § 2607.1(A)(2)(b)(4), the prohibition is based on congruence

[14] To the extent that the district court's finding was a conclusion of law, this Court owes it no deference and may decide the issue *de novo*. *See Stokes v. United States*, 967 F.3d 1034, 1043 (10th Cir. 2020).

or incongruence, not healthy or diseased states. For example, natural development processes for non-transgender adolescents may result in being short, being a late bloomer, having small breasts, or having a patchy beard. Under SB613, those are all matters for which an adolescent could seek hormonal treatment or surgery to address, even if there was no disease or disorder. Non-transgender adolescents can, under SB613, use pubertal suppression, estrogen, testosterone, or surgery to alter their appearances, even if they suffer from no medical condition but merely wish to appear more stereotypically feminine or masculine. It is only transgender adolescents who are prevented from altering their appearances to relieve the clinically significant distress resulting from the incongruence between their secondary sex characteristics and their gender identity, even when they have been diagnosed with gender dysphoria, a serious medical condition.

SB613 fails heightened scrutiny, as it is grossly underinclusive, lacks a rational relationship with Oklahoma's asserted interests, has no evidentiary basis, and is improperly aimed at enforcing gender conformity.

### D. SB613 Fails Any Level of Review.

Although SB613 is properly subject to heightened scrutiny, it ultimately fails any level of review. There is no rational basis for concluding that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten

legitimate interests of [Oklahoma] in a way that" allowing other types of care "would not." *Cleburne*, 473 U.S. at 448; *see also Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people only); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001).

SB613 furthers no legitimate interest. What the law does is "so far removed from [the asserted] justifications that … it [is] impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 635 (1996). Rather than protect children, SB613 harms them. SB613's improper motive of gender conformity arose, at a minimum, from "insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring). SB613 therefore fails any level of review.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR SUBSTANTIVE DUE PROCESS CLAIM.

SB613 impinges on Parent Plaintiffs' fundamental right to make medical decisions for their minor children, particularly when supported by the independent judgment of a consulting physician and with the minor's consent. Furthermore, SB613 is not a narrowly tailored means of vindicating a compelling state interest. Fundamental parental rights include "some level of protection for parents' decisions regarding their children's medical care." *PJ ex rel. Jensen v. Wagner*, 603 F.3d

1182, 1197 (10th Cir. 2010) (citing *Parham v. J.R.*, 442 U.S. 584, 604 (1979)); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003). In upholding a statute permitting parents to involuntarily commit their children to psychiatric institutions, the Supreme Court held that parents, not the government, have "plenary authority" in the usual course to make decisions concerning their children's healthcare and to "recognize symptoms of illness and to seek and follow medical advice" for their children. *Parham*, 442 U.S. at 602. "Neither state officials nor federal courts are equipped to review such parental decisions." *Id.* at 604.

In the light of parents' broad right to make medical decisions for their minor children, the district court erred when it adopted Defendants' hyper-specific framing of the right as "a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition." J.A.(Vol.6).1288. Fundamental rights are "carefully defined," J.A.(Vol.6).1288-89 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)), but not microscopically so. *See Obergefell v. Hodges*, 576 U.S. 644, 671 (2015) ("*Loving* did not ask about a 'right to interracial marriage'; *Turner* did not ask about a 'right of inmates to marry'; and *Zablocki* did not ask about a 'right of fathers with unpaid child support duties to marry.' Rather, each case inquired about the right to marry in its comprehensive sense . . . ."); *Kitchen v. Herbert*, 755 F.3d 1193, 1209–10 (10th Cir. 2014). The district court's narrow definition cannot be reconciled with

parents' plenary "authority to decide what is best for the child" in the medical context *generally*. *Parham*, 442 U.S. at 602, 604 (parents have the right "to recognize symptoms of illness and to seek and follow medical advice" on behalf of their children, including procuring "a tonsillectomy, appendectomy, or other medical procedure").

Relying on *Dobbs*, the district court demanded that Parent Plaintiffs demonstrate they have a "deeply rooted" right tethered to a specific *treatment*. This is inconsistent with *Parham*'s framing of the parental right as one to make medical *decisions* on behalf of their children.[15] The district court's reliance on *Dobbs* is further erroneous because the Supreme Court's instruction is unambiguous: "Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion." *Dobbs*, 142 S. Ct. 2228 at 2277–78 (2022); *id.* at 2309 (Kavanaugh, J., concurring).

The district court purported to distinguish *Parham* on the grounds that it involved procedural due process, not a substantive due process claim. But the

---

[15] A condition-specific interpretation would circumscribe the right based on whether the intervention was available and widely recognized at the time of the Fourteenth Amendment's ratification. *See Timbs v. Indiana*, 139 S. Ct. 682, 687–89 (2019) (examining whether the right to be free from excessive fines was widely recognized in 1868); *Glucksberg*, 521 U.S. at 711, 722–25 (same with respect to assisted suicide). That would leave parents with the fundamental right to vaccinate their children against smallpox, but not polio; to amputate infected limbs, but not to treat with antibiotics; and categorically exclude treatments for illnesses like ADHD, childhood cancer, diabetes, and asthma.

*Parham* court framed parents' liberty interest in choosing the best course of treatment for their children by reference to other substantive due process cases, *see* 442 U.S. at 602 (collecting cases), and this Court relies on *Parham* in the substantive due process context. *See Jensen*, 603 F.3d at 1197 (framing the substantive due process right as the "right to make decisions about the child's medical care" and citing *Parham*); *United States v. White*, 782 F.3d 1118, 1138–39 & n.20 (10th Cir. 2015) ( "The liberty interest parents have in the care, custody, and control of their children is a substantive due process right protected by the Fourteenth Amendment" (citing *Parham*)); *see also Dubbs*, 336 F.3d at 1203 (discussing "the right to consent to medical treatment for oneself and one's minor children" in the substantive due process context). *Accord Cook v. Gates*, 528 F.3d 42, 53 (1st Cir. 2008); *Anspach v. City of Phila.*, 503 F.3d 256, 261 (3d Cir. 2007); *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).

To justify supplanting this fundamental right in the case of transgender adolescents with gender dysphoria, the State must show that the "infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations omitted); *accord Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). Only "the most exact connection between justification and classification survives" this test. *Kitchen*, 755 F.3d at 1219 (cleaned up).

With respect to the tailoring requirement, the State has not come close to meeting its burden. Safeguarding minors' health and wellbeing is a compelling interest. *See Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982). But SB613 *harms*, rather than protects, transgender adolescents by denying them access to the only evidence-based treatment for their gender dysphoria. *See* J.A.(Vol.2).0173; J.A.(Vol.2).0214; J.A.(Vol.2).0253; J.A.(Vol.2).0356; J.A.(Vol.5).0980; J.A.(Vol.5).1000; J.A.(Vol.5).1019. The State has not demonstrated that SB613 survives such scrutiny. *See supra* section I.C.2. At most, the State points to the possibility of risks, but "risk[] does not automatically transfer the power to make [the healthcare] decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603. Parent Plaintiffs do not seek access to otherwise unavailable medical procedures: the banned treatments are still permitted for adults with gender dysphoria and for minors with any other condition (or no condition at all).

There is no justification for imposing a one-size-fits-all ban on care where parents, adolescents, and doctors all agree that treatments are medically appropriate. Denying access to this treatment exposes Minor Plaintiffs to severe distress and risk to their health and wellbeing. J.A.(Vol.2).0291; J.A.(Vol.2).303; J.A.(Vol.2).0329; J.A.(Vol.2).0340. The State has not advanced a compelling state interest to justify

this harm to the adolescents it purports to protect. The decision below must be reversed.

## III. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFFS.

### A. Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction.

If SB613 is not blocked, Plaintiffs will suffer serious and irreparable harm with no adequate remedy at law. *See Fort Collins*, 916 F.3d at 805–06. "[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (citation omitted); *see Fort Collins*, 916 F.3d at 806 (claim that city ordinance discriminated based on sex in violation of equal protection necessarily satisfied irreparable harm).

But the irreparable harm here is far greater than just the deprivation of Plaintiffs' constitutional rights. SB613 prohibits the initiation or continuation of lifesaving medical care, forces families either to watch their children suffer or incur the significant expense of travel or relocation out-of-state to access care, and compels medical providers to abandon their patients by threatening their medical licenses. *See* J.A.(Vol.2).0140-42. Losing access to medical treatment constitutes irreparable harm. *See Andersen*, 882 F.3d at 1236–37.

### B. The Balance of the Equities and Public Interest Favor Plaintiffs.

The balance of the harms and the public interest, which "merge when, like here, the government is the opposing party," both favor an injunction. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (citation omitted). The harms to Plaintiffs from SB613 are tangible, immediate, and irreparable. Whatever interest the State may have in enforcing SB613 during the pendency of this case pales compared to Plaintiffs' certain and severe harm. Oklahoma has little to no cognizable interest in immediately enforcing a "likely unconstitutional" law. *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014). In contrast, preserving Plaintiffs' constitutional rights is in the public interest. *See Verlo v. Martinez,* 820 F.3d 1113, 1127 (10th Cir. 2016). A preliminary injunction is warranted: this Court should preserve the status quo until a final decision on the merits.

## CONCLUSION

Oklahoma has withdrawn potentially lifesaving care from the Minor Plaintiffs. Only this Court can restore it. The denial of Plaintiffs' motion for preliminary injunction should be reversed, and this Court should order the issuance of a preliminary injunction enjoining enforcement of SB613.

Dated this 9th day of November 2023.

Respectfully submitted,


/s/ Omar Gonzalez-Pagan
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(646) 307-7406
ogonzalez-pagan@lambdalegal.org

Sasha Buchert
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
1776 K Street, NW, 8th Floor
Washington, DC 20006
(202) 804-6245
sbuchert@lambdalegal.org

Laura J. Edelstein
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com

Remi J.D. Jaffre
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
RJaffre@jenner.com

Megan Lambert
AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA FOUNDATION
P.O. Box 13327
Oklahoma City, OK 73113
(405) 524-8511
mlambert@acluok.org

Harper S. Seldin
Chase Strangio
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
hseldin@aclu.org
cstrangio@aclu.org

Luke C. Platzer
Madeleine V. Findley
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
(202) 639-6094
LPlatzer@jenner.com
MFindley@jenner.com

Lillian McGuire
Jocelyn A. Sitton
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7484
LMcGuire@jenner.com
JSitton@jenner.com


*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,818 words.

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs' counsel believes that oral argument would aid this Court in its consideration of this appeal. The disposition of this appeal will impact others beyond the parties, including transgender youth in Oklahoma, their parents or guardians, and their providers, both with respect to the matter of access to gender-affirming medical care for transgender adolescents with gender dysphoria in Oklahoma as well as larger issues concerning the level of scrutiny applicable to discrimination against transgender people and the scope of parents' fundamental right to direct the upbringing of their children, particularly as it pertains to medical decisions.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2023, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) any paper copies of this document submitted to the Court are exact copies of the version electronically filed; and (3) the electronic submission was scanned for viruses using Microsoft Defender and, according to that program, this document is virus free.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **PETER POE, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GENTNER DRUMMOND, *et al.*,**<br><br>**Defendants.** | **Case No. 23-CV-177-JFH-SH** |

**OPINION AND ORDER**

Before the Court is a motion for preliminary injunction ("Motion") filed by Plaintiffs Benjamin, Bethany, and Brandon Boe; Donna and Daphne Doe; Lauren and Lydia Loe; Paula, Patrick, and Peter Poe; Rachel, Richard, and Ryan Roe, and Shauna Lawlis ("Plaintiffs"). Dkt. No. 5. Defendants oppose the Motion.[1] For the reasons stated herein, the Motion is DENIED.

**BACKGROUND**

On September 29, 2022, the Oklahoma State Legislature enacted Senate Bill 3 ("SB 3"), conditionally appropriating $39.4 million to the University Hospitals Authority "for the construction and equipping of facilities designed to expand the capacity of behavioral health care" for pediatric patients. S.B. 3, 58th Leg., 2nd Ex. Sess. (Okla. 2022). The appropriation was subject to the condition that the University Hospitals Authority not budget or expend any appropriated funds for the benefit of any facility performing "gender reassignment medical treatment" on patients under the age of 18. *Id.* In October 2022, OU Medicine issued a statement indicating that

[1] In responding to the complaint and preliminary injunction motion, Defendants have separated themselves into two subgroups: (1) OU Medicine, Inc. ("OU Medicine") and Dr. Richard Lofgren in his official capacity as President and Chief Executive Officer of OU Health ("Dr. Lofgren") (collectively the "OU Defendants"); and (2) the remaining defendants (collectively the "State Defendants"). Each subgroup filed a separate response to the Motion. Dkt. No. 85; Dkt. No. 86.

it had "ceased hormone-related prescription therapies and surgical procedures for gender affirming services on patients under the age of 18" because of SB 3 (the "SB 3 Policy"). Dkt. No. 2 at 26.[2]

On May 1, 2023, the Oklahoma State Legislature enacted Senate Bill 613 ("SB 613" or the "Act"), codifying that a healthcare provider "shall not knowingly provide gender transition procedures to any child." 63 O.S. § 2607.1(B). SB 613 defined "gender transition procedures" as "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," including "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id.* at § 2607.1(A)(2)(a).[3] Under SB 613, a minor receiving puberty-blocking drugs ("puberty blockers") or cross-sex hormones at the time of the law's enactment may continue receiving such drugs or hormones for a period of six (6) months for the sole purpose of "gradually decreasing and discontinuing" their use. *Id.* at § 2607.1(A)(2)(b)(7). Healthcare providers who administer Treatment Protocols to minors in violation of SB 613 may face adverse proceedings by their professional licensing boards and may be subject to criminal and civil penalties. *Id.* at § 2607.1(D)-(F).

On May 2, 2023, Plaintiffs—five transgender youth who are receiving Treatment Protocols ("Minor Plaintiffs"),[4] their parents and legal guardians ("Parent Plaintiffs"), and one healthcare

[2] All record citations use ECF pagination.

[3] Referred to collectively as the "Treatment Protocols."

[4] Brandon Boe is taking cross-sex hormones. Dkt. No. 6-9 at 4. Daphne Doe is taking puberty blockers and cross-sex hormones. Dkt. No. 6-7 at 4. Lydia Loe is taking cross-sex hormones.

provider ("Provider Plaintiff")—filed a complaint seeking declaratory and injunctive relief. Dkt. No. 2. Plaintiffs allege that SB 613 violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates based on sex and transgender status. *Id.* at 48-53. Parent Plaintiffs also allege that SB 613 violates the Due Process Clause of the Fourteenth Amendment because it limits their fundamental right to seek and follow medical advice for their children. *Id.* at 56-57.

Four of the five Minor Plaintiffs received Treatment Protocols through OU Medicine before the enactment of SB 3. These Plaintiffs ("OU Minor Plaintiffs") and their parents and guardians (collectively, "OU Plaintiffs") also challenge the SB 3 Policy. *Id.* at 53-56, 58-61. OU Minor Plaintiffs allege that, like SB 613, the SB 3 Policy violates the Equal Protection Clause because it discriminates against them based on sex and transgender status. *Id.* at 53-56. OU Plaintiffs collectively allege that the SB 3 Policy violates the nondiscrimination provision of the Affordable Care Act ("ACA"). *Id.* at 58-61; *see* 42 U.S.C. § 18116.[5]

In the instant Motion, Plaintiffs seek to enjoin the enforcement of SB 613 on the equal protection and due process grounds set forth in their complaint. Dkt. No. 6.

---

Dkt. No. 6-11 at 4. Peter Poe is taking puberty blockers. Dkt. No. 6-5 at 3. Ryan Roe is taking puberty blockers. Dkt. No. 6-14 at 4.

[5] Although the heading for Plaintiffs' fourth claim indicates that it is brought by OU Plaintiffs [Dkt. No. 2 at 58], the complaint includes additional allegations pertaining to Provider Plaintiff [*Id.* at 60]. Specifically, Plaintiffs allege that: (1) Provider Plaintiff is "a recipient of federal financial assistance and therefore subject to [the ACA's] nondiscrimination mandate"; and (2) "[i]t is impossible for the [Provider] Plaintiff to continue to comply with her obligations under [the ACA] and also comply with the restrictions imposed by [the] SB 3 Policy." *Id.* Due to the inconsistency, it is not clear whether Provider Plaintiff is also asserting a claim under the ACA.

## AUTHORITY AND ANALYSIS

### I. Jurisdiction

A federal court may issue injunctive relief if it has subject matter jurisdiction over the claim and personal jurisdiction over the parties. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007); *Thomas v. Bolls*, No. 18-CV-00692-GPG, 2018 WL 9489245, at *2 (D. Colo. May 16, 2018) (citing *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)).

#### A. Subject Matter Jurisdiction

Federal courts possess subject matter jurisdiction for all claims "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "A case arises under federal law if its well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (internal quotation marks and citation omitted). Here, Plaintiffs' claims under 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment to the United States Constitution [Dkt. No. 2 at 48-57] and under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 [*id.* at 58-61] satisfy the conditions necessary for jurisdiction under § 1331.

#### B. Personal Jurisdiction

"To exercise jurisdiction in harmony with due process, defendants must have minimum contacts with the forum state, such that having to defend a lawsuit there would not offend traditional notions of fair play and substantial justice." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (brackets and internal quotation marks omitted) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)). Plaintiffs state that a substantial part of the events giving rise to their claims occurred in this district. Dkt. No. 2 at 9. Plaintiffs

also state that Defendants have ties to Oklahoma through their status as members of three groups: state officials or agencies in Oklahoma; officers, board members, or trustees of those state agencies sued in their official capacity; and officers or board members of several Oklahoma state medical licensing boards. *Id.* at 11-16. This is sufficient for a prima facie showing of personal jurisdiction.

## II. Standing

"Article III of the Constitution permits federal courts to decide only 'Cases' or 'Controversies.' To establish a case or controversy, a plaintiff must possess standing to sue." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (internal citations and quotation marks omitted). "[T]o demonstrate standing, a plaintiff must show: (1) that he or she has suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 898 (10th Cir. 2016) (citations and quotation marks omitted). "The injury alleged must be concrete and particularized, and the threat of that injury must be actual and imminent, not conjectural or hypothetical." *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (citations and quotation marks omitted). Here, Plaintiffs' alleged injury in fact is their actual and imminent loss of access to the Treatment Protocols, and the risk of disciplinary action to Provider Plaintiff by her licensing board or the courts. These imminent threats are fairly traceable to SB 613 and would be redressed by a decision in Plaintiffs' favor on the constitutionality of SB 613. Plaintiffs have made a prima facie showing of standing to assert a facial challenge to SB 613.

## III. Plaintiffs' Preliminary Injunction Burden

A preliminary injunction is "an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (citation and

quotation marks omitted). *See also Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). A court may only grant preliminary injunctive relief, pursuant to Federal Rule of Civil Procedure 65, if plaintiffs meet their burden to demonstrate that: (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) their threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).[6] However, the likelihood-of-success inquiry is often dispositive in the case of a constitutional challenge.

At the outset, it must be observed that, "every time a court recognizes an asserted right as a fundamental right protected by the Constitution, the court, 'to a great extent, place[s] the matter outside the arena of public debate and legislative action.'" *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1220 (11th Cir. 2023) (alteration in original) (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997)). For this reason, "the Supreme Court has instructed courts addressing substantive due process claims to 'engage[] in a careful analysis of the history of the right at issue' and 'be "reluctant" to recognize rights that are not mentioned in the Constitution.'" *Id.* (quoting *Dobbs v. Jackson Women's Health Org.,* 142 S.Ct. 2228, 2246-47 (2022)). This highlights an initial obstacle to Plaintiffs' requested relief. That is, Plaintiffs do not argue that the original fixed meaning of either the due process guarantee or the equal protection guarantee covers their claims. When faced with a similar challenge to bans on procedures for minors in Kentucky and Tennessee,

---

[6] Although this case involves challenges to both SB 613 and the SB 3 Policy, Plaintiffs only seek to enjoin the enforcement of SB 613. Dkt. No. 2 at 48-61; Dkt. No. 5 at 1; Dkt. No. 6 at 31. Therefore, the Court will consider the factors set forth above as they pertain to Plaintiffs' SB 613 claims only.

the Sixth Circuit noted the plaintiffs' lack of historical analysis of these constitutional guarantees and discerned:

> That prompts the question whether the people of this country ever agreed to remove debates of this sort—over the use of innovative, and potentially irreversible, medical treatments for children—from the conventional place for dealing with new norms, new drugs, and new public health concerns: the democratic process. Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy by construing a largely unamendable Constitution to occupy the field.

*L.W., by and through Williams v. Skrmetti,* --- F.4th ---, 2023 WL 6321688, at *5 (6th Cir. Sept. 28, 2023).

Plaintiffs face another challenge in that they seek to extend constitutional guarantees into new territory. The *Skrmetti* court addressed this as well:

> There is nothing wrong with that, to be certain. But this reality does suggest that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing. Constitutionalizing new areas of American life is not something federal courts should do lightly, particularly when "the States are currently engaged in serious, thoughtful" debates about the issue.

*Id.* at *6 (quoting *Glucksberg*, 521 U.S. at 719).

These two concerns highlighted in *Skrmetti* are also present here. Plaintiffs' burden to establish that the purported rights at issue fall within the original fixed meaning of constitutional guarantees—or are of the kind that support newly recognized constitutional guarantees (despite ongoing, vigorous public debate)—is a heavy one. Understanding the significant nature of this burden, the Court now turns to the alleged rights Plaintiffs claim are violated by SB 613.

## IV. Plaintiffs' Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This clause "seeks to ensure that any classifications the law makes are made without respect to persons, that like cases are treated alike, [and] that those who appear similarly situated

are not treated differently without, at the very least, a rational reason for the difference." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012) (citation and quotation marks omitted).

To establish a violation of the Equal Protection Clause, a plaintiff must first show that the state engaged in intentional discrimination in a manner that harmed the plaintiff. *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (recognizing that a party who asserts an equal protection violation "has the burden of proving the existence of purposeful discrimination causing an adverse effect" (citation and quotation marks omitted)). Intent can be established by either: (1) direct proof of a distinction between groups that is evident from the face of the law or other state action; or (2) circumstantial evidence that, despite being facially neutral, the state action was taken with the purpose of discriminating against a particular group. *See id.* (recognizing that intentional discrimination can be established through circumstantial evidence that "the plaintiff was treated differently from similarly situated persons who are alike in all relevant respects") (citations and quotation marks omitted); *SECSYS*, 666 F.3d at 686 (detailing "several forms" of intentional discrimination that, if established, require an inquiry into whether the state's intentional classification is permissible).

Once a plaintiff demonstrates he or she was adversely affected by the state's intentional discrimination, the Court turns to the question of "whether the state's intentional decision to discriminate can be justified by reference to some upright government purpose." *SECSYS*, 666 F.3d at 686. The Equal Protection Clause does not prohibit a state from making *any* distinctions between people; instead, it requires that, to the extent meaningful distinctions are made between groups of individuals, it can nevertheless be said that the state action "treat[s] similarly situated persons similarly." *Id.* (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-40

(1985)) (recognizing that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").

The question of whether a state's classification is justified by reference to an upright purpose depends upon the classification at issue. If the government action concerns fundamental rights or distinguishes between individuals based upon a suspect classification—such as race or national origin—the state action will be subject to strict scrutiny and will be upheld only if it is "narrowly tailored to further a compelling government interest." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (citing *Goetz v. Glickman*, 149 F.3d 1131, 1140 (10th Cir. 1998)). State action that distinguishes among groups based on "quasi-suspect" classifications, such as sex, are subject to an intermediate standard of review and will be upheld so long as the discriminatory means serves "important governmental objectives" and is "substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 516 (1996) (citation and quotation marks omitted). Where the state action does not implicate a fundamental right or draw a distinction based upon a suspect class, rational basis scrutiny applies, and the Court's inquiry will be directed to whether the classification is rationally related to a legitimate purpose. *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (10th Cir. 2008). Given the different standards of scrutiny that apply to the different types of distinctions that a legislature may draw, the Court must take care to accurately identify the distinction that the Oklahoma Legislature made in SB 613.[7]

[7] In a sense, there is a level of overlap between Plaintiffs' due process and equal protection claims. "[I]f a classification impinge[s] upon the exercise of a fundamental right, the Equal Protection Clause requires the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014) (citation and quotation marks omitted) (alteration in original); *see Fowler v. Stitt*, No. 22-CV-115-JWB-SH, 2023 WL 4010694, at *18 (N.D. Okla. June 8, 2023).

The Court concludes that SB 613 restricts particular medical procedures for individuals under a particular age. The evidence is apparent from the face of the Act itself, which is not a wholesale prohibition on gender affirming care for transgender individuals but is instead a legislative determination that only adults may have access to gender affirming care through the Treatment Protocols.

**A. Age Classification**

SB 613 does not prevent any adult—male or female—from undergoing Treatment Protocols in connection with gender affirming care; it only prevents minors from doing so. *See Eknes-Tucker*, 80 F.4th at 1227 (agreeing that Alabama's similar act "is best understood as a law that targets specific medical interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause"). Facially, the distinction made is between adults who are ready to make life-altering decisions and minors who, at least in the eyes of the legislature, are not. This is precisely the type of age-based legislative decision that courts have long accepted as being subject to rational basis review. *See Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (concluding that "classifications based on youth—like those based on age in general—do not trigger heightened scrutiny for equal protection purposes"); *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242, 1266 (M.D. Pa. 1975) (recognizing that "youths under the age of eighteen have traditionally been regulated and restricted by American law in many ways," including through limitations on their ability to enter into contracts, purchase certain goods, work at certain jobs, and be held liable for criminal behavior), *aff'd*, 535 F.2d 1245 (3d Cir. 1976).

**B. Sex Classification**

The Court rejects Plaintiffs' argument that the Act is discriminatory on its face because it makes distinctions in "explicit gendered terms." Dkt. No. 6 at 18-19. True, SB 613 uses terms such as "sex" and "gender" to discuss the Treatment Protocols, but the use of those terms is due to the fact the Act itself concerns "medical or surgical services performed for the purpose of attempting to affirm [a] minor's perception of his or her gender or biological sex . . . ." 63 O.S. § 2607.1(A)(2). The use of these "gendered terms" reflects the nature of the procedure being regulated, not an intention to discriminate between people of different sexes. *See Eknes-Tucker*, 80 F.4th at 1228 (rejecting argument that a similar statutory classification was sex-based where "the statute refer[red] to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based"). Indeed, it would be difficult, if not impossible, for the legislature to regulate this area without using the challenged terms. *See Skrmetti*, 2023 WL 6321688, at *14 (rejecting the argument that the use of the word "sex" in Kentucky and Tennessee statutes banning medical procedures similar to the Treatment Protocols for minors constituted sex discrimination, explaining, "The Acts mention the word 'sex,' true. But how could they not? The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures.").

Rather than applying a litmus test in which the presence of the word "sex" or "gender" necessitates intermediate scrutiny, the Court must look to the language of the statute and examine whether SB 613 uses gendered terms to distinguish between groups of people. The Court finds that it does not. Where the Act uses gendered terms, it does so to identify the procedures at issue.

As noted, SB 613 uses the terms "gender" and "sex" when articulating the "gender transition procedures" that are prohibited for minors. *See* 63 O.S. § 2607.1(A)(2)(a). It likewise provides specific examples of the procedures that individuals cannot undergo before reaching the age of majority, including "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and drugs that "promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id.*

The Act does not use sex as a means to distinguish between groups—treatments allowed by SB 613 are allowed for *all* minors, regardless of sex. *Id.* at § 2607.1(A)(2)(b). Similarly, *all* minors, regardless of sex, are prohibited from undergoing certain procedures for the purpose of gender transition before reaching the age of majority. 63 O.S. § 2607.1(B) ("A health care provider shall not knowingly provide gender transition procedures to any child."); *id.* at § 2607.1(A)(1) (defining a "child" as "*any person* under the age of eighteen (18) years of age") (emphasis added). So far, they are equal. *See Eknes-Tucker*, 80 F.4th at 1228 (holding that the challenged statute did "not establish an unequal regime for males and females" where the law restricted certain treatments for treating gender discordance "for *all* minors").

Plaintiffs argue that, notwithstanding the facially neutral application, SB 613 has the effect of discriminating based on sex because it "enforces sex stereotypes and gender conformity." Dkt. No. 6 at 19-20. They point to *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020), where the Supreme Court held that an employer violates Title VII when it takes an adverse employment action against an individual because that person is transgender. *Accord Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) (recognizing that "transgender discrimination . . . is

discrimination 'because of sex' prohibited under Title VII"). According to Plaintiffs, the reasoning of *Bostock* equally applies to equal protection claims.

At one point, it could have appeared that one circuit might agree with Plaintiffs' argument. *See Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (recognizing that discrimination against a transgender individual because of his or her gender non-conformity is gender stereotyping prohibited by Title VII and the Equal Protection Clause). However, the Eleventh Circuit recently removed any belief that could be so. *See Eknes-Tucker*, 80 F.4th at 1228-29 (rejecting application of *Bostock* and *Brumby* in upholding Alabama's similar ban on gender affirming procedures for minors, explaining that neither of those cases dealt with the Equal Protection Clause as applied to laws regulating medical treatments). More importantly, the Tenth Circuit has not accepted Plaintiffs' theory about the application of *Bostock* here.

Absent binding precedent to the contrary, this Court will not extend the reasoning of *Bostock*—a Title VII case concerning an adverse employment action—to this case, which concerns a materially different governing law, materially different language, and materially different facts. *See id.* at 1229 (concluding that because *Bostock* "concerned a different law (with materially different language) and a different factual context," that decision bore "minimal relevance" to the question of whether the statutory prohibition against certain gender transition procedures violated the Equal Protection Clause). *See also Skrmetti,* 2023 WL 6321688, at *16-17 (contrasting the facts in *Bostock,* where adult employees were "fired . . . because their behavior did not match stereotypes of how adult men or women dress or behave," with the laws at issue, which "do not deny anyone general healthcare treatment based on any such stereotypes[, but] merely deny the same medical treatments to all children facing gender dysphoria if they are 17 or under"); *Students for Fair Admissions v. Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring)

(comparing the text of Title VII with the Equal Protection Clause and concluding that the suggestion that "such differently worded provisions should mean the same thing is implausible on its face").

Even if this Court were to hold that classifications based upon "gender conformity" (or lack thereof) constitute sex-based classifications under the Equal Protection Clause, this would not advance Plaintiffs' claims. This is not a case where a state action is being taken to further a particular gender stereotype or prohibit conduct that contravenes that stereotype. *See Eknes-Tucker*, 80 F.4th at 1229 (concluding that rational basis scrutiny applied to a law targeting certain medical interventions associated with gender dysphoria, as that law did not "further any particular gender stereotype"); *Skrmetti,* 2023 WL 6321688, at *18 ("Recognizing and respecting biological sex differences does not amount to stereotyping . . . .") Instead, this is a case where the Oklahoma Legislature has prohibited *all* minors from using certain medical procedures to treat gender dysphoria. The law does not further gender stereotypes by taking adverse actions against those who fail to conform to them; it simply requires that adolescents reach the age of majority before undergoing certain medical interventions to treat the psychological condition of gender dysphoria.

**C. Transgender Status Classification**

Plaintiffs take the position that, even if SB 613 does not distinguish on the basis of gender (or conformance with gender norms), the statute is nevertheless subject to heightened scrutiny because it treats transgender individuals differently than other individuals. The Court disagrees. First, the Supreme Court has not recognized transgender status as a suspect class.[8] In addition, the

[8] "The bar for recognizing a new suspect class is a high one. The Supreme Court 'has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so.'" *Skrmetti,* 2023 WL 6321688, at *18 (quoting *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015)).

Tenth Circuit "has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims," and has analyzed such claims under the rational basis standard. *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015).[9] *See also Skrmetti,* 2023 WL 6321688, at *18-19 (discussing the considerations the Supreme Court has highlighted when recognizing a new suspect class and explaining why transgender status is not likely to qualify under such considerations). Furthermore, even if heightened scrutiny were to apply to classifications based on transgender status, the Court would not find that SB 613 makes such a classification.

The Court is not persuaded by Plaintiffs' argument that SB 613 is part of a "larger legislative strategy to discriminate against transgender people, including by restricting access to gender-affirming care for people of all ages" [Dkt. No. 6 at 21-22 & n.3] for three reasons. First, although Plaintiffs suggest that 15 bills were introduced as part of a legislature-wide strategy to discriminate against transgender people, they cite only two: HB 1011 and SB 345. *Id.* Neither of these bills received a floor vote,[10] which undercuts Plaintiffs' claims; if these bills were components of an overarching discriminatory strategy, it seems unlikely that they would have died in committee. Second, Plaintiffs provide no evidence for their claim that SB 613 was one of 15 similar bills. The Court declines to further inquire into Oklahoma's legislative records concerning the nature and purpose of these purported bills when Plaintiffs apparently did not believe the endeavor to be worth their own time. It would seem likely, however, that had any bills made more

---

[9] Unpublished appellate decisions are not precedential but may be cited for their persuasive value. *See* 10th Cir. R. 32.1; Fed. R. App. P. 32.1.

[10] *See* http://www.oklegislature.gov/BillInfo.aspx?Bill=hb1011&Session=2300 and http://www.oklegislature.gov/BillInfo.aspx?Bill=sb345&Session=2300. The Court takes judicial notice of these governmental records. *See High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019).

progress than HB 1011 or SB 345, Plaintiffs would have cited them. Third, one of the bills referenced by Plaintiffs, HB 1011, sought to ban Treatment Protocols for anyone under the age of 21, rather than under the age of 18. The legislature's decision to enact SB 613, with its lower age restriction, undermines Plaintiffs' argument that the legislature was operating with the goal of invidious discrimination against all transgender individuals. Plaintiffs' theory is simply insufficient to establish a likelihood that they will prove that SB 613 was part of an impermissible scheme to discriminate against transgender people.

The Court likewise rejects Plaintiffs' claim that SB 613 discriminates against transgender individuals because it "singles out medical care that only transgender people need or seek." Dkt. No. 6 at 18. Although the statute does restrict a specific course of treatment that only transgender individuals would normally request, that fact alone does not render the statute invalid. As the Supreme Court recently recognized when addressing whether a state's regulation of abortion was a sex-based classification, the "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S.Ct. at 2245-46 (alteration in original) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). Just as the "goal of preventing abortion does not constitute invidiously discriminatory animus against women," *id.* at 2246, the goal of prohibiting minors from accessing a course of treatment that "only transgender people need or seek" [Dkt. No. 6 at 18] does not itself constitute discriminatory animus against transgender people. Where, as here, there is no evidence of pretext for discrimination, SB 613's classification scheme does not trigger a heightened standard of review. *See Eknes-Tucker*, 80 F.4th at 1230 (holding that, because there was no evidence that the regulation was pretext for discrimination against transgender individuals, the ban's "relationship

to transgender status [did] not warrant heightened scrutiny"). Accordingly, the legislature's classification scheme will be upheld so long as it survives rational basis review. *See* Section VI, *infra*.

**V. Parent Plaintiffs' Substantive Due Process Claim**

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Two types of substantive rights have been recognized within the Due Process Clause: enumerated rights, set out in the first eight Amendments, and implied rights, "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*, 152 S.Ct. at 2246. This case involves implied rights. *See Fowler v. Stitt*, --- F. Supp. 3d ---, 2023 WL 4010694, at *8 (N.D. Okla. June 8, 2023) ("The Constitution makes no express reference to . . . one's gender, nor does it reference a right to be treated consistent with one's gender identity. Thus, Plaintiffs must show that the right is somehow implicit in the constitutional text . . . ."), *appeal docketed*, No. 23-5080 (10th Cir. July 7, 2023).

An implied rights substantive due process analysis generally requires two steps. The Court must first "carefully describe the asserted fundamental liberty interest," then "decide whether the asserted liberty interest, once described, is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008) (citation and quotation marks omitted).[11]

---

[11] A second test, referred to as the "shocks the conscience" test, is sometimes appropriate for a substantive due process case (usually, though not exclusively, in cases involving challenged actions by the executive branch of government). *Seegmiller*, 528 F.3d at 767. "Conduct that shocks the judicial conscience . . . is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Id.* (quoting

**A. Description of the Interest**

"That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected . . . ." *Glucksberg*, 521 U.S. at 727 (1997) (first citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 852 (1992); and then citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-35 (1973)). "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-26 (1985)). The Supreme Court emphasized the need for precise framing in *Glucksberg*, explaining:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [judiciary].

521 U.S. at 720 (internal citations and quotation marks omitted). Rights framed as "[v]ague generalities . . . will not suffice." *Chavez v. Martinez*, 538 U.S. 760, 776 (2003).

*Glucksberg* demonstrated the type of the precise framing required. In that case, terminally ill patients and treating physicians who challenged a state law banning physician-assisted suicide

---

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). The Tenth Circuit has cautioned that "[c]ourts should not unilaterally choose to consider only one or the other" test. *Id.* at 769. Here, no party raised the "shocks the conscience" test, and the Court does not believe it to be appropriate under the facts of this case. "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense," *id.* at 767 (citation and quotation marks omitted), and nothing in the record gives the Court concern that the ordinary legislative process through which SB 613 was codified would qualify as egregious. Therefore, the Court focuses on the "fundamental liberty" test.

argued that "our liberty jurisprudence, and the broad, individualistic principles it reflects, protect[ed] the liberty of competent, terminally ill adults to make end-of-life decisions free of undue government interference." 521 U.S. at 724 (citation and quotation marks omitted). The Court narrowed the issue significantly, framing the question presented as "whether the protections of the Due Process Clause include a right to commit suicide with another's assistance." *Id.*

Similarly, "[a]lthough many of the Court's 'privacy' decisions have implicated sexual matters, the Court has never indicated that the mere fact that an activity is sexual and private entitles it to protection as a fundamental right." *Seegmiller*, 528 F.3d at 770 (quoting *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1236 (11th Cir. 2004)). Rather than considering broad, generalized rights, courts have examined "more narrowly defined right[s]" such as that "of married couples to obtain and use contraceptives." *Id.* (citing *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965)).[12]

The direction to district courts is clear: an asserted implied right must be narrowly and precisely expressed. Thus, "our first job in assessing a substantive due process claim is to make a 'careful description' of the allegedly violated right." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1078 (10th Cir. 2015) (quoting *Glucksberg*, 521 U.S. at 721). Here, the parties frame the disputed liberty interest differently. Plaintiffs describe the asserted right as "the fundamental right[] of parents to seek appropriate medical care for their minor children." Dkt. No. 6 at 25. Defendants describe the asserted right as a "fundamental right for parents to choose for their

[12] Even when distinguishing *Glucksberg*, the Supreme Court structured the question presented based on the action that plaintiffs wanted to perform rather than the characteristics of the plaintiffs. *See Obergefell v. Hodges*, 576 U.S. 644, 671 (2015). More recently, the Court reiterated the *Glucksberg* standard in *Dobbs*, directing lower courts to "exercise the utmost care" and avoid "freewheeling judicial policymaking" in structuring substantive due process inquiries. 142 S.Ct. at 2247-48.

children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition." Dkt. No. 86 at 35. The Court examines each.

Federal precedent "historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Parents are presumed to act in the best interest of their children. *Id.* at 602-03 ("That some parents may at times be acting against the interests of their children . . . creates a basis for caution[] but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests.") (internal citation and quotation marks omitted).

Because "[t]he law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," *id.* at 602, "the interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by [the] Court," *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). Parental obligations toward children include the "'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602. "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* at 603. "Nonetheless, [the Court has] recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.*

Although the Tenth Circuit has "never specifically recognized or defined the scope of a parent's right to direct her child's medical care" it has expressed confidence in the position that "a parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right to make decisions about the child's medical care." *PJ ex rel. Jensen v.*

*Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (citation and quotation omitted). At the same time, "parental rights, including any right to direct a child's medical care, are not absolute." *Id.* at 1197-98 (first citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); and then citing *Parham*, 442 U.S. at 604). "Indeed, states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders." *Id.* (citing *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982)).

A close examination of *Parham* and *Troxel* demonstrates that they do not support the conclusion that there is a broad, general right of the type asserted by Plaintiffs. First, the *Parham* decision involved procedural due process, which has a far less fraught history than its substantive cousin. *See* 442 U.S. at 620 n.23. The question at issue in *Parham* was whether minors had a due process right to greater procedural safeguards—e.g., a judicial hearing—before their parents could commit them to a mental health institution. *Eknes-Tucker*, 80 F.4th at 1222-23 (citing *Parham*, 442 U.S. at 610). "*Parham* was concerned about the *procedures* a state must afford a child prior to institutionalization when the parent believes such treatment—*which is not only lawful but provided by the state itself*—is necessary." *Id.* at 1223 (emphasis added). Because "*Parham* does not at all suggest that parents have a fundamental right to direct a particular medical treatment for their child that is prohibited by state law," it "offers no support" for Plaintiffs' substantive due process claim. *Id.*

Next, the *Troxel* case involved a fractured Court. 530 U.S. at 60. Four justices joined the plurality opinion, two justices concurred in judgment only, and one of those two noted that the decision did not "call for turning any fresh furrows in the 'treacherous field' of substantive due process." *Id.* at 76 (Souter, J., concurring in judgment); *see also id.* at 80 (Thomas, J., concurring in judgment). One of the dissenting justices noted that "[d]espite this Court's repeated recognition

of [the] significant parental liberty interests, these interests have never been seen to be without limits." *Id.* at 87 (Stevens, J., dissenting). Another emphasized that "[o]nly three holdings of [the Supreme] Court rest in whole or in part upon a substantive constitutional right of parents to direct the upbringing of their children—two of them from an era rich in substantive due process holdings that have since been repudiated." *Id.* at 92 (Scalia, J., dissenting). Further, *Troxel* did not involve parental rights with respect to making medical decisions; it involved parental rights with respect to decision-making concerning the visitation of grandparents. *Id*. at 61.

Finally, the Tenth Circuit has avoided specificity, instead directing that, "[w]hen a child's life or health is endangered by her parents' decisions, in some circumstances a state may intervene without violating the parents' constitutional rights." *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (quoting *Jensen*, 603 F.3d at 1198).

This analysis leads to the inevitable conclusion that Plaintiffs' rights formulation has the same overbreadth issue as the *Glucksberg* plaintiffs' rights formulation. Here, Parent Plaintiffs allege that Oklahoma's ban on the Treatment Protocols violates their right to seek appropriate medical care for their minor children. Dkt. No. 6 at 25. In *Glucksberg*, plaintiffs alleged that Washington's ban on physician-assisted suicide violated their right to "make end-of-life decisions free of undue government interference." 521 U.S. at 724. The Supreme Court rejected this wide formulation, instead narrowing the question presented to whether individuals had an affirmative right to perform a specific activity: committing suicide with another's assistance. *Id.*

"Guideposts for responsible decisionmaking" regarding substantive due process are "scarce and open-ended" in the best of circumstances. *Collins*, 503 U.S. at 125. Guideposts regarding parental medical decisionmaking are even more nebulous. "In interpreting what is meant by the Fourteenth Amendment's reference to 'liberty,' we must guard against the natural

human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs*, 142 S.Ct. at 2247. Thus, following the Supreme Court's direction to "exercise the utmost care" in carefully describing the asserted fundamental liberty interest, the Court concludes that Plaintiffs' rights formulation is too much of a "vague generality" to satisfy this first step.

Defendants' framing of the issue is consistent with the approach approved by the Supreme Court. They define the asserted right as "a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition." Dkt. No. 86 at 35. This follows the method of framing presented in *Glucksberg* and other substantive due process precedents. *See, e.g.,* 521 U.S. at 724; *Lawrence v. Texas*, 539 U.S. 558 (2003) (examining whether substantive due process includes the right for adults to perform consensual homosexual acts in private). *Accord Eknes-Tucker*, 80 F.4th at 1221, 1224 (emphasizing that "a substantive due process analysis must focus on the specific right asserted, rather than simply rely on a related general right," and framing the issue as a right to "treat [one's] children with transitioning medications subject to medically accepted standards") (alteration in original). The Court finds Defendants' definition is an appropriately careful description of the allegedly violated right.

**B. Historical Analysis**

Now that the Court has a definition for the allegedly infringed right, it must "examine whether the right at issue . . . is rooted in our Nation's history and tradition and whether it is an essential component of what we have described as 'ordered liberty.'" *Dobbs*, 142 S.Ct. at 2244. Plaintiffs have not provided any historical antecedents demonstrating that a right to the Treatment

Protocols is deeply rooted.[13] Plaintiffs have therefore failed to carry their burden of proving the liberty interest they seek is so fundamental that it must be protected through a heightened scrutiny analysis. *Seegmiller*, 528 F.3d at 770.

The Court's conclusion is harmonious with the conclusions of numerous courts "reject[ing] arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government."[14] *Abigail All. for Better Access to Dev'l Drugs v. von Eschenbach*, 495 F.3d 695, 710 (D.C. Cir. 2007) (en banc); *see also id.* at n.18 ("No circuit court has acceded to an affirmative access claim."). "While our longstanding traditions may give individuals a right to refuse treatment, there is no historical support for an affirmative right to specific treatments." *Skrmetti*, 2023 WL 6321688, at *9 (citing *Glucksberg*, 521 U.S. at 725-26). In fact, except for one district court in Texas in 1980,[15] "it appears that every court to consider the issue has rejected the argument that access to a specific treatment or specific provider . . . is a fundamental right protected by the Constitution." *Birchansky v. Clabaugh*, No. 417CV00209RGERAW, 2018 WL 10110860, at *18 (S.D. Iowa Oct. 17, 2018), *aff'd*, 955 F.3d

---

[13] Borrowing Defendants' phrasing, "The reason for this is simple: The treatments that they seek have only existed for a few decades." Dkt. No. 86 at 35 (citing Dkt. No. 6-16 at ¶ 28). As the Eleventh Circuit recently explained, "the earliest-recorded use of puberty blocking medication and cross-sex hormone treatment for purposes of treating the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century." *Eknes-Tucker*, 80 F.4th at 1220-21.

[14] Some of these cases involved various forms of executive action, such as practitioner licensing laws or patients seeking access to treatments that had issues in the FDA approval process. Here, SB 613 came about through legislative action. The executive action cases are pertinent because the key inquiry is whether the government (regardless of branch) infringed on constitutional rights. *Seegmiller*, 528 F.3d at 767 ("Although some precedential support exists for [an] executive versus legislative distinction, an overly rigid demarcation between the two lines of cases is neither warranted by existing case law nor helpful to the substantive analysis.").

[15] *Andrews v. Ballard*, 498 F. Supp. 1038 (S.D. Tex. 1980) (holding the constitutional right of privacy included a patient's right to obtain acupuncture treatment).

751 (8th Cir. 2020). *See also Nat'l Ass'n for Advan. of Psych. v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1050 (9th Cir. 2000) (holding that "substantive due process rights do not extend to the choice of type of treatment or of a particular health care provider."); *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993) (explaining that "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider"). And the Tenth Circuit reversed a trial court's holding that the constitutional right of privacy allowed patients to take "whatever treatment they wished regardless of whether the FDA regarded the medication as 'effective' or 'safe.'" *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980). The Sixth Circuit effectively summarized the issue:

> This country does not have a "deeply rooted" tradition of preventing governments from regulating the medical profession in general or certain treatments in particular, whether for adults or their children. Quite to the contrary in fact. State and federal governments have long played a critical role in regulating health and welfare, which explains why their efforts receive a strong presumption of validity. State governments have an abiding interest in protecting the integrity and ethics of the medical profession and preserving and promoting the welfare of the child. These interests give States broad power, even broad power to limit parental freedom when it comes to medical treatment.

*Skrmetti,* 2023 WL 6321688, at *7 (internal quotation marks and citations omitted).

In the case before this Court, Plaintiffs have not demonstrated a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for the purpose of effectuating a gender transition. "Absent a fundamental right, the state may regulate an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate state interest." *Seegmiller*, 528 F.3d at 771. Accordingly, rational basis review applies.

## VI. Rational Basis Review

Since both of Plaintiffs' constitutional claims call for rational basis review, the Court examines the two claims in tandem to determine whether Plaintiffs are likely to succeed in showing

that there is no rational basis for the restrictions in SB 613. As explained below, it is unlikely that Plaintiffs' claims will survive this level of scrutiny for numerous reasons, many of which are demonstrated by the profound debate concerning this very issue.

**A. Legislative Debate**

Where, as here, there is robust scientific and political debate concerning a significant public-policy question, a court should be loath to step in to end the debate and thereby suggest it is all-knowing. The record in this case amply demonstrates that there is no consensus in the medical field about the extent of the risks or the benefits of the Treatment Protocols. *See* Section VI.B., *infra*. Plaintiffs assert throughout their briefing that the Treatment Protocols for minors are not "experimental." While this is perhaps technically true, Plaintiffs' representations are misleading. "Not experimental" in this case does not translate to "proven" or "established."[16] Rather, Plaintiffs admit that experiments and scientific studies of the sort generally seen in the medical field *have not been done* in this area. Whether such experiments or studies could be done ethically is a topic of healthy debate between the parties' experts. *Compare* Dkt. No. 6-16 at 9, 16 *with* Dkt. No. 86-1 at 30, 132-33. Nonetheless, it is more accurate to state that the Treatment Protocols are not "experimental" only because the experimental phase has truly not yet begun.

The Court should not cut off this debate by declaring that only one side has all the answers in its corner. Instead, the "conventional place for dealing with new norms, new drugs, and new technologies [is] the democratic process," and "[l]ife-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy." *Skrmetti*, 2023 WL 6321688, at *5. When "Americans are engaged in an earnest and profound

[16] *See, e.g.*, Dkt. No. 132-1 at 10 ("Experiments test treatments by comparing two groups (or 'arms'), one that receives the treatment and one that does not. Because medicalized transition has not yet been tested with a two-group design, it has not yet passed the experimental stage.")

debate about the morality, legality, and practicality" of a life-altering medical intervention, courts are wise to "permit[] this debate to continue, as it should in a democratic society." *Glucksberg*, 521 U.S. at 735.[17] The Sixth Circuit succinctly applied this general rule to the issue at hand when it explained:

> Given the high stakes of these nascent policy deliberations—the long-term health of children facing gender dysphoria—sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches. To permit legislatures on one side of the debate to have their say while silencing legislatures on the other side of the debate under the Constitution does not further these goals. That is all the more critical in view of two realities looming over both cases—the concept of gender dysphoria as a medical condition is relatively new and the use of drug treatments that change or modify a child's sex characteristics is even more recent. Prohibiting citizens and legislatures from offering their perspectives on high-stakes medical policies, in which compassion for the child points in both directions, is not something life-tenured federal judges should do without a clear warrant in the Constitution.

*Skrmetti*, 2023 WL 6321688, at *6. The legislature in this case weighed in on one side of a nationwide dispute over how to balance the truth that parents generally can be expected to know what is best for their children against the competing reality that state governments have an abiding interest "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731, and "preserving and promoting the welfare of the child," *Schall v. Martin,* 467 U.S. 253, 265 (1984) (citation and quotation marks omitted).[18] The very existence of this dispute, and ongoing

---

[17] It is evident that the states are engaged in thoughtful debate over this issue. *See Skrmetti*, 2023 WL 6321688, at *6 (recognizing numerous state laws similar to those at issue restricting gender transition procedures for minors, as well as state laws providing various protections for those seeking treatment for gender dysphoria). The Sixth Circuit observed that most of this legislative activity has occurred within the last two years and that the "[f]ailure to allow these laws to go into effect would grind these all-over-the-map gears to halt." *Id.*

[18] "[I]t is well to remember that the most deeply rooted tradition in this country is that we look to democracy to answer pioneering public-policy questions, meaning that federal courts must resist the temptation to invoke an unenumerated guarantee to 'substitute' their views for those of legislatures." *Skrmetti*, 2023 WL 6321688, at *7 (citing *Dobbs,* 142 S.Ct. at 2277).

thoughtful debate, is independent evidence that Plaintiffs are unlikely to establish that there is no rational basis for the legislature's decision.

**B. Safeguarding Minors**

It is rational for the Oklahoma Legislature to regulate the Treatment Protocols for minors while the democratic process resolves ongoing questions of safety and efficacy. Courts have long recognized that states have a compelling interest in "safeguarding the physical and psychological well-being of [] minors." *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (*quoting Globe Newspaper*, 457 U.S. at 607). For this reason, the judiciary has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Id.*[19] Indeed, courts have upheld restrictions designed to protect and prevent minors from engaging in behaviors that are far less risky than the procedures banned by SB 613. *See e.g., City of Dallas v. Stanglin*, 490 U.S. 19, 28 (1989) (upholding age restriction for dance halls based upon "the city's interest in promoting the welfare of teenagers").[20]

The Court could conclude that Plaintiffs' challenge to SB 613 is unlikely to succeed based on nothing more than its own rational speculation, should it choose to do so. *F.C.C. v. Beach*

---

[19] *See*, *e.g., In re Hawley*, 606 N.W.2d 50, 53 (1999) (decision to charge 15 year old, but not his 13 year old partner, for conduct arising from the pair's sexual relationship did not violate Equal Protection Clause because the difference in age was a "legitimate distinguishing factor" under the statutory scheme); *Am. Ent'rs, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 723 (4th Cir. 2018) (confirming state's interest in ensuring that sexually-oriented-business owners are of legal drinking age justified age-based restriction on ownership of such venues).

[20] *See also Qutb v. Strauss*, 11 F.3d 488, 496 (5th Cir. 1993) (affirming curfew ordinance following strict scrutiny review); *Rothner v. City of Chicago*, 929 F.2d 297, 298 (7th Cir. 1991) (affirming ordinance prohibiting minors from playing video games during school hours); *Blassman v. Markworth*, 359 F. Supp. 1, 6 (N.D. Ill. 1973) (concluding state's decision to set a minimum age for state and local officers was neither unreasonable nor irrational).

*Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (noting that, on rational basis review, "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"). But such speculation is not necessary, as there is ample record evidence to establish that SB 613 is rationally related to a legitimate state interest for at least four distinct reasons.

**1. Difference in Diagnoses**

It is undisputed that gender transition procedures address a psychological diagnosis, rather than a physiological one. *See* Dkt. No. 119-4 at 3 (concession by Plaintiffs' expert that "[g]ender dysphoria is a psychiatric diagnosis"). A diagnosis of gender dysphoria depends upon "patients' reports of their symptoms," rather than objective diagnostic criteria, and there is no evidence that a diagnosis of gender dysphoria can be confirmed by any objective measurement or testing protocol. *Id.* at 4; Dkt. No. 86-1 at 126-27 (distinguishing a medical diagnosis, which identifies the cause of a patient's symptoms, and a psychiatric diagnosis, which labels the symptoms regardless of cause). The evidence demonstrates that a diagnosis of gender dysphoria is so tied to the patients' subjective beliefs and psychological condition that it cannot be diagnosed over a patient's objection.[21] This diagnosis is, therefore, readily distinguishable from the physiological

[21] Dkt. No. 86-1 at 127.

conditions—including precocious puberty[22] and disorders of sexual development[23]—that are specifically exempted from the statutory definition of "gender transition procedures." It is entirely within the legislature's purview to conclude that, while it may be appropriate for a minor to undergo hormone therapy and/or surgery to address a physiological condition, it is not appropriate for a minor to undergo such invasive procedures to treat a psychological one.[24]

**2. Difference in Purpose and Risks**

Plaintiffs argue that the same Treatment Protocols are allowed for cisgender (or non-transgender) children but unfairly banned for transgender children. As an example, Plaintiffs suggest that cisgender children are allowed access to the Treatment Protocols for precocious puberty while transgender children are denied the Treatment Protocols. But this argument misses

---

[22] Precocious puberty is a condition diagnosed by reference to objective facts and measurements, including the age of the patient, the existence of physical indicia that puberty has begun, and increased testosterone or estrogen production. Dkt. No. 86-2 at 11 (describing the stages of sexual development and the physical symptoms associated with each); *id.* at 17 (recognizing that the onset of puberty is associated with an increase in the production of sex hormones); *id.* at 22 (identifying ages with corresponding stages of pubertal development); Dkt. No. 86-3 at 16-17, 28 (describing physical changes and onset ages associated with Tanner Stage 2 of pubertal development). Minor patients being treated for the physiological condition of precocious puberty are therefore readily distinguishable from minor patients being treated for the psychological condition of gender dysphoria.

[23] Dkt. No. 86-1 at 124 (describing disorders of sexual development as "*physical* medical disorders" which can be diagnosed using objective and verifiable criteria). A physical disorder of sexual development that can be observed or detected through objective means is not "like" a psychological diagnosis that cannot be ascertained in the absence of a subjective complaint.

[24] Plaintiffs argue that neither the manner in which gender dysphoria is classified nor the subjectivity of the symptoms associated with that condition undermines the validity of a gender dysphoria diagnosis. Dkt. No. 119-4 at 4. This may be true, but this Court is not being asked whether gender dysphoria is a valid diagnosis; instead, the Court is being asked to determine whether the legislature has a rational basis for banning certain procedures for use in addressing gender dysphoria, but permitting those procedures to treat other, physiological conditions. Plaintiffs' concession that gender dysphoria is a psychological diagnosis based upon patients' subjective reports of their symptoms is particularly salient to the latter question.

an important fact. Nothing in SB 613 bans the Treatment Protocols to treat *any* child *for precocious puberty*, a physiological malady, whether the child is cisgender or transgender. Conversely, the Treatment Protocols are banned to treat *all* children *for gender dysphoria*, a psychological condition.

The evidence likewise demonstrates that minors who seek to undergo the Treatment Protocols for the purpose of affirming perceived gender face risks that are different and more extensive than those for minors who would use the same protocols for other diagnoses. Minors who undergo the Treatment Protocols for purposes of gender affirming care—in contrast to those who use the same protocols to treat precocious puberty—do so with the intent and effect of undergoing puberty later than it would be physically appropriate to do so. These are different treatments with different purposes. As a result, the risks are very different. *See* Dkt. No. 86-1 at 36 (recognizing that the "use of puberty blockers to treat precocious puberty avoids the medical risks caused by undergoing puberty growth before the body is ready," while the use of the same medication on "patients already at their natural puberty pushes them away from the mean age of the healthy population").

Undergoing puberty later than the typical range of pubertal onset carries a range of risks, including impaired brain development[25] and poorer psychosocial and educational development.[26]

---

[25] *See* Dkt. No. 86-1 at 99-100 (recognizing an association of brain development with age of pubertal onset, a correlation between the administration of GnRH-agonists and a decrease in brain activity and cognitive performance, and concerns that "blocking the process of puberty during its natural time could have a negative and potentially permanent impact on brain development"); Dkt. No. 86-2 at 25 (acknowledging that sex hormones can influence the development and maturation of the human brain); Dkt. No. 86-3 at 7.

[26] *See* Dkt. No. 86-1 at 101 (recognizing that "[u]ndergoing puberty much later than one's peers is also associated with poorer psychosocial functioning and lesser educational achievement"); Dkt. No. 86-2 at 25 (noting the importance of peer relationships during adolescence and recognizing that one reason for treating precocious puberty with puberty blockers is the generally accepted

Minors who undergo the Treatment Protocols to delay puberty for gender-transition purposes take on these risks (whether knowingly or unknowingly); those who use the same protocols for the purpose of undergoing puberty at an age-appropriate time, in contrast, attempt to avoid them. Dkt. No. 86-1 at 36; Dkt. No. 86-2 at 18, 22; Dkt. No. 86-4 at 9-10. This is a rational basis for the legislature's decision.

**3. Difference in Length of Use**

The risks associated with the Treatment Protocols also vary depending upon when and for how long they are administered. For example, the evidence suggests that puberty blockers negatively impact a child's ability to increase his or her bone density. *See* Dkt. 86-1 at 102; Dkt. No. 86-2 at 22-24. A minor who is prescribed puberty blockers during the teen years, when bone density "typically surges by about 8 to 12 percent a year," faces a different—and more serious—risk than a minor with precocious puberty whose body is not in a similar stage of growth. Dkt. No. 86-1 at 102; *see* Dkt. No. 86-2 at 22-23 (recognizing that peak bone mass is achieved in the early to late twenties for both males and females, and that "factors which lead to a lowering of peak bone mass will predispose a person to future osteoporosis").[27]

Similarly, a five-year-old who undergoes pubertal suppression will delay—for a time—sexual development until his or her body is able to withstand the changes associated with puberty, at which point puberty will be allowed to resume; a child administered puberty blockers during adolescence, by contrast, will inhibit puberty at the precise time his or her body should be

---

understanding in endocrinology that "there are psychological benefits to adolescents who go through puberty around the same time as their peers").

[27] *See also id.* at 23-24, Fig. 2 (discussing impact on puberty blocking medication on bone density and opining that any pause in normal puberty introduces a risk of inability to obtain peak bone density and creates a risk of osteoporosis, serious fractures, and impairment of bone growth).

undergoing those same changes. *See* Dkt. No. 86-2 at 21-22. Individuals in the latter group "will continue their chronological age progression toward adulthood and yet remain with underdeveloped genitalia," will immediately experience infertility,[28] and will run the risk of masking developmental milestones that, by their presence or absence, would give medical practitioners insight as to the individuals' overall health. Dkt. No. 86-2 at 22; Dkt. No. 86-3 at 39 (recognizing that puberty blockers, if administered at Tanner Stage 2, "makes the full maturation of the gametes impossible"); Dkt. No. 86-3 at 39 (noting that suppressing pubertal development masks the onset of the menstrual cycle, the absence of which can be indicative of underlying physiological diseases). The legislature's decision can readily be construed as a rational determination that the risks associated with minors' short-term use of the Treatment Protocols to treat precocious puberty are warranted, while the risks associated with minors' long-term (and often permanent)[29] use of the Treatment Protocols for gender dysphoria are not.

**4. Difference in Intent**

Finally, the legislature's decision to ban the Treatment Protocols solely for certain purposes is warranted by the fact that the Treatment Protocols are permitted for those who seek to align their bodies with the development they would undergo without being in a diseased or disordered state, but not for those who seek to force their bodies out of alignment with such development. When used to treat endocrine disorders, the Treatment Protocols bring the patient's body back into the hormonal states they would have been in but for the disorder. *See* Dkt. No. 86-2 at 12. When used

---

[28] While there is potential for this infertility to be transient, there appears to be scant information concerning the impact of the long-term use of puberty blockers. *See* Dkt. No. 86-2 at 20, n.5.

[29] *See* Dkt. 86-2 at 26 (recognizing that the use of puberty blockers has altered natural desistance rates, such that puberty blockers, rather than operating as a "pause button," are instead a "pathway towards future sterilizing surgeries").

to treat precocious puberty, the Treatment Protocols allow the patient's body to go through puberty at the appropriate time, rather than at an unhealthy time. Dkt. No. 86-1 at 105. When used to treat a disorder of sexual development, the Treatment Protocols are used to correct a diagnosable condition that occurred "on the way to binary sex development." Dkt. No. 86-2 at 9. When, however, the Treatment Protocols are used to treat gender dysphoria, they have the effect of pushing the body out of alignment with the natural developmental process to permit the individual's cosmetic appearance to align with his or her perception. *See* Dkt. No. 86-1 at 36. Plaintiffs themselves acknowledge that the goal of the Treatment Protocols is not to cure the state of being transgendered. *See* Dkt. No. 6 at 8 ("Being transgender is not itself a condition to be cured."); Dkt. No. 6-2 at 11 ("[B]eing transgender or gender nonconforming is not a medical condition or pathology to be treated."). *Accord* Dkt. No. 86-3 at 7 ("[I]dentifying as transgender . . . is not a pathological condition (i.e., it is not caused by or considered to be a disease."). The legislature's decision to permit minors to have access to the Treatment Protocols for medical disorders that can be cured or corrected, but not to permit those same protocols (with greater associated risk) to treat a condition for which no "cure" is sought, is a rational one.

In sum, "states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders." *Jensen*, 603 F.3d at 1198. Where there is robust debate concerning whether that interest warrants authorizing a particular medical procedure for a minor child, the debate is best left in the hands of the legislature. Judicial deference is especially appropriate where "medical and scientific uncertainty" exists. *Gonzalez v. Carhart*, 550 U.S. 124, 163 (2007). It is certainly not the judiciary's role to cut into that thoughtful debate and decree that

one side has the right of it, and the Court declines Plaintiffs' invitation to make such a decree.[30] As evidenced by the ongoing debate on this issue, Plaintiffs stand little chance of prevailing on their claim under the rational basis standard, and their motion for injunctive relief is therefore DENIED.

**CONCLUSION**

As to equal protection, SB 613 is not an outright ban on gender affirming care. Nor is it a bill that has the intent or effect of enforcing stereotypical gender norms or discriminating against those who do not conform to those norms. Instead, SB 613 requires only that, to the extent an individual desires to utilize certain physiological procedures to treat the psychological condition of gender dysphoria, he or she must wait until a certain age to do so. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) (recognizing that states "may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest"). This permissible, age-based restriction is subject only to rational basis review, which is easily satisfied by at least the four alternative grounds identified by the Court in Section VI.B., *supra*. Given the state of the record, the Court concludes that Plaintiffs have failed to establish that they are likely to prevail on their claim that there is no rational basis for the legitimate, age-based distinction made by the legislature.

As to substantive due process, SB 613 is rationally related to legitimate state interests because it regulates parental decision-making as to the Treatment Protocols based on the

[30] The Court's determination that the legislature has a rational basis for the exercise of caution in this realm should not be interpreted as a lack of concern for Plaintiffs or any minor experiencing real psychological suffering. It should be apparent there is deep concern for the well-being of the children in this state, such that the legislature has determined caution is warranted given the magnitude of risks involved and the lack of medical and scientific evidence to support the would-be experimental treatment of gender dysphoria by use of the Treatment Protocols.

legislature's interests in protecting children, public health, and integrity of the medical profession. This an area in which medical and policy debate is unfolding and the Oklahoma Legislature can rationally take the side of caution before permitting irreversible medical treatments of its children. As the Eleventh Circuit explained:

> This case revolves around an issue that is surely of the utmost importance to all of the parties involved: the safety and well-being of the children of [our state]. But it is complicated by the fact that there is a strong disagreement between the parties over what is best for those children. Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action.

*Eknes-Tucker*, 80 F.4th at 1231. Plaintiffs have not demonstrated a likelihood of success on the merits of their substantive due process claim.

Because Plaintiffs have failed to show a likelihood of success on the merits of each of their constitutional claims, their request for injunctive relief must be denied. *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021) (recognizing that where the failure to satisfy one requisite factor for obtaining preliminary injunctive relief is dispositive, a court "need not consider the other factors").

IT IS THEREFORE ORDERED that Plaintiffs' motion for preliminary injunction [Dkt. No. 5] is DENIED.

Dated this 5th day of October 2023.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

**PETER POE, *et al.*,**

**Plaintiffs,**

**v.**

**GENTNER DRUMMOND, *et al.*,**

**Defendants.**

**Case No. 23-CV-177-JFH-SH**

**OPINION AND ORDER**

Before the Court is a motion for preliminary injunction ("Motion") filed by Plaintiffs Benjamin, Bethany, and Brandon Boe; Donna and Daphne Doe; Lauren and Lydia Loe; Paula, Patrick, and Peter Poe; Rachel, Richard, and Ryan Roe, and Shauna Lawlis ("Plaintiffs"). Dkt. No. 5. Defendants oppose the Motion.[1] For the reasons stated herein, the Motion is DENIED.

**BACKGROUND**

On September 29, 2022, the Oklahoma State Legislature enacted Senate Bill 3 ("SB 3"), conditionally appropriating $39.4 million to the University Hospitals Authority "for the construction and equipping of facilities designed to expand the capacity of behavioral health care" for pediatric patients. S.B. 3, 58th Leg., 2nd Ex. Sess. (Okla. 2022). The appropriation was subject to the condition that the University Hospitals Authority not budget or expend any appropriated funds for the benefit of any facility performing "gender reassignment medical treatment" on patients under the age of 18. *Id.* In October 2022, OU Medicine issued a statement indicating that

[1] In responding to the complaint and preliminary injunction motion, Defendants have separated themselves into two subgroups: (1) OU Medicine, Inc. ("OU Medicine") and Dr. Richard Lofgren in his official capacity as President and Chief Executive Officer of OU Health ("Dr. Lofgren") (collectively the "OU Defendants"); and (2) the remaining defendants (collectively the "State Defendants"). Each subgroup filed a separate response to the Motion. Dkt. No. 85; Dkt. No. 86.

it had "ceased hormone-related prescription therapies and surgical procedures for gender affirming services on patients under the age of 18" because of SB 3 (the "SB 3 Policy"). Dkt. No. 2 at 26.[2]

On May 1, 2023, the Oklahoma State Legislature enacted Senate Bill 613 ("SB 613" or the "Act"), codifying that a healthcare provider "shall not knowingly provide gender transition procedures to any child." 63 O.S. § 2607.1(B). SB 613 defined "gender transition procedures" as "medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," including "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id.* at § 2607.1(A)(2)(a).[3] Under SB 613, a minor receiving puberty-blocking drugs ("puberty blockers") or cross-sex hormones at the time of the law's enactment may continue receiving such drugs or hormones for a period of six (6) months for the sole purpose of "gradually decreasing and discontinuing" their use. *Id.* at § 2607.1(A)(2)(b)(7). Healthcare providers who administer Treatment Protocols to minors in violation of SB 613 may face adverse proceedings by their professional licensing boards and may be subject to criminal and civil penalties. *Id.* at § 2607.1(D)-(F).

On May 2, 2023, Plaintiffs—five transgender youth who are receiving Treatment Protocols ("Minor Plaintiffs"),[4] their parents and legal guardians ("Parent Plaintiffs"), and one healthcare

---

[2] All record citations use ECF pagination.

[3] Referred to collectively as the "Treatment Protocols."

[4] Brandon Boe is taking cross-sex hormones. Dkt. No. 6-9 at 4. Daphne Doe is taking puberty blockers and cross-sex hormones. Dkt. No. 6-7 at 4. Lydia Loe is taking cross-sex hormones.

provider ("Provider Plaintiff")—filed a complaint seeking declaratory and injunctive relief. Dkt. No. 2. Plaintiffs allege that SB 613 violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates based on sex and transgender status. *Id.* at 48-53. Parent Plaintiffs also allege that SB 613 violates the Due Process Clause of the Fourteenth Amendment because it limits their fundamental right to seek and follow medical advice for their children. *Id.* at 56-57.

Four of the five Minor Plaintiffs received Treatment Protocols through OU Medicine before the enactment of SB 3. These Plaintiffs ("OU Minor Plaintiffs") and their parents and guardians (collectively, "OU Plaintiffs") also challenge the SB 3 Policy. *Id.* at 53-56, 58-61. OU Minor Plaintiffs allege that, like SB 613, the SB 3 Policy violates the Equal Protection Clause because it discriminates against them based on sex and transgender status. *Id.* at 53-56. OU Plaintiffs collectively allege that the SB 3 Policy violates the nondiscrimination provision of the Affordable Care Act ("ACA"). *Id.* at 58-61; *see* 42 U.S.C. § 18116.[5]

In the instant Motion, Plaintiffs seek to enjoin the enforcement of SB 613 on the equal protection and due process grounds set forth in their complaint. Dkt. No. 6.

---

Dkt. No. 6-11 at 4. Peter Poe is taking puberty blockers. Dkt. No. 6-5 at 3. Ryan Roe is taking puberty blockers. Dkt. No. 6-14 at 4.

[5] Although the heading for Plaintiffs' fourth claim indicates that it is brought by OU Plaintiffs [Dkt. No. 2 at 58], the complaint includes additional allegations pertaining to Provider Plaintiff [*Id.* at 60]. Specifically, Plaintiffs allege that: (1) Provider Plaintiff is "a recipient of federal financial assistance and therefore subject to [the ACA's] nondiscrimination mandate"; and (2) "[i]t is impossible for the [Provider] Plaintiff to continue to comply with her obligations under [the ACA] and also comply with the restrictions imposed by [the] SB 3 Policy." *Id.* Due to the inconsistency, it is not clear whether Provider Plaintiff is also asserting a claim under the ACA.

## AUTHORITY AND ANALYSIS

### I. Jurisdiction

A federal court may issue injunctive relief if it has subject matter jurisdiction over the claim and personal jurisdiction over the parties. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007); *Thomas v. Bolls*, No. 18-CV-00692-GPG, 2018 WL 9489245, at *2 (D. Colo. May 16, 2018) (citing *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)).

#### A. Subject Matter Jurisdiction

Federal courts possess subject matter jurisdiction for all claims "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "A case arises under federal law if its well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (internal quotation marks and citation omitted). Here, Plaintiffs' claims under 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment to the United States Constitution [Dkt. No. 2 at 48-57] and under Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 [*id.* at 58-61] satisfy the conditions necessary for jurisdiction under § 1331.

#### B. Personal Jurisdiction

"To exercise jurisdiction in harmony with due process, defendants must have minimum contacts with the forum state, such that having to defend a lawsuit there would not offend traditional notions of fair play and substantial justice." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (brackets and internal quotation marks omitted) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)). Plaintiffs state that a substantial part of the events giving rise to their claims occurred in this district. Dkt. No. 2 at 9. Plaintiffs

also state that Defendants have ties to Oklahoma through their status as members of three groups: state officials or agencies in Oklahoma; officers, board members, or trustees of those state agencies sued in their official capacity; and officers or board members of several Oklahoma state medical licensing boards. *Id.* at 11-16. This is sufficient for a prima facie showing of personal jurisdiction.

**II. Standing**

"Article III of the Constitution permits federal courts to decide only 'Cases' or 'Controversies.' To establish a case or controversy, a plaintiff must possess standing to sue." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (internal citations and quotation marks omitted). "[T]o demonstrate standing, a plaintiff must show: (1) that he or she has suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 898 (10th Cir. 2016) (citations and quotation marks omitted). "The injury alleged must be concrete and particularized, and the threat of that injury must be actual and imminent, not conjectural or hypothetical." *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (citations and quotation marks omitted). Here, Plaintiffs' alleged injury in fact is their actual and imminent loss of access to the Treatment Protocols, and the risk of disciplinary action to Provider Plaintiff by her licensing board or the courts. These imminent threats are fairly traceable to SB 613 and would be redressed by a decision in Plaintiffs' favor on the constitutionality of SB 613. Plaintiffs have made a prima facie showing of standing to assert a facial challenge to SB 613.

**III. Plaintiffs' Preliminary Injunction Burden**

A preliminary injunction is "an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (citation and

quotation marks omitted). *See also Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). A court may only grant preliminary injunctive relief, pursuant to Federal Rule of Civil Procedure 65, if plaintiffs meet their burden to demonstrate that: (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) their threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).[6] However, the likelihood-of-success inquiry is often dispositive in the case of a constitutional challenge.

At the outset, it must be observed that, "every time a court recognizes an asserted right as a fundamental right protected by the Constitution, the court, 'to a great extent, place[s] the matter outside the arena of public debate and legislative action.'" *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1220 (11th Cir. 2023) (alteration in original) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). For this reason, "the Supreme Court has instructed courts addressing substantive due process claims to 'engage[] in a careful analysis of the history of the right at issue' and 'be "reluctant" to recognize rights that are not mentioned in the Constitution.'" *Id.* (quoting *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2246-47 (2022)). This highlights an initial obstacle to Plaintiffs' requested relief. That is, Plaintiffs do not argue that the original fixed meaning of either the due process guarantee or the equal protection guarantee covers their claims. When faced with a similar challenge to bans on procedures for minors in Kentucky and Tennessee,

---

[6] Although this case involves challenges to both SB 613 and the SB 3 Policy, Plaintiffs only seek to enjoin the enforcement of SB 613. Dkt. No. 2 at 48-61; Dkt. No. 5 at 1; Dkt. No. 6 at 31. Therefore, the Court will consider the factors set forth above as they pertain to Plaintiffs' SB 613 claims only.

the Sixth Circuit noted the plaintiffs' lack of historical analysis of these constitutional guarantees and discerned:

> That prompts the question whether the people of this country ever agreed to remove debates of this sort—over the use of innovative, and potentially irreversible, medical treatments for children—from the conventional place for dealing with new norms, new drugs, and new public health concerns: the democratic process. Life-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy by construing a largely unamendable Constitution to occupy the field.

*L.W., by and through Williams v. Skrmetti*, --- F.4th ---, 2023 WL 6321688, at *5 (6th Cir. Sept. 28, 2023).

Plaintiffs face another challenge in that they seek to extend constitutional guarantees into new territory. The *Skrmetti* court addressed this as well:

> There is nothing wrong with that, to be certain. But this reality does suggest that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing. Constitutionalizing new areas of American life is not something federal courts should do lightly, particularly when "the States are currently engaged in serious, thoughtful" debates about the issue.

*Id.* at *6 (quoting *Glucksberg*, 521 U.S. at 719).

These two concerns highlighted in *Skrmetti* are also present here. Plaintiffs' burden to establish that the purported rights at issue fall within the original fixed meaning of constitutional guarantees—or are of the kind that support newly recognized constitutional guarantees (despite ongoing, vigorous public debate)—is a heavy one. Understanding the significant nature of this burden, the Court now turns to the alleged rights Plaintiffs claim are violated by SB 613.

## IV. Plaintiffs' Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This clause "seeks to ensure that any classifications the law makes are made without respect to persons, that like cases are treated alike, [and] that those who appear similarly situated

are not treated differently without, at the very least, a rational reason for the difference." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012) (citation and quotation marks omitted).

To establish a violation of the Equal Protection Clause, a plaintiff must first show that the state engaged in intentional discrimination in a manner that harmed the plaintiff. *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (recognizing that a party who asserts an equal protection violation "has the burden of proving the existence of purposeful discrimination causing an adverse effect" (citation and quotation marks omitted)). Intent can be established by either: (1) direct proof of a distinction between groups that is evident from the face of the law or other state action; or (2) circumstantial evidence that, despite being facially neutral, the state action was taken with the purpose of discriminating against a particular group. *See id.* (recognizing that intentional discrimination can be established through circumstantial evidence that "the plaintiff was treated differently from similarly situated persons who are alike in all relevant respects") (citations and quotation marks omitted); *SECSYS*, 666 F.3d at 686 (detailing "several forms" of intentional discrimination that, if established, require an inquiry into whether the state's intentional classification is permissible).

Once a plaintiff demonstrates he or she was adversely affected by the state's intentional discrimination, the Court turns to the question of "whether the state's intentional decision to discriminate can be justified by reference to some upright government purpose." *SECSYS*, 666 F.3d at 686. The Equal Protection Clause does not prohibit a state from making *any* distinctions between people; instead, it requires that, to the extent meaningful distinctions are made between groups of individuals, it can nevertheless be said that the state action "treat[s] similarly situated persons similarly." *Id.* (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-40

(1985)) (recognizing that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").

The question of whether a state's classification is justified by reference to an upright purpose depends upon the classification at issue. If the government action concerns fundamental rights or distinguishes between individuals based upon a suspect classification—such as race or national origin—the state action will be subject to strict scrutiny and will be upheld only if it is "narrowly tailored to further a compelling government interest." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (citing *Goetz v. Glickman*, 149 F.3d 1131, 1140 (10th Cir. 1998)). State action that distinguishes among groups based on "quasi-suspect" classifications, such as sex, are subject to an intermediate standard of review and will be upheld so long as the discriminatory means serves "important governmental objectives" and is "substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 516 (1996) (citation and quotation marks omitted). Where the state action does not implicate a fundamental right or draw a distinction based upon a suspect class, rational basis scrutiny applies, and the Court's inquiry will be directed to whether the classification is rationally related to a legitimate purpose. *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (10th Cir. 2008). Given the different standards of scrutiny that apply to the different types of distinctions that a legislature may draw, the Court must take care to accurately identify the distinction that the Oklahoma Legislature made in SB 613.[7]

---

[7] In a sense, there is a level of overlap between Plaintiffs' due process and equal protection claims. "[I]f a classification impinge[s] upon the exercise of a fundamental right, the Equal Protection Clause requires the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014) (citation and quotation marks omitted) (alteration in original); *see Fowler v. Stitt*, No. 22-CV-115-JWB-SH, 2023 WL 4010694, at *18 (N.D. Okla. June 8, 2023).

The Court concludes that SB 613 restricts particular medical procedures for individuals under a particular age. The evidence is apparent from the face of the Act itself, which is not a wholesale prohibition on gender affirming care for transgender individuals but is instead a legislative determination that only adults may have access to gender affirming care through the Treatment Protocols.

**A. Age Classification**

SB 613 does not prevent any adult—male or female—from undergoing Treatment Protocols in connection with gender affirming care; it only prevents minors from doing so. *See Eknes-Tucker*, 80 F.4th at 1227 (agreeing that Alabama's similar act "is best understood as a law that targets specific medical interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause"). Facially, the distinction made is between adults who are ready to make life-altering decisions and minors who, at least in the eyes of the legislature, are not. This is precisely the type of age-based legislative decision that courts have long accepted as being subject to rational basis review. *See Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (concluding that "classifications based on youth—like those based on age in general—do not trigger heightened scrutiny for equal protection purposes"); *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242, 1266 (M.D. Pa. 1975) (recognizing that "youths under the age of eighteen have traditionally been regulated and restricted by American law in many ways," including through limitations on their ability to enter into contracts, purchase certain goods, work at certain jobs, and be held liable for criminal behavior), *aff'd*, 535 F.2d 1245 (3d Cir. 1976).

**B. Sex Classification**

The Court rejects Plaintiffs' argument that the Act is discriminatory on its face because it makes distinctions in "explicit gendered terms." Dkt. No. 6 at 18-19. True, SB 613 uses terms such as "sex" and "gender" to discuss the Treatment Protocols, but the use of those terms is due to the fact the Act itself concerns "medical or surgical services performed for the purpose of attempting to affirm [a] minor's perception of his or her gender or biological sex . . . ." 63 O.S. § 2607.1(A)(2). The use of these "gendered terms" reflects the nature of the procedure being regulated, not an intention to discriminate between people of different sexes. *See Eknes-Tucker*, 80 F.4th at 1228 (rejecting argument that a similar statutory classification was sex-based where "the statute refer[red] to sex only because the medical procedures that it regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based"). Indeed, it would be difficult, if not impossible, for the legislature to regulate this area without using the challenged terms. *See Skrmetti*, 2023 WL 6321688, at *14 (rejecting the argument that the use of the word "sex" in Kentucky and Tennessee statutes banning medical procedures similar to the Treatment Protocols for minors constituted sex discrimination, explaining, "The Acts mention the word 'sex,' true. But how could they not? The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures.").

Rather than applying a litmus test in which the presence of the word "sex" or "gender" necessitates intermediate scrutiny, the Court must look to the language of the statute and examine whether SB 613 uses gendered terms to distinguish between groups of people. The Court finds that it does not. Where the Act uses gendered terms, it does so to identify the procedures at issue.

As noted, SB 613 uses the terms "gender" and "sex" when articulating the "gender transition procedures" that are prohibited for minors. *See* 63 O.S. § 2607.1(A)(2)(a). It likewise provides specific examples of the procedures that individuals cannot undergo before reaching the age of majority, including "surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex" and drugs that "promote the development of feminizing or masculinizing features consistent with the opposite biological sex." *Id.*

The Act does not use sex as a means to distinguish between groups—treatments allowed by SB 613 are allowed for *all* minors, regardless of sex. *Id.* at § 2607.1(A)(2)(b). Similarly, *all* minors, regardless of sex, are prohibited from undergoing certain procedures for the purpose of gender transition before reaching the age of majority. 63 O.S. § 2607.1(B) ("A health care provider shall not knowingly provide gender transition procedures to any child."); *id.* at § 2607.1(A)(1) (defining a "child" as "*any person* under the age of eighteen (18) years of age") (emphasis added). So far, they are equal. *See Eknes-Tucker*, 80 F.4th at 1228 (holding that the challenged statute did "not establish an unequal regime for males and females" where the law restricted certain treatments for treating gender discordance "for *all* minors").

Plaintiffs argue that, notwithstanding the facially neutral application, SB 613 has the effect of discriminating based on sex because it "enforces sex stereotypes and gender conformity." Dkt. No. 6 at 19-20. They point to *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020), where the Supreme Court held that an employer violates Title VII when it takes an adverse employment action against an individual because that person is transgender. *Accord Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) (recognizing that "transgender discrimination . . . is

discrimination 'because of sex' prohibited under Title VII"). According to Plaintiffs, the reasoning of *Bostock* equally applies to equal protection claims.

At one point, it could have appeared that one circuit might agree with Plaintiffs' argument. *See Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (recognizing that discrimination against a transgender individual because of his or her gender non-conformity is gender stereotyping prohibited by Title VII and the Equal Protection Clause). However, the Eleventh Circuit recently removed any belief that could be so. *See Eknes-Tucker*, 80 F.4th at 1228-29 (rejecting application of *Bostock* and *Brumby* in upholding Alabama's similar ban on gender affirming procedures for minors, explaining that neither of those cases dealt with the Equal Protection Clause as applied to laws regulating medical treatments). More importantly, the Tenth Circuit has not accepted Plaintiffs' theory about the application of *Bostock* here.

Absent binding precedent to the contrary, this Court will not extend the reasoning of *Bostock*—a Title VII case concerning an adverse employment action—to this case, which concerns a materially different governing law, materially different language, and materially different facts. *See id.* at 1229 (concluding that because *Bostock* "concerned a different law (with materially different language) and a different factual context," that decision bore "minimal relevance" to the question of whether the statutory prohibition against certain gender transition procedures violated the Equal Protection Clause). *See also Skrmetti*, 2023 WL 6321688, at *16-17 (contrasting the facts in *Bostock*, where adult employees were "fired . . . because their behavior did not match stereotypes of how adult men or women dress or behave," with the laws at issue, which "do not deny anyone general healthcare treatment based on any such stereotypes[, but] merely deny the same medical treatments to all children facing gender dysphoria if they are 17 or under"); *Students for Fair Admissions v. Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring)

(comparing the text of Title VII with the Equal Protection Clause and concluding that the suggestion that "such differently worded provisions should mean the same thing is implausible on its face").

Even if this Court were to hold that classifications based upon "gender conformity" (or lack thereof) constitute sex-based classifications under the Equal Protection Clause, this would not advance Plaintiffs' claims. This is not a case where a state action is being taken to further a particular gender stereotype or prohibit conduct that contravenes that stereotype. *See Eknes-Tucker*, 80 F.4th at 1229 (concluding that rational basis scrutiny applied to a law targeting certain medical interventions associated with gender dysphoria, as that law did not "further any particular gender stereotype"); *Skrmetti*, 2023 WL 6321688, at *18 ("Recognizing and respecting biological sex differences does not amount to stereotyping . . . .") Instead, this is a case where the Oklahoma Legislature has prohibited *all* minors from using certain medical procedures to treat gender dysphoria. The law does not further gender stereotypes by taking adverse actions against those who fail to conform to them; it simply requires that adolescents reach the age of majority before undergoing certain medical interventions to treat the psychological condition of gender dysphoria.

**C. Transgender Status Classification**

Plaintiffs take the position that, even if SB 613 does not distinguish on the basis of gender (or conformance with gender norms), the statute is nevertheless subject to heightened scrutiny because it treats transgender individuals differently than other individuals. The Court disagrees. First, the Supreme Court has not recognized transgender status as a suspect class.[8] In addition, the

[8] "The bar for recognizing a new suspect class is a high one. The Supreme Court 'has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so.'" *Skrmetti*, 2023 WL 6321688, at *18 (quoting *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015)).

Tenth Circuit "has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims," and has analyzed such claims under the rational basis standard. *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015).[9] *See also Skrmetti*, 2023 WL 6321688, at *18-19 (discussing the considerations the Supreme Court has highlighted when recognizing a new suspect class and explaining why transgender status is not likely to qualify under such considerations). Furthermore, even if heightened scrutiny were to apply to classifications based on transgender status, the Court would not find that SB 613 makes such a classification.

The Court is not persuaded by Plaintiffs' argument that SB 613 is part of a "larger legislative strategy to discriminate against transgender people, including by restricting access to gender-affirming care for people of all ages" [Dkt. No. 6 at 21-22 & n.3] for three reasons. First, although Plaintiffs suggest that 15 bills were introduced as part of a legislature-wide strategy to discriminate against transgender people, they cite only two: HB 1011 and SB 345. *Id.* Neither of these bills received a floor vote,[10] which undercuts Plaintiffs' claims; if these bills were components of an overarching discriminatory strategy, it seems unlikely that they would have died in committee. Second, Plaintiffs provide no evidence for their claim that SB 613 was one of 15 similar bills. The Court declines to further inquire into Oklahoma's legislative records concerning the nature and purpose of these purported bills when Plaintiffs apparently did not believe the endeavor to be worth their own time. It would seem likely, however, that had any bills made more

[9] Unpublished appellate decisions are not precedential but may be cited for their persuasive value. *See* 10th Cir. R. 32.1; Fed. R. App. P. 32.1.

[10] *See* http://www.oklegislature.gov/BillInfo.aspx?Bill=hb1011&Session=2300 and http://www.oklegislature.gov/BillInfo.aspx?Bill=sb345&Session=2300. The Court takes judicial notice of these governmental records. *See High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019).

progress than HB 1011 or SB 345, Plaintiffs would have cited them. Third, one of the bills referenced by Plaintiffs, HB 1011, sought to ban Treatment Protocols for anyone under the age of 21, rather than under the age of 18. The legislature's decision to enact SB 613, with its lower age restriction, undermines Plaintiffs' argument that the legislature was operating with the goal of invidious discrimination against all transgender individuals. Plaintiffs' theory is simply insufficient to establish a likelihood that they will prove that SB 613 was part of an impermissible scheme to discriminate against transgender people.

The Court likewise rejects Plaintiffs' claim that SB 613 discriminates against transgender individuals because it "singles out medical care that only transgender people need or seek." Dkt. No. 6 at 18. Although the statute does restrict a specific course of treatment that only transgender individuals would normally request, that fact alone does not render the statute invalid. As the Supreme Court recently recognized when addressing whether a state's regulation of abortion was a sex-based classification, the "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S.Ct. at 2245-46 (alteration in original) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). Just as the "goal of preventing abortion does not constitute invidiously discriminatory animus against women," *id.* at 2246, the goal of prohibiting minors from accessing a course of treatment that "only transgender people need or seek" [Dkt. No. 6 at 18] does not itself constitute discriminatory animus against transgender people. Where, as here, there is no evidence of pretext for discrimination, SB 613's classification scheme does not trigger a heightened standard of review. *See Eknes-Tucker*, 80 F.4th at 1230 (holding that, because there was no evidence that the regulation was pretext for discrimination against transgender individuals, the ban's "relationship

to transgender status [did] not warrant heightened scrutiny"). Accordingly, the legislature's classification scheme will be upheld so long as it survives rational basis review. *See* Section VI, *infra*.

**V. Parent Plaintiffs' Substantive Due Process Claim**

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Two types of substantive rights have been recognized within the Due Process Clause: enumerated rights, set out in the first eight Amendments, and implied rights, "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*, 152 S.Ct. at 2246. This case involves implied rights. *See Fowler v. Stitt*, --- F. Supp. 3d ---, 2023 WL 4010694, at *8 (N.D. Okla. June 8, 2023) ("The Constitution makes no express reference to . . . one's gender, nor does it reference a right to be treated consistent with one's gender identity. Thus, Plaintiffs must show that the right is somehow implicit in the constitutional text . . . ."), *appeal docketed*, No. 23-5080 (10th Cir. July 7, 2023).

An implied rights substantive due process analysis generally requires two steps. The Court must first "carefully describe the asserted fundamental liberty interest," then "decide whether the asserted liberty interest, once described, is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008) (citation and quotation marks omitted).[11]

---

[11] A second test, referred to as the "shocks the conscience" test, is sometimes appropriate for a substantive due process case (usually, though not exclusively, in cases involving challenged actions by the executive branch of government). *Seegmiller*, 528 F.3d at 767. "Conduct that shocks the judicial conscience . . . is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Id.* (quoting

**A. Description of the Interest**

"That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected . . . ." *Glucksberg*, 521 U.S. at 727 (1997) (first citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 852 (1992); and then citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-35 (1973)). "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-26 (1985)). The Supreme Court emphasized the need for precise framing in *Glucksberg*, explaining:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [judiciary].

521 U.S. at 720 (internal citations and quotation marks omitted). Rights framed as "[v]ague generalities . . . will not suffice." *Chavez v. Martinez,* 538 U.S. 760, 776 (2003).

*Glucksberg* demonstrated the type of the precise framing required. In that case, terminally ill patients and treating physicians who challenged a state law banning physician-assisted suicide

---

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). The Tenth Circuit has cautioned that "[c]ourts should not unilaterally choose to consider only one or the other" test. *Id.* at 769. Here, no party raised the "shocks the conscience" test, and the Court does not believe it to be appropriate under the facts of this case. "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense," *id.* at 767 (citation and quotation marks omitted), and nothing in the record gives the Court concern that the ordinary legislative process through which SB 613 was codified would qualify as egregious. Therefore, the Court focuses on the "fundamental liberty" test.

argued that "our liberty jurisprudence, and the broad, individualistic principles it reflects, protect[ed] the liberty of competent, terminally ill adults to make end-of-life decisions free of undue government interference." 521 U.S. at 724 (citation and quotation marks omitted). The Court narrowed the issue significantly, framing the question presented as "whether the protections of the Due Process Clause include a right to commit suicide with another's assistance." *Id.*

Similarly, "[a]lthough many of the Court's 'privacy' decisions have implicated sexual matters, the Court has never indicated that the mere fact that an activity is sexual and private entitles it to protection as a fundamental right." *Seegmiller*, 528 F.3d at 770 (quoting *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1236 (11th Cir. 2004)). Rather than considering broad, generalized rights, courts have examined "more narrowly defined right[s]" such as that "of married couples to obtain and use contraceptives." *Id.* (citing *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965)).[12]

The direction to district courts is clear: an asserted implied right must be narrowly and precisely expressed. Thus, "our first job in assessing a substantive due process claim is to make a 'careful description' of the allegedly violated right." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1078 (10th Cir. 2015) (quoting *Glucksberg*, 521 U.S. at 721). Here, the parties frame the disputed liberty interest differently. Plaintiffs describe the asserted right as "the fundamental right[] of parents to seek appropriate medical care for their minor children." Dkt. No. 6 at 25. Defendants describe the asserted right as a "fundamental right for parents to choose for their

---

[12] Even when distinguishing *Glucksberg*, the Supreme Court structured the question presented based on the action that plaintiffs wanted to perform rather than the characteristics of the plaintiffs. *See Obergefell v. Hodges*, 576 U.S. 644, 671 (2015). More recently, the Court reiterated the *Glucksberg* standard in *Dobbs*, directing lower courts to "exercise the utmost care" and avoid "freewheeling judicial policymaking" in structuring substantive due process inquiries. 142 S.Ct. at 2247-48.

children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition." Dkt. No. 86 at 35. The Court examines each.

Federal precedent "historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Parents are presumed to act in the best interest of their children. *Id.* at 602-03 ("That some parents may at times be acting against the interests of their children . . . creates a basis for caution[] but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests.") (internal citation and quotation marks omitted).

Because "[t]he law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," *id.* at 602, "the interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by [the] Court," *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). Parental obligations toward children include the "'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602. "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* at 603. "Nonetheless, [the Court has] recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.*

Although the Tenth Circuit has "never specifically recognized or defined the scope of a parent's right to direct her child's medical care" it has expressed confidence in the position that "a parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right to make decisions about the child's medical care." *PJ ex rel. Jensen v.*

*Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (citation and quotation omitted). At the same time, "parental rights, including any right to direct a child's medical care, are not absolute." *Id.* at 1197-98 (first citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); and then citing *Parham*, 442 U.S. at 604). "Indeed, states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders." *Id.* (citing *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 (1982)).

A close examination of *Parham* and *Troxel* demonstrates that they do not support the conclusion that there is a broad, general right of the type asserted by Plaintiffs. First, the *Parham* decision involved procedural due process, which has a far less fraught history than its substantive cousin. *See* 442 U.S. at 620 n.23. The question at issue in *Parham* was whether minors had a due process right to greater procedural safeguards—e.g., a judicial hearing—before their parents could commit them to a mental health institution. *Eknes-Tucker*, 80 F.4th at 1222-23 (citing *Parham*, 442 U.S. at 610). "*Parham* was concerned about the *procedures* a state must afford a child prior to institutionalization when the parent believes such treatment—*which is not only lawful but provided by the state itself*—is necessary." *Id.* at 1223 (emphasis added). Because "*Parham* does not at all suggest that parents have a fundamental right to direct a particular medical treatment for their child that is prohibited by state law," it "offers no support" for Plaintiffs' substantive due process claim. *Id.*

Next, the *Troxel* case involved a fractured Court. 530 U.S. at 60. Four justices joined the plurality opinion, two justices concurred in judgment only, and one of those two noted that the decision did not "call for turning any fresh furrows in the 'treacherous field' of substantive due process." *Id.* at 76 (Souter, J., concurring in judgment); *see also id.* at 80 (Thomas, J., concurring in judgment). One of the dissenting justices noted that "[d]espite this Court's repeated recognition

of [the] significant parental liberty interests, these interests have never been seen to be without limits." *Id.* at 87 (Stevens, J., dissenting). Another emphasized that "[o]nly three holdings of [the Supreme] Court rest in whole or in part upon a substantive constitutional right of parents to direct the upbringing of their children—two of them from an era rich in substantive due process holdings that have since been repudiated." *Id.* at 92 (Scalia, J., dissenting). Further, *Troxel* did not involve parental rights with respect to making medical decisions; it involved parental rights with respect to decision-making concerning the visitation of grandparents. *Id*. at 61.

Finally, the Tenth Circuit has avoided specificity, instead directing that, "[w]hen a child's life or health is endangered by her parents' decisions, in some circumstances a state may intervene without violating the parents' constitutional rights." *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (quoting *Jensen*, 603 F.3d at 1198).

This analysis leads to the inevitable conclusion that Plaintiffs' rights formulation has the same overbreadth issue as the *Glucksberg* plaintiffs' rights formulation. Here, Parent Plaintiffs allege that Oklahoma's ban on the Treatment Protocols violates their right to seek appropriate medical care for their minor children. Dkt. No. 6 at 25. In *Glucksberg*, plaintiffs alleged that Washington's ban on physician-assisted suicide violated their right to "make end-of-life decisions free of undue government interference." 521 U.S. at 724. The Supreme Court rejected this wide formulation, instead narrowing the question presented to whether individuals had an affirmative right to perform a specific activity: committing suicide with another's assistance. *Id.*

"Guideposts for responsible decisionmaking" regarding substantive due process are "scarce and open-ended" in the best of circumstances. *Collins*, 503 U.S. at 125. Guideposts regarding parental medical decisionmaking are even more nebulous. "In interpreting what is meant by the Fourteenth Amendment's reference to 'liberty,' we must guard against the natural

human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs*, 142 S.Ct. at 2247. Thus, following the Supreme Court's direction to "exercise the utmost care" in carefully describing the asserted fundamental liberty interest, the Court concludes that Plaintiffs' rights formulation is too much of a "vague generality" to satisfy this first step.

Defendants' framing of the issue is consistent with the approach approved by the Supreme Court. They define the asserted right as "a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for the purposes of effectuating a gender transition." Dkt. No. 86 at 35. This follows the method of framing presented in *Glucksberg* and other substantive due process precedents. *See, e.g.*, 521 U.S. at 724; *Lawrence v. Texas*, 539 U.S. 558 (2003) (examining whether substantive due process includes the right for adults to perform consensual homosexual acts in private). *Accord Eknes-Tucker*, 80 F.4th at 1221, 1224 (emphasizing that "a substantive due process analysis must focus on the specific right asserted, rather than simply rely on a related general right," and framing the issue as a right to "treat [one's] children with transitioning medications subject to medically accepted standards") (alteration in original). The Court finds Defendants' definition is an appropriately careful description of the allegedly violated right.

**B. Historical Analysis**

Now that the Court has a definition for the allegedly infringed right, it must "examine whether the right at issue . . . is rooted in our Nation's history and tradition and whether it is an essential component of what we have described as 'ordered liberty.'" *Dobbs*, 142 S.Ct. at 2244. Plaintiffs have not provided any historical antecedents demonstrating that a right to the Treatment

Protocols is deeply rooted.[13] Plaintiffs have therefore failed to carry their burden of proving the liberty interest they seek is so fundamental that it must be protected through a heightened scrutiny analysis. *Seegmiller*, 528 F.3d at 770.

The Court's conclusion is harmonious with the conclusions of numerous courts "reject[ing] arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government."[14] *Abigail All. for Better Access to Dev'l Drugs v. von Eschenbach*, 495 F.3d 695, 710 (D.C. Cir. 2007) (en banc); *see also id.* at n.18 ("No circuit court has acceded to an affirmative access claim."). "While our longstanding traditions may give individuals a right to refuse treatment, there is no historical support for an affirmative right to specific treatments." *Skrmetti*, 2023 WL 6321688, at *9 (citing *Glucksberg*, 521 U.S. at 725-26). In fact, except for one district court in Texas in 1980,[15] "it appears that every court to consider the issue has rejected the argument that access to a specific treatment or specific provider . . . is a fundamental right protected by the Constitution." *Birchansky v. Clabaugh*, No. 417CV00209RGERAW, 2018 WL 10110860, at *18 (S.D. Iowa Oct. 17, 2018), *aff'd*, 955 F.3d

[13] Borrowing Defendants' phrasing, "The reason for this is simple: The treatments that they seek have only existed for a few decades." Dkt. No. 86 at 35 (citing Dkt. No. 6-16 at ¶ 28). As the Eleventh Circuit recently explained, "the earliest-recorded use of puberty blocking medication and cross-sex hormone treatment for purposes of treating the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century." *Eknes-Tucker*, 80 F.4th at 1220-21.

[14] Some of these cases involved various forms of executive action, such as practitioner licensing laws or patients seeking access to treatments that had issues in the FDA approval process. Here, SB 613 came about through legislative action. The executive action cases are pertinent because the key inquiry is whether the government (regardless of branch) infringed on constitutional rights. *Seegmiller*, 528 F.3d at 767 ("Although some precedential support exists for [an] executive versus legislative distinction, an overly rigid demarcation between the two lines of cases is neither warranted by existing case law nor helpful to the substantive analysis.").

[15] *Andrews v. Ballard*, 498 F. Supp. 1038 (S.D. Tex. 1980) (holding the constitutional right of privacy included a patient's right to obtain acupuncture treatment).

751 (8th Cir. 2020). *See also Nat'l Ass'n for Advan. of Psych. v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1050 (9th Cir. 2000) (holding that "substantive due process rights do not extend to the choice of type of treatment or of a particular health care provider."); *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993) (explaining that "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider"). And the Tenth Circuit reversed a trial court's holding that the constitutional right of privacy allowed patients to take "whatever treatment they wished regardless of whether the FDA regarded the medication as 'effective' or 'safe.'" *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980). The Sixth Circuit effectively summarized the issue:

> This country does not have a "deeply rooted" tradition of preventing governments from regulating the medical profession in general or certain treatments in particular, whether for adults or their children. Quite to the contrary in fact. State and federal governments have long played a critical role in regulating health and welfare, which explains why their efforts receive a strong presumption of validity. State governments have an abiding interest in protecting the integrity and ethics of the medical profession and preserving and promoting the welfare of the child. These interests give States broad power, even broad power to limit parental freedom when it comes to medical treatment.

*Skrmetti*, 2023 WL 6321688, at *7 (internal quotation marks and citations omitted).

In the case before this Court, Plaintiffs have not demonstrated a fundamental right for parents to choose for their children to use puberty blockers, cross-sex hormones, and surgeries for the purpose of effectuating a gender transition. "Absent a fundamental right, the state may regulate an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate state interest." *Seegmiller*, 528 F.3d at 771. Accordingly, rational basis review applies.

## VI. Rational Basis Review

Since both of Plaintiffs' constitutional claims call for rational basis review, the Court examines the two claims in tandem to determine whether Plaintiffs are likely to succeed in showing

that there is no rational basis for the restrictions in SB 613. As explained below, it is unlikely that Plaintiffs' claims will survive this level of scrutiny for numerous reasons, many of which are demonstrated by the profound debate concerning this very issue.

**A. Legislative Debate**

Where, as here, there is robust scientific and political debate concerning a significant public-policy question, a court should be loath to step in to end the debate and thereby suggest it is all-knowing. The record in this case amply demonstrates that there is no consensus in the medical field about the extent of the risks or the benefits of the Treatment Protocols. *See* Section VI.B., *infra*. Plaintiffs assert throughout their briefing that the Treatment Protocols for minors are not "experimental." While this is perhaps technically true, Plaintiffs' representations are misleading. "Not experimental" in this case does not translate to "proven" or "established."[16] Rather, Plaintiffs admit that experiments and scientific studies of the sort generally seen in the medical field *have not been done* in this area. Whether such experiments or studies could be done ethically is a topic of healthy debate between the parties' experts. *Compare* Dkt. No. 6-16 at 9, 16 *with* Dkt. No. 86-1 at 30, 132-33. Nonetheless, it is more accurate to state that the Treatment Protocols are not "experimental" only because the experimental phase has truly not yet begun.

The Court should not cut off this debate by declaring that only one side has all the answers in its corner. Instead, the "conventional place for dealing with new norms, new drugs, and new technologies [is] the democratic process," and "[l]ife-tenured federal judges should be wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy." *Skrmetti*, 2023 WL 6321688, at *5. When "Americans are engaged in an earnest and profound

---

[16] *See, e.g.*, Dkt. No. 132-1 at 10 ("Experiments test treatments by comparing two groups (or 'arms'), one that receives the treatment and one that does not. Because medicalized transition has not yet been tested with a two-group design, it has not yet passed the experimental stage.")

debate about the morality, legality, and practicality" of a life-altering medical intervention, courts are wise to "permit[] this debate to continue, as it should in a democratic society." *Glucksberg*, 521 U.S. at 735.[17] The Sixth Circuit succinctly applied this general rule to the issue at hand when it explained:

> Given the high stakes of these nascent policy deliberations—the long-term health of children facing gender dysphoria—sound government usually benefits from more rather than less debate, more rather than less input, more rather than less consideration of fair-minded policy approaches. To permit legislatures on one side of the debate to have their say while silencing legislatures on the other side of the debate under the Constitution does not further these goals. That is all the more critical in view of two realities looming over both cases—the concept of gender dysphoria as a medical condition is relatively new and the use of drug treatments that change or modify a child's sex characteristics is even more recent. Prohibiting citizens and legislatures from offering their perspectives on high-stakes medical policies, in which compassion for the child points in both directions, is not something life-tenured federal judges should do without a clear warrant in the Constitution.

*Skrmetti*, 2023 WL 6321688, at *6. The legislature in this case weighed in on one side of a nationwide dispute over how to balance the truth that parents generally can be expected to know what is best for their children against the competing reality that state governments have an abiding interest "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731, and "preserving and promoting the welfare of the child," *Schall v. Martin*, 467 U.S. 253, 265 (1984) (citation and quotation marks omitted).[18] The very existence of this dispute, and ongoing

---

[17] It is evident that the states are engaged in thoughtful debate over this issue. *See Skrmetti*, 2023 WL 6321688, at *6 (recognizing numerous state laws similar to those at issue restricting gender transition procedures for minors, as well as state laws providing various protections for those seeking treatment for gender dysphoria). The Sixth Circuit observed that most of this legislative activity has occurred within the last two years and that the "[f]ailure to allow these laws to go into effect would grind these all-over-the-map gears to halt." *Id.*

[18] "[I]t is well to remember that the most deeply rooted tradition in this country is that we look to democracy to answer pioneering public-policy questions, meaning that federal courts must resist the temptation to invoke an unenumerated guarantee to 'substitute' their views for those of legislatures." *Skrmetti*, 2023 WL 6321688, at *7 (citing *Dobbs*, 142 S.Ct. at 2277).

thoughtful debate, is independent evidence that Plaintiffs are unlikely to establish that there is no rational basis for the legislature's decision.

**B. Safeguarding Minors**

It is rational for the Oklahoma Legislature to regulate the Treatment Protocols for minors while the democratic process resolves ongoing questions of safety and efficacy. Courts have long recognized that states have a compelling interest in "safeguarding the physical and psychological well-being of [] minors." *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (*quoting Globe Newspaper*, 457 U.S. at 607). For this reason, the judiciary has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Id.*[19] Indeed, courts have upheld restrictions designed to protect and prevent minors from engaging in behaviors that are far less risky than the procedures banned by SB 613. *See e.g.*, *City of Dallas v. Stanglin*, 490 U.S. 19, 28 (1989) (upholding age restriction for dance halls based upon "the city's interest in promoting the welfare of teenagers").[20]

The Court could conclude that Plaintiffs' challenge to SB 613 is unlikely to succeed based on nothing more than its own rational speculation, should it choose to do so. *F.C.C. v. Beach*

---

[19] *See*, *e.g.*, *In re Hawley*, 606 N.W.2d 50, 53 (1999) (decision to charge 15 year old, but not his 13 year old partner, for conduct arising from the pair's sexual relationship did not violate Equal Protection Clause because the difference in age was a "legitimate distinguishing factor" under the statutory scheme); *Am. Ent'rs, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 723 (4th Cir. 2018) (confirming state's interest in ensuring that sexually-oriented-business owners are of legal drinking age justified age-based restriction on ownership of such venues).

[20] *See also Qutb v. Strauss*, 11 F.3d 488, 496 (5th Cir. 1993) (affirming curfew ordinance following strict scrutiny review); *Rothner v. City of Chicago*, 929 F.2d 297, 298 (7th Cir. 1991) (affirming ordinance prohibiting minors from playing video games during school hours); *Blassman v. Markworth*, 359 F. Supp. 1, 6 (N.D. Ill. 1973) (concluding state's decision to set a minimum age for state and local officers was neither unreasonable nor irrational).

*Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (noting that, on rational basis review, "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"). But such speculation is not necessary, as there is ample record evidence to establish that SB 613 is rationally related to a legitimate state interest for at least four distinct reasons.

**1. Difference in Diagnoses**

It is undisputed that gender transition procedures address a psychological diagnosis, rather than a physiological one. *See* Dkt. No. 119-4 at 3 (concession by Plaintiffs' expert that "[g]ender dysphoria is a psychiatric diagnosis"). A diagnosis of gender dysphoria depends upon "patients' reports of their symptoms," rather than objective diagnostic criteria, and there is no evidence that a diagnosis of gender dysphoria can be confirmed by any objective measurement or testing protocol. *Id.* at 4; Dkt. No. 86-1 at 126-27 (distinguishing a medical diagnosis, which identifies the cause of a patient's symptoms, and a psychiatric diagnosis, which labels the symptoms regardless of cause). The evidence demonstrates that a diagnosis of gender dysphoria is so tied to the patients' subjective beliefs and psychological condition that it cannot be diagnosed over a patient's objection.[21] This diagnosis is, therefore, readily distinguishable from the physiological

[21] Dkt. No. 86-1 at 127.

conditions—including precocious puberty[22] and disorders of sexual development[23]—that are specifically exempted from the statutory definition of "gender transition procedures." It is entirely within the legislature's purview to conclude that, while it may be appropriate for a minor to undergo hormone therapy and/or surgery to address a physiological condition, it is not appropriate for a minor to undergo such invasive procedures to treat a psychological one.[24]

**2. Difference in Purpose and Risks**

Plaintiffs argue that the same Treatment Protocols are allowed for cisgender (or non-transgender) children but unfairly banned for transgender children. As an example, Plaintiffs suggest that cisgender children are allowed access to the Treatment Protocols for precocious puberty while transgender children are denied the Treatment Protocols. But this argument misses

[22] Precocious puberty is a condition diagnosed by reference to objective facts and measurements, including the age of the patient, the existence of physical indicia that puberty has begun, and increased testosterone or estrogen production. Dkt. No. 86-2 at 11 (describing the stages of sexual development and the physical symptoms associated with each); *id.* at 17 (recognizing that the onset of puberty is associated with an increase in the production of sex hormones); *id.* at 22 (identifying ages with corresponding stages of pubertal development); Dkt. No. 86-3 at 16-17, 28 (describing physical changes and onset ages associated with Tanner Stage 2 of pubertal development). Minor patients being treated for the physiological condition of precocious puberty are therefore readily distinguishable from minor patients being treated for the psychological condition of gender dysphoria.

[23] Dkt. No. 86-1 at 124 (describing disorders of sexual development as "*physical* medical disorders" which can be diagnosed using objective and verifiable criteria). A physical disorder of sexual development that can be observed or detected through objective means is not "like" a psychological diagnosis that cannot be ascertained in the absence of a subjective complaint.

[24] Plaintiffs argue that neither the manner in which gender dysphoria is classified nor the subjectivity of the symptoms associated with that condition undermines the validity of a gender dysphoria diagnosis. Dkt. No. 119-4 at 4. This may be true, but this Court is not being asked whether gender dysphoria is a valid diagnosis; instead, the Court is being asked to determine whether the legislature has a rational basis for banning certain procedures for use in addressing gender dysphoria, but permitting those procedures to treat other, physiological conditions. Plaintiffs' concession that gender dysphoria is a psychological diagnosis based upon patients' subjective reports of their symptoms is particularly salient to the latter question.

an important fact. Nothing in SB 613 bans the Treatment Protocols to treat *any* child *for precocious puberty*, a physiological malady, whether the child is cisgender or transgender. Conversely, the Treatment Protocols are banned to treat *all* children *for gender dysphoria*, a psychological condition.

The evidence likewise demonstrates that minors who seek to undergo the Treatment Protocols for the purpose of affirming perceived gender face risks that are different and more extensive than those for minors who would use the same protocols for other diagnoses. Minors who undergo the Treatment Protocols for purposes of gender affirming care—in contrast to those who use the same protocols to treat precocious puberty—do so with the intent and effect of undergoing puberty later than it would be physically appropriate to do so. These are different treatments with different purposes. As a result, the risks are very different. *See* Dkt. No. 86-1 at 36 (recognizing that the "use of puberty blockers to treat precocious puberty avoids the medical risks caused by undergoing puberty growth before the body is ready," while the use of the same medication on "patients already at their natural puberty pushes them away from the mean age of the healthy population").

Undergoing puberty later than the typical range of pubertal onset carries a range of risks, including impaired brain development[25] and poorer psychosocial and educational development.[26]

---

[25] *See* Dkt. No. 86-1 at 99-100 (recognizing an association of brain development with age of pubertal onset, a correlation between the administration of GnRH-agonists and a decrease in brain activity and cognitive performance, and concerns that "blocking the process of puberty during its natural time could have a negative and potentially permanent impact on brain development"); Dkt. No. 86-2 at 25 (acknowledging that sex hormones can influence the development and maturation of the human brain); Dkt. No. 86-3 at 7.

[26] *See* Dkt. No. 86-1 at 101 (recognizing that "[u]ndergoing puberty much later than one's peers is also associated with poorer psychosocial functioning and lesser educational achievement"); Dkt. No. 86-2 at 25 (noting the importance of peer relationships during adolescence and recognizing that one reason for treating precocious puberty with puberty blockers is the generally accepted

Minors who undergo the Treatment Protocols to delay puberty for gender-transition purposes take on these risks (whether knowingly or unknowingly); those who use the same protocols for the purpose of undergoing puberty at an age-appropriate time, in contrast, attempt to avoid them. Dkt. No. 86-1 at 36; Dkt. No. 86-2 at 18, 22; Dkt. No. 86-4 at 9-10. This is a rational basis for the legislature's decision.

**3. Difference in Length of Use**

The risks associated with the Treatment Protocols also vary depending upon when and for how long they are administered. For example, the evidence suggests that puberty blockers negatively impact a child's ability to increase his or her bone density. *See* Dkt. 86-1 at 102; Dkt. No. 86-2 at 22-24. A minor who is prescribed puberty blockers during the teen years, when bone density "typically surges by about 8 to 12 percent a year," faces a different—and more serious—risk than a minor with precocious puberty whose body is not in a similar stage of growth. Dkt. No. 86-1 at 102; *see* Dkt. No. 86-2 at 22-23 (recognizing that peak bone mass is achieved in the early to late twenties for both males and females, and that "factors which lead to a lowering of peak bone mass will predispose a person to future osteoporosis").[27]

Similarly, a five-year-old who undergoes pubertal suppression will delay—for a time—sexual development until his or her body is able to withstand the changes associated with puberty, at which point puberty will be allowed to resume; a child administered puberty blockers during adolescence, by contrast, will inhibit puberty at the precise time his or her body should be

understanding in endocrinology that "there are psychological benefits to adolescents who go through puberty around the same time as their peers").

[27] *See also id.* at 23-24, Fig. 2 (discussing impact on puberty blocking medication on bone density and opining that any pause in normal puberty introduces a risk of inability to obtain peak bone density and creates a risk of osteoporosis, serious fractures, and impairment of bone growth).

undergoing those same changes. *See* Dkt. No. 86-2 at 21-22. Individuals in the latter group "will continue their chronological age progression toward adulthood and yet remain with underdeveloped genitalia," will immediately experience infertility,[28] and will run the risk of masking developmental milestones that, by their presence or absence, would give medical practitioners insight as to the individuals' overall health. Dkt. No. 86-2 at 22; Dkt. No. 86-3 at 39 (recognizing that puberty blockers, if administered at Tanner Stage 2, "makes the full maturation of the gametes impossible"); Dkt. No. 86-3 at 39 (noting that suppressing pubertal development masks the onset of the menstrual cycle, the absence of which can be indicative of underlying physiological diseases). The legislature's decision can readily be construed as a rational determination that the risks associated with minors' short-term use of the Treatment Protocols to treat precocious puberty are warranted, while the risks associated with minors' long-term (and often permanent)[29] use of the Treatment Protocols for gender dysphoria are not.

**4. Difference in Intent**

Finally, the legislature's decision to ban the Treatment Protocols solely for certain purposes is warranted by the fact that the Treatment Protocols are permitted for those who seek to align their bodies with the development they would undergo without being in a diseased or disordered state, but not for those who seek to force their bodies out of alignment with such development. When used to treat endocrine disorders, the Treatment Protocols bring the patient's body back into the hormonal states they would have been in but for the disorder. *See* Dkt. No. 86-2 at 12. When used

---

[28] While there is potential for this infertility to be transient, there appears to be scant information concerning the impact of the long-term use of puberty blockers. *See* Dkt. No. 86-2 at 20, n.5.

[29] *See* Dkt. 86-2 at 26 (recognizing that the use of puberty blockers has altered natural desistance rates, such that puberty blockers, rather than operating as a "pause button," are instead a "pathway towards future sterilizing surgeries").

to treat precocious puberty, the Treatment Protocols allow the patient's body to go through puberty at the appropriate time, rather than at an unhealthy time. Dkt. No. 86-1 at 105. When used to treat a disorder of sexual development, the Treatment Protocols are used to correct a diagnosable condition that occurred "on the way to binary sex development." Dkt. No. 86-2 at 9. When, however, the Treatment Protocols are used to treat gender dysphoria, they have the effect of pushing the body out of alignment with the natural developmental process to permit the individual's cosmetic appearance to align with his or her perception. *See* Dkt. No. 86-1 at 36. Plaintiffs themselves acknowledge that the goal of the Treatment Protocols is not to cure the state of being transgendered. *See* Dkt. No. 6 at 8 ("Being transgender is not itself a condition to be cured."); Dkt. No. 6-2 at 11 ("[B]eing transgender or gender nonconforming is not a medical condition or pathology to be treated."). *Accord* Dkt. No. 86-3 at 7 ("[I]dentifying as transgender . . . is not a pathological condition (i.e., it is not caused by or considered to be a disease."). The legislature's decision to permit minors to have access to the Treatment Protocols for medical disorders that can be cured or corrected, but not to permit those same protocols (with greater associated risk) to treat a condition for which no "cure" is sought, is a rational one.

In sum, "states have a compelling interest in and a solemn duty to protect the lives and health of the children within their borders." *Jensen*, 603 F.3d at 1198. Where there is robust debate concerning whether that interest warrants authorizing a particular medical procedure for a minor child, the debate is best left in the hands of the legislature. Judicial deference is especially appropriate where "medical and scientific uncertainty" exists. *Gonzalez v. Carhart*, 550 U.S. 124, 163 (2007). It is certainly not the judiciary's role to cut into that thoughtful debate and decree that

one side has the right of it, and the Court declines Plaintiffs' invitation to make such a decree.[30] As evidenced by the ongoing debate on this issue, Plaintiffs stand little chance of prevailing on their claim under the rational basis standard, and their motion for injunctive relief is therefore DENIED.

## CONCLUSION

As to equal protection, SB 613 is not an outright ban on gender affirming care. Nor is it a bill that has the intent or effect of enforcing stereotypical gender norms or discriminating against those who do not conform to those norms. Instead, SB 613 requires only that, to the extent an individual desires to utilize certain physiological procedures to treat the psychological condition of gender dysphoria, he or she must wait until a certain age to do so. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) (recognizing that states "may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest"). This permissible, age-based restriction is subject only to rational basis review, which is easily satisfied by at least the four alternative grounds identified by the Court in Section VI.B., *supra*. Given the state of the record, the Court concludes that Plaintiffs have failed to establish that they are likely to prevail on their claim that there is no rational basis for the legitimate, age-based distinction made by the legislature.

As to substantive due process, SB 613 is rationally related to legitimate state interests because it regulates parental decision-making as to the Treatment Protocols based on the

[30] The Court's determination that the legislature has a rational basis for the exercise of caution in this realm should not be interpreted as a lack of concern for Plaintiffs or any minor experiencing real psychological suffering. It should be apparent there is deep concern for the well-being of the children in this state, such that the legislature has determined caution is warranted given the magnitude of risks involved and the lack of medical and scientific evidence to support the would-be experimental treatment of gender dysphoria by use of the Treatment Protocols.

legislature's interests in protecting children, public health, and integrity of the medical profession. This an area in which medical and policy debate is unfolding and the Oklahoma Legislature can rationally take the side of caution before permitting irreversible medical treatments of its children. As the Eleventh Circuit explained:

> This case revolves around an issue that is surely of the utmost importance to all of the parties involved: the safety and well-being of the children of [our state]. But it is complicated by the fact that there is a strong disagreement between the parties over what is best for those children. Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action.

*Eknes-Tucker*, 80 F.4th at 1231. Plaintiffs have not demonstrated a likelihood of success on the merits of their substantive due process claim.

Because Plaintiffs have failed to show a likelihood of success on the merits of each of their constitutional claims, their request for injunctive relief must be denied. *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021) (recognizing that where the failure to satisfy one requisite factor for obtaining preliminary injunctive relief is dispositive, a court "need not consider the other factors").

IT IS THEREFORE ORDERED that Plaintiffs' motion for preliminary injunction [Dkt. No. 5] is DENIED.

Dated this 5th day of October 2023.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE