No. 23-5110

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

◆

PETER POE, by and through his parents and next friends, et al.,
*Plaintiffs-Appellants*,

v.

GENTNER DRUMMOND, in his official capacity as the Attorney General of
Oklahoma, et al.,
*Defendants-Appellees*.

◆

On Appeal from the U.S. District Court for the Northern District of Oklahoma,
No. 4:23-cv-00177-JSH, Hon. John F. Heil, III, District Judge

## BRIEF OF ALABAMA, ARKANSAS, MISSOURI, TENNESSEE, AND 19 OTHER STATES AS *AMICI CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302

Jonathan Skrmetti
  *Attorney General & Reporter*
Whitney D. Hermandorfer
  *Director of Strategic Litigation Unit
  & Assistant Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403

Andrew Bailey
  *Attorney General*
Joshua M. Divine
  *Solicitor General*
MISSOURI ATTORNEY GENERAL'S
OFFICE
207 West High St.
Jefferson City, MO 65101
(573) 751-3221

*Additional Counsel Listed on Signature Page*

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................... i

TABLE OF AUTHORITIES ..................................................... ii

INTERESTS OF AMICI CURIAE AND SUMMARY OF
     ARGUMENT........................................................... 1

ARGUMENT ....................................................................... 7

    I.    Laws Prohibiting Pediatric Gender-Transition Procedures Do
    Not Trigger Heightened Scrutiny ....................................... 7

        A.    Laws Prohibiting Pediatric Gender-Transition
        Procedures Do Not Discriminate Based on Sex ...................... 7

        B.    Transgender Individuals Are Not a Suspect Class ................. 14

    II.    Oklahoma's Law Survives Any Level of Review ............................ 18

        A.    Courts Should Defer to Legislatures in the Face
        of Medical Uncertainty ............................................ 19

        B.    Plaintiffs Erroneously Rely on American
        Medical Interest Groups That Are Biased
        Advocates, Not Neutral Experts ............................... 22

CONCLUSION .................................................................... 28

CERTIFICATE OF COMPLIANCE ...................................... 31

CERTIFICATE OF SERVICE .............................................. 32

CERTIFICATE OF DIGITAL SUBMISSION ...................... 33

# TABLE OF AUTHORITIES

**Cases**

*Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*,
    495 F.3d 695 (D.C. Cir. 2007) (en banc) ................................................2

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
    57 F.4th 791 (11th Cir. 2022) (en banc) ...................................... 14, 15

*Boe v. Marshall*,
    No. 2:22-cv-184-LCB (N.D. Ala.) ..........................................................26

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020) ...................................................................... 11, 17

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) .......................................................................... 15, 18

*Craig v. Boren*,
    429 U.S. 190 (1976) ...............................................................................8, 23

*Dent v. West Virginia*,
    129 U.S. 114 (1889) ................................................................................2, 8

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ...................................... 3, 7, 10, 13, 15, 22, 27

*Eknes-Tucker v. Governor of Ala.*,
    80 F.4th 1205 (11th Cir. 2023) .............................. 2, 7, 8, 11, 13, 18, 19, 21, 22

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) .......................................................................... 14, 16

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) ................................................................27

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ................................................................................2, 19

*Kosilek v. Spencer*,
   774 F.3d 63 (1st Cir. 2014) .................................................................27

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ...................................2, 7, 8, 10-13, 17, 18, 20, 22

*L.W. v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) .................................................................2

*Lange v. Houston Cnty.*,
   No. 22-13626 (11th Cir. Mar. 17, 2023) ...................................................5

*Lyng v. Castillo*,
   477 U.S. 635 (1986) ..........................................................................16

*Marshall v. United States*,
   414 U.S. 417 (1974) ..........................................................................19

*Mass. Bd. of Retirement v. Murgia*,
   427 U.S. 307 (1976) ................................................................... 15, 17

*Michael M. v. Super. Ct.*,
   450 U.S. 464 (1981) ............................................................................8

*Orr v. Orr*,
   440 U.S. 268 (1979) ............................................................................8

*Planned Parenthood v. Casey*,
   505 U.S. 833 (1992) ..........................................................................19

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ..........................................................................14

*Rucho v. Com. Cause*,
   139 S. Ct. 2484 (2019) ......................................................................19

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973) ..................................................................... 15, 17

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017)...........................................................................8

*Tennessee v. Dep't of Educ.*,
  615 F. Supp. 3d 807 (E.D. Tenn. 2022)..........................................17

*Tigner v. Texas*,
  310 U.S. 141 (1940).........................................................................13

*United States v. Virginia*,
  518 U.S. 515 (1996)...........................................................................3

*Vacco v. Quill*,
  521 U.S. 793 (1997).........................................................................15

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)...........................................................................5

**Statutes**

18 U.S.C. §116.......................................................................................3

Ala. Code §26-26-4.................................................................................1

Ark. Code Ann. 20-9-1502......................................................................1

Fla. Admin. Code Ann. R.64B8-9.019 ...................................................1

Ga. Code Ann. §31-7-3.5.........................................................................1

Idaho Code §18-1506C............................................................................1

Ind. Code §25-1-22-13............................................................................1

Iowa Code §147.164................................................................................1

Ky. Rev. Stat. Ann. §311.372..................................................................1

La. Stat. Ann. §40:1098 (effective Jan. 1, 2024)....................................1

Miss. Code Ann. §41-141-1-9 ...................................................1

Mo. Rev. Stat. Ann. §191.1720 ................................................1

S.B. 99, 68th Leg., 2023 Sess. (Mont. 2023)..............................1

Neb. Rev. Stat. §72-7301-07.....................................................1

H.B. 808, 2023 Sess. (N.C. 2023)..............................................1

N.D. Cent. Code. §12.1-36.1-02 ................................................1

Okla. Stat. Ann. tit. 63, §2607.1(B) ...........................................7

H.B. 1080, 98th Leg. Sess. (S.D. 2023)......................................1

S.B. 14, 88th Leg. Sess. (Tex. 2023) .........................................1

Tenn. Code Ann. §68-33-101 ....................................................1

Utah Code Ann. §58-68-502(1)(g) .............................................1

W. Va. Code §30-3-20 (effective Jan. 1, 2024).........................1

## Rules

Fed. R. App. P. 29(a)(2)..............................................................1

## Federal Regulations

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021)..................................17

## Other Authorities

AHRQ, *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth*
(Jan. 8, 2021), https://perma.cc/23B5-D7C8 .....................................20

American Society of Plastic Surgeries, *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*, https://perma.cc/5WFH-57QP (last accessed Dec. 10, 2023) ................................................................4

Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460 (2014) ...............................................24

Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW ...........10

Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review,* N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J......................................................... 23, 25

Chris Drew, *81 Types of Genders & Gender Identities (A to Z List)*, HELPFULPROFESSOR.COM (Mar. 26, 2022), https://perma.cc/SK4T-J5T4 .........17

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022)................................................................... 5, 6, 16, 26

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX ...............................................26

Endocrine Society, *Precocious Puberty* (Jan. 24, 2022), https://perma.cc/6Q3E-PEMP ...............................................................................9

Fan Liang, Johns Hopkins Medicine, *Vaginoplasty for Gender Affirmation*, https://perma.cc/RFU9-S72N (last accessed Dec. 10, 2023) ..............................5

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-MLRU ......................................................................................6

Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLIN. ENDOCRINOL. METAB. 3869 (2017)................................................25

HHS, *30 Achievements in Women's Health in 30 Years (1984-2014)*, https://perma.cc/HXQ3-TRAM (last accessed Dec. 10, 2023) ...........................3

Human Rights Campaign, Glossary of Terms, *Gender Fluid*,
https://perma.cc/D4ND-7GEQ ..........................................................................17

Jayne Leonard, *What Causes High Testosterone in Women?*,
MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.............10

Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, THE BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.........25

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.............21

Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019),
https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18)..................26

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022) ........................ 24, 25

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 460 (2019), https://perma.cc/WU36-5889 ...................................10

Kenzie Birse et al., *The Neovaginal Microbiome of Transgender Women Post-Gender Reassignment Surgery*, 8 MICROBIOME 61 (2020).
https://doi.org/10.1186/s40168-020-00804-1 ....................................................12

Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. J. (June 9, 2023)......................................................27

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021)............ 14, 16

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*,
5 J. ENDOCRINE SOC'Y 1 (2021), https://perma.cc/E3ZQ-4PZV ........................10

Nat'l Inst. for Health & Care Excellence, *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/93NB-BGAN...........................9, 21

Nat'l Inst. for Health & Care Excellence, *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ........................................................... 21

*Recommendation of the Council for Choices in Health Care in Finland: Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020), https://perma.cc/VN38-67WT .................. 20

Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. J. (Jul. 14, 2023) ................................................................... 28

Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. J. (June 28, 2023) ......................................................... 25

Sweden National Board of Health and Welfare Policy Statement, SOCIALSTYRELSEN, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3 ............................................ 21

U.S. Dep't of Health & Human Servs., Office on Women's Health, *Addressing Sex Differences in Health*, https://perma.cc/93H3-66C5 (last accessed Dec. 10, 2023) ................................................................... 3

Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X ............................................................................................................... 26

Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020) ...................................................................................................... 24

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT[1]

Amici curiae are the States of Alabama, Arkansas, Missouri, Tennessee, Alaska, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Kansas, Kentucky, Mississippi, Montana, Nebraska, North Dakota, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virginia.

Amici are acutely aware that the American medical establishment has been responsible for both great healing and, at times, great harm. Eugenics, lobotomies, and opioids are just a few examples of scandals sanctioned by America's leading medical organizations. Amici are concerned that another devastating scandal is at hand: the medical establishment's fast-tracking of vulnerable youth suffering from gender dysphoria—and, almost always, a host of other psychiatric co-morbidities—for hormonal and surgical gender-transition procedures that can leave them sterilized. In response, at least twenty States have joined Oklahoma in prohibiting these procedures for minors, at least until the evidence can prove their safety and efficacy.[2]

---

[1] This brief is filed under Federal Rule of Appellate Procedure 29(a)(2).

[2] *See* Ala. Code §26-26-4; Ark. Code Ann. 20-9-1502; Fla. Admin. Code Ann. R.64B8-9.019; Ga. Code Ann. §31-7-3.5; Idaho Code §18-1506C; Ind. Code §25-1-22-13; Iowa Code §147.164; Ky. Rev. Stat. Ann. §311.372; La. Stat. Ann. §40:1098 (effective Jan. 1, 2024); Miss. Code Ann. §41-141-1-9; Mo. Rev. Stat. Ann. §191.1720; S.B. 99, 68th Leg., 2023 Sess. (Mont. 2023); Neb. Rev. Stat. §72-7301-07; H.B. 808, 2023 Sess. (N.C. 2023); N.D. Cent. Code. §12.1-36.1-02; H.B. 1080, 98th Leg. Sess. (S.D. 2023); Tenn. Code Ann. §68-33-101; S.B. 14, 88th Leg. Sess. (Tex. 2023); Utah Code Ann. §58-68-502(1)(g); W. Va. Code §30-3-20 (effective Jan. 1, 2024).

"State[s] plainly ha[ve] authority, in truth a responsibility, to look after the health and safety of [their] children." *L.W. v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) (staying injunction of Tennessee's similar law). Governments have done so "from time immemorial"—regulating the medical profession, restricting access to potentially dangerous medicines, and banning treatments that are unsafe or unproven. *Dent v. West Virginia*, 129 U.S. 114, 121-24 (1889); *see Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-05 (D.C. Cir. 2007) (en banc).

And when it comes to "areas where there is medical and scientific uncertainty," States have particularly "wide discretion." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). So States like Oklahoma can "choose fair-minded caution and their own approach to child welfare" before subjecting their children to irreversible transitioning treatments. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023) (vacating preliminary injunctions of similar laws in Tennessee and Kentucky). "Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1231 (11th Cir. 2023) (vacating preliminary injunction of similar Alabama law).

The district court understood this, correctly according Oklahoma's "health and welfare laws" a "strong presumption of validity." *Dobbs v. Jackson Women's*

2

*Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted). Undeterred, Plaintiffs and their amici now ask this Court to invert the constitutional standard and set their favored medical interest groups as the *real* regulators, authoring standards no mere State can contradict. The Court should reject the invitation.

*First*, Oklahoma's law is presumed constitutional. While Plaintiffs suggest that heightened scrutiny applies any time a medical regulation depends on a patient's sex, that has never been true. The Constitution takes as given that "[p]hysical differences between men and woman" "are enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996). As the U.S. Department of Health and Human Services (HHS) explains, "a woman's body [is] obviously different from a man's," "[s]o it is no surprise that diseases, and the medications and medical devices used to treat them, may affect women differently" from men.[3] Accordingly, HHS regularly oversees health initiatives that are sex specific—from improving breast cancer screening for women to promoting sex-specific approaches to treating heart disease.[4] And Congress routinely recognizes differences in the sexes, as when it made it a felony to perform genital mutilation on a minor girl. 18 U.S.C. §116. That is a procedure for which the provider must "know the patient's sex at birth and the purpose of the treatment to

---

[3] U.S. Dep't of Health & Human Servs., Office on Women's Health, *Addressing Sex Differences in Health*, https://perma.cc/93H3-66C5 (last accessed Dec. 10, 2023).
[4] *Id.*; *see also* HHS, *30 Achievements in Women's Health in 30 Years (1984-2014)*, https://perma.cc/HXQ3-TRAM (last accessed Dec. 10, 2023).

know whether the treatment is lawful" (as the California-led amicus brief complains here, Cal. Br. 13), but the prohibition is nonetheless presumed constitutional. Why? Because it is rooted in biological reality, not stereotype—and, contra Plaintiffs' reasoning (at 28), the presence of a penis or XY chromosomes is not a "stereotype."

Common sense also answers Plaintiffs' "same treatments" argument. Oklahoma prohibits a physician from providing a vaginoplasty to a minor boy to transition his gender appearance. Plaintiffs and their amici complain that "[t]hese same treatments remain legal for" other youth and that heightened scrutiny is therefore required. *E.g.*, Cal. Br. 13.[5] But there is a world of difference between a vaginoplasty for a female and the "same treatment" for a transitioning male. The former can be performed under local anesthesia and brings "separated muscles together" and removes "extra mucosa skin" to surgically tighten the vagina and restore normal function, typically following trauma.[6] The latter is major "surgery to create a vagina" and

---

[5] Not even the World Professional Association for Transgender Health recommends vaginoplasties for minors—the *only* transitioning surgery for which this is true—but Plaintiffs nonetheless challenge Oklahoma's ban on the surgery. And under Plaintiffs' theory of heightened scrutiny, whether WPATH deems a procedure appropriate for minors "may provide reasons why a particular classification survives heightened scrutiny, but it cannot be a basis for refusing to apply heightened scrutiny in the first place." Pls' Br. 19-20 (citation omitted).

[6] *See* American Society of Plastic Surgeries, *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*, https://perma.cc/5WFH-57QP (last accessed Dec. 10, 2023).

"involves removing the penis, testicles and scrotum."[7] These are not the "same treatments."[8]

*Second*, the Constitution does not put the World Professional Association for Transgender Health (WPATH) and the Endocrine Society in charge of regulating medicine. Not only would this flip the purpose of regulation on its head (making the regulated the regulators), but one could scarcely dream up a more radical organization to outsource the job to than WPATH (whose members are also almost entirely responsible for the Endocrine Society Guidelines). While "Americans are engaged in an earnest and profound debate about" how best to help children suffering from gender dysphoria, *cf. Washington v. Glucksberg*, 521 U.S. 702, 735 (1997), WPATH has taken its gender ideology to the extreme and included in its latest Standards of Care an entire chapter on self-identified "eunuchs"—individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[9] Drawing on the "Eunuch Archive"—a "large online peer-

---

[7] *See* Fan Liang, Johns Hopkins Medicine, *Vaginoplasty for Gender Affirmation*, https://perma.cc/RFU9-S72N (last accessed Dec. 10, 2023).

[8] Lest the Court think this is an absurd example, pending before the Eleventh Circuit is a case in which the United States advances the "same treatments" argument to claim that Title VII requires an employer's health insurance carrier to cover transitioning "vaginoplasties" for men if it covers reparative vaginal surgery for women. *See* Brief for the United States as Amicus Curiae, *Lange v. Houston Cnty.*, No. 22-13626 (11th Cir. Mar. 17, 2023).

[9] E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022), S88-89 ("SOC 8").

support community" that WPATH boasts contains "the greatest wealth of information about contemporary eunuch-identified people"[10] (and hosts thousands of stories "focus[ing] on the eroticization of child castration," though WPATH leaves that part out[11])—the WPATH Standards proclaim that "castration" may be "medically necessary gender-affirming care" for eunuchs who "wish for a body that is compatible with their eunuch identity."[12] And just as with eunuchs, WPATH considers sterilizing gender-transition procedures to be medically necessary "gender-affirming care" for *minors* suffering from gender dysphoria.[13]

It is no wonder that European governmental healthcare authorities are rejecting the WPATH model of "care." Having determined through systematic literature reviews that the evidence does not support such an extreme approach, these national authorities have severely curtailed the availability of gender-transition procedures for minors outside controlled research settings. *See infra*, pp. 20-22.

Oklahoma went one step further and concluded that it would await the results of the experiments being conducted elsewhere rather than allow its vulnerable children to be used as guinea pigs. Nothing in the Constitution prohibits that legislative determination. The Court should affirm.

---

[10] *Id.* at S88-89.
[11] Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-MLRU.
[12] *See* SOC 8, *supra*, at S88-89.
[13] *Id.* at S43-66.

## ARGUMENT

### I. Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Trigger Heightened Scrutiny.

SB613, like similar laws enacted by many of the amici States, prohibits healthcare providers from performing surgeries on and administering hormones to minors for the purpose of gender transition. As with "other health and welfare laws," the law is subject only to rational-basis review. *Dobbs*, 142 S. Ct. at 2284.

#### A. Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Discriminate Based on Sex.

Plaintiffs and their amici argue that the default rule of rational basis does not apply here because "[w]hether a specific treatment is prohibited" by SB613 "depends exclusively on whether the treatment is deemed consistent or inconsistent with the minor's sex designated at birth." Pls' Br. 18; *see* U.S. Br. 12; Cal. Br. 13-16. As both the Sixth and Eleventh Circuits have recently explained, this argument fails. *See L.W.*, 83 F.4th at 480-81; *Eknes-Tucker*, 80 F.4th at 1228.

As an initial matter, Oklahoma's law regulates gender-transition procedures for *all* minors, regardless of sex. Under SB613, "[a] health care provider shall not knowingly provide gender transition procedures to *any* child." Okla. Stat. Ann. tit. 63, §2607.1(B) (emphasis added). This type of "across-the-board regulation lacks any of the hallmarks of sex discrimination" and does not "prefer one sex over the other." *L.W.*, 83 F.4th at 480 (citation omitted). It does not include one sex and

7

exclude the other. *Cf. Virginia*, 518 U.S. at 519-20. It does not "bestow benefits or burdens based on sex." *Cf. Michael M. v. Super. Ct.*, 450 U.S. 464, 466 (1981) (plurality opinion); *Orr v. Orr*, 440 U.S. 268, 271 (1979). And it does not "apply one rule for males and another for females." *Cf. Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017); *Craig v. Boren*, 429 U.S. 190, 192 (1976). The Act's prohibitions are sex-neutral and treat similarly situated individuals "evenhandedly." *L.W.*, 83 F.4th at 479-80.

Plaintiffs' contrary view reflects a fundamental misunderstanding both as to how these statutes operate and how heightened scrutiny works. Plaintiffs argue that SB613 discriminates based on sex because, for instance, "an adolescent can be prescribed testosterone to affirm a male gender identity if the minor's sex designated at birth was male but not if it was female." Pls' Br. 32. Putting aside the fact that Plaintiffs point to no evidence suggesting that boys in Oklahoma receive testosterone to "affirm" their "male gender identity" (rather than simply to treat a testosterone deficiency or kickstart delayed puberty), Plaintiffs' logic would "force [States] to *either* ban puberty blockers and hormones for all purposes *or* allow them for all purposes." *Eknes-Tucker*, 80 F.4th at 1234 (Brasher, J., concurring). That is because Plaintiffs erroneously view the administration of testosterone as one monolithic treatment— the "same medical treatment" regardless of whether the hormone is used to treat a

boy's testosterone deficiency or transition a teenaged girl. But just as with the vaginoplasty example discussed above, these are different treatments.

*First*, common sense tells us that a physician can use the same drug or procedure to treat different conditions with different risk profiles and that that fact does not make the two treatments the same. To the diabetic patient, injecting insulin is lifesaving. To the hypoglycemic patient, it can be life ending. Same drug, different treatments.

This same is true here. Puberty blockers, for example, are typically used in children to treat precocious puberty, a condition where a child begins puberty at an unusually early age.[14] Unlike gender dysphoria, precocious puberty is a physical abnormality that can be diagnosed through medical tests.[15] When puberty blockers are used to treat precocious puberty, the goal is to ensure that children develop at the normal age of puberty. The goal of using them to treat gender dysphoria, by contrast, is to *block* normally timed puberty. This distinction changes the cost-benefit analysis because using puberty blockers well beyond the normal pubertal age can, at minimum, risk a child's bone growth and social development.[16]

---

[14] Endocrine Society, *Precocious Puberty* (Jan. 24, 2022), https://perma.cc/6Q3E-PEMP.

[15] *Id.*

[16] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/93NB-BGAN, at 26-32 ("NICE Puberty Blocker Evidence Review").

Likewise for testosterone and estrogen, which also serve different purposes and carry different risks when given to boys versus girls. Excess testosterone in females can *cause* infertility,[17] while testosterone is used in males to *alleviate* fertility problems.[18] On the other hand, excessive amounts of estrogen in males can *cause* infertility and sexual dysfunction,[19] while estrogen is often given to females to *treat* problems with sexual development.[20] Thus, giving testosterone or estrogen to a physically healthy child for the purpose of gender transitioning has a different purpose and different risks than using the same drugs to treat a genetic or congenital condition that occurs exclusively in one sex.[21] *L.W.*, 83 F.4th at 481. These distinctions, among others, make the use of the same hormones in the different sexes different treatments altogether.

*Second*, a State's medical regulation does not become "a sex-based classification" merely by mentioning sex. *Dobbs*, 142 S. Ct. at 2245. That is because the fact

---

[17] Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.

[18] Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1, 2 (2021), https://perma.cc/E3ZQ-4PZV.

[19] Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW.

[20] Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 460 (2019), https://perma.cc/WU36-5889.

[21] While there may be some instances in which administering testosterone to a female (for instance) could be necessary—say, to treat symptoms of menopause or a gland disorder—doing so would not be the "same medical treatment" as that given to a male.

that a patient's sex affects the nature of a treatment does not mean anyone is denied equal protection. The Constitution does not look askance on a hospital offering testicular exams only to boys or pap smears only to girls. And here, "laws banning, permitting, or otherwise regulating [gender-transition procedures] all face the same linguistic destiny of describing the biology of the procedures." *L.W.*, 83 F.4th at 483. They refer to sex only because the procedures they regulate "are themselves sex-based." *Eknes-Tucker*, 80 F.4th at 1228. Yet just as States can enact laws concerning abortion, female genital mutilation, testicular cancer, prostate cancer, breastfeeding, cervical cancer, Cesarean sections, and in-vitro fertilization without those laws being considered "presumptively unconstitutional," so can they regulate experimental gender-transition procedures. *L.W.*, 83 F.4th at 482 (collecting examples).

This is also one reason why the reasoning of *Bostock* does not apply. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). Whatever the merits of the Supreme Court's "simple test" "in the workplace" (*id.* at 1737, 1743)—"if changing the employee's sex would have yielded a different choice by the employer," the employer has treated the employee differently "because of sex," *id.* at 1741—it makes no sense to apply the test to medicine, where males and females are not similarly situated. A fertility clinic does not discriminate on the basis of sex by implanting fertilized eggs only in females, even though "changing the [patient's] sex would have yielded a different choice by the [clinic]." There is no stereotype or inequality in the clinic's

11

policy. So here. Administering testosterone to bring a boy's levels into a normal range is not the same treatment as ramping up a young girl's testosterone levels to that of a healthy boy—ten times that of a healthy girl—or, for that matter, as providing the hormone to a Tour de France cyclist seeking a yellow jersey.

Returning to Plaintiffs' reasoning, it is *not* true that boys in Oklahoma can receive testosterone *to transition*. Not only is this because no minor, male *or* female, may be prescribed testosterone *to transition*, but biology dictates that a "minor born as a male" cannot use testosterone *to transition* at all. Only females can use testosterone for the purpose of gender transition—never males. *See L.W.*, 83 F.4th at 481. Although a male can use testosterone for other types of treatment, no amount of testosterone will cause a male to develop female characteristics.

The inverse is true for estrogen gender-transitioning treatments. Estrogen can be used for gender transition *only* in males, never the reverse. *Id*. The same goes for the surgical procedures at issue here. Only females would obtain a double mastectomy or a phalloplasty for the purpose of gender transition. And only males would seek breast enlargement surgery or the creation of a neovagina[22] for the purpose of gender transition. These are "medical procedure[s] that only one sex can undergo,"

---

[22] *See* Kenzie Birse et al., *The Neovaginal Microbiome of Transgender Women Post-Gender Reassignment Surgery*, 8 MICROBIOME 61 (2020). https://doi.org/10.1186/s40168-020-00804-1.

making heightened scrutiny inappropriate. *Dobbs*, 142 S. Ct. at 2245; *see L.W.*, 83 F.4th at 481; *Eknes-Tucker*, 80 F.4th at 1229.

As for puberty-blocking gender-transitioning treatment, sex does not matter to Oklahoma's law. "In contrast to cross-sex hormones, puberty blockers involve the same drug used equally by gender-transitioning boys and girls." *L.W.*, 83 F.4th at 483. Prohibiting their use for the purpose of gender transition does not depend on sex at all.

The "right question under the Equal Protection Clause" is whether "those who want to use these drugs to treat a discordance between their sex and gender identity and those who want to use these drugs to treat other conditions" are "similarly situated." *Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring). To ask the question answers it. Oklahoma and other States have discretion to "permit varying treatments of distinct diagnoses, as the 'Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *L.W.*, 83 F.4th at 482-83 (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).

This leaves Plaintiffs' complaint about stereotyping. *See* Pls' Br. 28-30. To hear Plaintiffs and their amici tell it, Oklahoma's law "conditions the availability of particular medical procedures on an individual conforming to sex stereotypes," Cal. Br. 18—as though Oklahoma makes access to gender-transition treatments turn on who "walk[s] more femininely, talk[s] more femininely, dress[es] more femininely,

13

wear[s] make-up, ha[s] [their] hair styled, [or] wear[s] jewelry," *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (plurality op.). To state the obvious, "biological sex … is not a stereotype." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc). And characteristics determined by biological sex—hormonal levels or the presence of male or female genitalia—are not stereotypes. Stereotypes are not "immutable characteristics determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). The Constitution does not forbid States from accounting for biological reality when regulating medicine.

## B.    Transgender Individuals Are Not a Suspect Class.

Plaintiffs next argue that "SB613 necessarily classifies based on transgender status" because "only transgender people undergo 'gender transition.'" Pls' Br. 22. In making that argument, Plaintiffs erase the experiences of a growing number of detransitioners who received gender-transition procedures but later chose to detransition and live in accordance with their biological sex.[23] If detransitioners were never transgender, then it cannot be true that *only* transgender individuals seek the prohibited procedures. And if detransitioners *were* transgender but no longer are, then transgender status cannot be an immutable characteristic.

---

[23] *E.g.*, Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021).

Regardless, heightened scrutiny does not apply simply because people seeking a procedure are disproportionately (or even uniformly) members of a suspect class. *Vacco v. Quill*, 521 U.S. 793, 800 (1997). Classifications based on sex receive intermediate scrutiny, but a classification of "people seeking abortions" does not, even though only women seek abortions. *Dobbs*, 142 S. Ct. at 2245-46.

And individuals who identify as transgender do not constitute a suspect class to begin with. Aside from the obvious—race, sex, national origin, religion, etc.—the Supreme Court rarely designates suspect or quasi-suspect classes. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985). Indeed, the Court has rejected suspect classification for disability, age, and poverty. *Id.*; *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). That so few classifications rise to the level of "suspect" itself casts "grave doubt" on the assertion that transgender identity does. *Adams*, 57 F.4th at 803 n.5.

Precedent explains why. Classifications are suspect when they single out "distinguishing characteristics" that have historically been divorced from "the interests the State has the authority to implement." *Cleburne*, 473 U.S. at 441. Sex classifications, for example, are (quasi)-suspect because they often "reflect outmoded notions of the relative capabilities of men and women," rather than real differences. *Id.* Same for racial classifications. *Murgia*, 427 U.S. at 313-14. Thus, to be "suspect," a

classification must single out a so-called "immutable" characteristic that has histor-ically been the basis for deep discrimination. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (looking for (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness).

Transgender status does not check any of these boxes. For one, it is not "an immutable characteristic determined solely by the accident of birth." *Frontiero*, 411 U.S. at 686. To the contrary, according to Plaintiffs, individuals identify as transgender when their internal perception of who they are departs from the immu-table characteristic of their biological sex, a characteristic known since birth. Transgender identification necessarily takes place sometime *after* birth. And many individuals who identify as transgender alternate between gender identifications, be it non-binary, gender fluid, third gender, or their natal gender.[24] If a child can hop in and out of the category based on her "fluid" identity, it makes no sense to use the category for equal protection purposes.

For similar reasons, transgender status hardly defines a "discrete group." *Lyng*, 477 U.S. at 638. The term "transgender" can describe "a huge variety of gen-der identities and expressions,"[25] with recent estimates citing more than 80 types of gender identities that include "aliagender," "bigender," "demiboy," "gender-fluid,"

---

[24] *See* Littman, *Individuals Treated for Gender Dysphoria*, *supra*.
[25] WPATH SOC8, *supra*, at S15.

"maverique," "non-binary," "polygender," and many others.[26] Transgender individuals may also "embrace a fluidity of gender identity" or even an "unfixed gender identity."[27]

Nor are transgender individuals a "politically powerless" group. *Rodriguez*, 411 U.S. at 28. To start, they are quite "unlike" those individuals who were long purposefully denied equal protection under the law due to their race, national origin, or sex. *Murgia*, 427 U.S. at 313-14 (rejecting age as suspect class because elderly persons have not faced discrimination "akin to [suspect] classifications"). To take just some recent examples, from his first day in office, President Biden has prioritized "Preventing and Combating Discrimination on the Basis of Gender Identity." Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 20, 2021). Executive agencies have attempted to impose new gender-identity obligations on the States. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 838-39 (E.D. Tenn. 2022) (rejecting agency attempts to "go[] beyond the holding of *Bostock*"). And more than a dozen States have enacted laws expressly allowing pediatric gender-transition procedures prohibited under Oklahoma's law. *See* Cal. Br. 7-9; *L.W.*, 83 F.4th at 487.

---

[26] Chris Drew, *81 Types of Genders & Gender Identities (A to Z List)*, HELPFULPROFESSOR.COM (Mar. 26, 2022), https://perma.cc/SK4T-J5T4.

[27] Human Rights Campaign, Glossary of Terms, *Gender Fluid*, https://perma.cc/D4ND-7GEQ .

Plaintiffs here have the support of the Department of Justice, many (American) medical organizations, and prestigious law firms.

State laws regulating gender-transition procedures are recent enactments by policymakers grappling with tough policy questions about how to protect children from the significant risks posed by still-novel medical interventions for gender dysphoria. To the extent a State's regulation of those procedures requires focusing on gender-dysphoric youth, such a classification is a "sensible ground for different treatment," not the sort of irrelevant grouping that warrants heightened scrutiny. *Cleburne*, 473 U.S. at 440. As evidenced by the two amicus briefs filed by the States in this case, States have taken varying approaches to these issues. Removing these "trying policy choices" from the "arena of public debate and legislative action" and placing them in the hands of the federal judiciary "is not how a constitutional democracy is supposed to work—or at least works best—when confronting evolving social norms." *L.W.*, 83 F.4th at 486-87. Until the Supreme Court says otherwise, "rational basis review applies to transgender-based classifications." *Id.* at 419.

## II.    Oklahoma's Law Survives Any Level of Review.

Even if heightened scrutiny applied, Oklahoma's law would pass muster. *See Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) (finding "exceedingly persuasive justification" for prohibiting pediatric gender-transition procedures).

## A.    Courts Should Defer to Legislatures in the Face of Medical Uncertainty.

States have "wide discretion" to regulate "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163; *accord Marshall v. United States*, 414 U.S. 417, 427 (1974) ("When [a legislature] undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad."). This deference applies even in cases involving heightened scrutiny. *Gonzales*, 550 U.S. at 163 (stating that "[t]his traditional rule is consistent with [*Planned Parenthood v.*] *Casey*," 505 U.S. 833 (1992), which involved heightened scrutiny)).

The reason for that is clear: The Constitution provides no guidance to courts for choosing between competing medical authorities. *Cf. Rucho v. Com. Cause*, 139 S. Ct. 2484, 2498 (2019) (requiring deference to legislatures unless there are "clear, manageable, and politically neutral" standards for judicial intervention). Federal courts are not equipped to choose, as a constitutional matter, between (on the one hand) the medical opinions of Plaintiffs' expert witnesses and preferred medical interest groups and (on the other hand) the medical opinions of Oklahoma's expert witnesses, half a dozen countries in Europe, and the U.S. Agency for Healthcare Research and Quality. That job is for the legislature. *See Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) ("Intermediate scrutiny permits the legislature to make a predictive judgment based on competing evidence." (cleaned up)). And "the

States are indeed engaged in thoughtful debates about the issue." *L.W.*, 83 F.4th at 471 (citation omitted).

Accordingly, all Oklahoma had to do to prevail even under heightened scrutiny is show that there is a medical dispute on the issue at hand. It did that. *See* J.A. (Vol. IV) 578-93, 621-36. The U.S. Agency for Healthcare Research and Quality itself admits that these interventions lack evidentiary support: "There is a lack of current evidence-based guidance for the care of children and adolescents who identify as transgender, particularly regarding the benefits and harms of pubertal suppression, medical affirmation with hormone therapy, and surgical affirmation."[28]

Finland's medical authority likewise concluded that, "[i]n light of available evidence, gender reassignment of minors is an experimental practice," and "there are no medical treatment[s] that can be considered evidence-based."[29] So did the United Kingdom's National Health Service, which recently restricted gender-transition interventions to formal research settings after an independent medical review concluded that there is no evidentiary support for these interventions given the "lack

---

[28] AHRQ, *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth* (Jan. 8, 2021), https://perma.cc/23B5-D7C8.
[29] *Recommendation of the Council for Choices in Health Care in Finland: Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020), https://perma.cc/VN38-67WT.

of reliable comparative studies."[30] Sweden's National Board of Health and Welfare reached a similar conclusion, finding that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits."[31] And earlier this year, the Norwegian Healthcare Investigation Board (Ukom) found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people, especially for teenagers who are increasingly seeking health services."[32] Thus, "Ukom defines such treatments as utprøvende behandling, or 'treatments under trial,'"[33]—that is, experimental.

In fact, calling the treatments "experimental" may be overstating things. As the district court found, it may be "more accurate to state that the [treatments] are not 'experimental' only because the experimental phase has truly not yet begun." J.A. (Vol. VI) at 1291; *see Eknes-Tucker*, 80 F.4th at 1225 (noting that gender-transition drugs provided to minors have "uncertainty regarding benefits, recent surges in use," "irreversible effects," and "growing concern about the medications' risks."

---

[30] Nat'l Inst. for Health & Care Excellence, *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ("NICE Cross-Sex Hormone Review"); NICE Puberty Blocker Evidence Review, *supra*.

[31] Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.

[32] Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, The BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.

[33] *Id.*

(citations omitted)); *L.W.*, 83 F.4th at 471 (gender-transition procedures for minors is "a vexing and novel topic of medical debate."). In light of this uncertainty, Oklahoma had "wide discretion" to restrict these interventions to protect the "health and welfare" of children." *Dobbs*, 142 S. Ct. at 2284.

### B.    Plaintiffs Erroneously Rely on American Medical Interest Groups That Are Biased Advocates, Not Neutral Experts.

Plaintiffs' amici discount the European experience because none of the European countries that has conducted a systematic review responded by banning the procedures outright. *E.g.*, Cal. Br. 25; Foreign Non-Profit Br. 3. *But see* Foreign Non-Profit Br. 11, 14, 23 (acknowledging that Finland, Norway, and Spain have banned minors from accessing transitioning surgeries, and other countries have imposed age limits on hormones). But these countries do not allow gender transitioning interventions as a matter of general medical practice, which is what Plaintiffs here are seeking. Instead, they generally confine access to the procedures to formal research protocols. *See* J.A. (Vol. IV) 554-62.

And regardless, if the treatments are experimental, what does it matter if England chooses to conduct the experiments? The Constitution does not require Oklahoma to offer its children as guinea pigs rather than waiting on results of the ongoing experiments. And considering whether there are less-restrictive alternatives to a ban is not "how intermediate scrutiny works under the Equal Protection Clause" in any case. *Eknes-Tucker*, 80 F.4th at 1235-36 (Brasher, J., concurring) (discussing *Boren*,

429 U.S. 190). The pertinent question is "whether the state has an interest in classifying based on sex"—*not* "whether, even if the state were allowed to classify based on sex, the state could achieve its objective with some lesser restriction." *Id.*

Plaintiffs' answer is that Oklahoma cannot await the results of the European experiments because the American medical organizations have not done so. Pls' Br. 39-40. Indeed they haven't. While healthcare authorities in Europe have urged caution, American medical organizations advocate for unfettered access to transitioning treatments even as they admit more research is needed.[34]

In some ways, it is unsurprising that, until recent decisions by the Sixth and Eleventh Circuits, courts repeatedly deferred to these organizations. One would hope that medical societies like American Academy of Pediatrics (AAP), the Endocrine Society, and WPATH would be honest brokers, reviewing the evidence as Europe has done and responding accordingly. And one would hope that organizations like the American Medical Association—which has not published guidelines on this topic but supports the WPATH Standards of Care—would use their institutional goodwill, built up over time, to be the voice of reason and prioritize the safety of children.

Sadly, this has not happened. As with other institutions, American medical organizations have become increasingly "performative," treated by their leaders as

---

[34] *E.g.*, Ghorayshi, *Medical Group Backs Youth Gender Treatments*, *supra*.

platforms for advancing the current moment's cause célèbre.[35] Add to this a replication crisis in scientific literature and the ability of researchers to use statistics to make findings appear significant when they are not,[36] and it is no wonder that medical organizations find it easier to just go with the zeitgeist. (Not to mention that the American interest groups that endorse gender-transition procedures are just that— interest groups, with a strong financial interest in the procedures their members make a living by providing.) Science is *hard*, and there is no reward in the current climate for any organization that questions the safety and efficacy of using sterilizing gender-transition procedures on children.

Take AAP, for instance, which has "decried" "as transphobic" a resolution by its members discussing "the growing international skepticism of pediatric gender transition" and calling for a literature review.[37] Then, when AAP finally acknowledged that there are no systematic reviews supporting the treatments it recommends, the group promised to conduct one—while assuring it would continue to recommend the treatments while awaiting evidence of their safety and efficacy. As Dr. Gordon

---

[35] *See generally* Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020).

[36] *E.g.*, Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460, 460-65 (2014) (noting "statistical significance" can "be obtained even from pure noise" by various tricks of the trade).

[37] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022).

Guyatt, the father of evidence-based medicine, put it, that "puts the cart before the horse."[38] AAP member Dr. Julia Mason concluded: "AAP has stifled debate" and "put its thumb on the scale … in favor of a shoddy but politically correct research agenda."[39]

Similar concerns have been raised about the Endocrine Society,[40] whose guidelines for treating gender dysphoria the *British Medical Journal* recently exposed as having "serious problems" because—remarkably—the "systematic reviews" the guidelines were based on "didn't look at the effect of the interventions on gender dysphoria itself."[41] The Endocrine Society knows that plaintiffs in cases like this one bandy about its Guidelines to justify the procedures its members profit from, yet the Guidelines themselves emphasize that they do not "establish a standard of care."[42] One member of the Guidelines authoring committee acknowledged, when not testifying in court against the States, that the Endocrine Society did not even have "some little data"—it "had none"—to justify the language allowing

---

[38] Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review,* N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J.

[39] Mason, *supra*.

[40] *E.g.*, Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. J. (June 28, 2023).

[41] Jennifer Block, *Gender dysphoria in young people is rising—and so is professional disagreement*, THE BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.

[42] Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLIN. ENDOCRINOL. METAB. 3869, 3895 (2017).

prescription of cross-sex hormones prior to age 16, a change that gave "cover" to doctors to do so.[43]

Then there is WPATH, which at least confesses to being "an advocacy organization[]." *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. Ample evidence shows just how true that is. In addition to advocating castration as "medically necessary gender-affirming care" for males whose "gender identity" is "eunuch," WPATH recently removed most minimum-age requirements for gender-modification procedures from its Standards of Care.[44] According to the lead author of the chapter on children, WPATH did so to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held liable for malpractice if they deviated from the standards.[45]

WPATH has also suppressed dissent, including canceling the presentation of a prominent researcher who dared to question the safety of transitioning young children and censuring a board member who went public with concerns that medical providers in America are transitioning minors without proper safeguards.[46]

---

[43] Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18).

[44] *See* SOC 8, *supra*, at S43-79.

[45] Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

[46] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX.

And just recently, WPATH's leaders were successful in having a major scientific publishing house, Springer, retract a published paper that dared to examine the growing phenomenon of groups of adolescents suddenly "declar[ing] a transgender identity after extensive exposure to social media and peer influence."[47] Indeed, WPATH has tried to cancel nearly every researcher that has studied "Rapid Onset Gender Dysphoria," for the simple reason that, "[e]ven mentioning the possibility that trans identity is socially influenced or a phase threatens [its] claims that children can know early in life they have a permanent transgender identity and therefore that they should have broad access to permanent body-modifying and sterilizing procedures."[48] More examples abound. *E.g.*, Amicus Br. of Family Research Council at 7-26.

There is thus good reason for the Supreme Court's observation that medical interest groups' position statements do not "shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267. The First and Fifth Circuits had it right when they found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014). While medical organizations are certainly capable of establishing true, evidence-based

---

[47] Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. J. (June 9, 2023).
[48] *Id.*

standards of care, they have utterly failed to act responsibly when it comes to pediatric gender-transition procedures. As a group of respected gender clinicians and researchers from Finland, the UK, Sweden, Norway, Belgium, France, Switzerland, and South Africa recently opined, "medical societies" in the United States should "align their recommendations with the best available evidence—rather than exaggerating the benefits and minimizing the risks."[49] Until they do so, States like Oklahoma are forced to step in to protect children.

## CONCLUSION

The Court should affirm.

---

[49] Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. J. (Jul. 14, 2023).

Dated: December 18, 2023

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
<u>s/ A. Barrett Bowdre</u>
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Barrett.Bowdre@AlabamaAG.gov

Jonathan Skrmetti
  *Attorney General & Reporter*
Whitney D. Hermandorfer
  *Director of Strategic Litigation Unit*
  *& Assistant Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

Respectfully submitted,

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

Andrew T. Bailey
  *Attorney General*
Joshua M. Divine
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF MISSOURI
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Additional Counsel for Amici Curiae Listed on Next Page*

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

ASHLEY MOODY
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

JEFF LANDRY
Attorney General
State of Louisiana

KRIS W. KOBACH
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

SEAN REYES
Attorney General
State of Utah

JASON MIYARES
Attorney General
Commonwealth of Virginia

PATRICK MORRISEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

1.     I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5). This brief contains 6,484 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Federal Rule of Appellate Procedure 32(f).

2.     In addition, this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: December 18, 2023

s/ A. Barrett Bowdre
A. Barrett Bowdre

## CERTIFICATE OF SERVICE

I certify that on December 18, 2023, I electronically filed this document using

the Court's CM/ECF system, which will serve all counsel of record.


s/ A. Barrett Bowdre
A. Barrett Bowdre

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) any paper copies of this document submitted to the Court are exact copies of the version electronically filed; and (3) the electronic submission was scanned for viruses using Microsoft Defender and, according to that program, this document is virus free.

Dated: December 18, 2023

s/ A. Barrett Bowdre
A. Barrett Bowdre
