**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**August 6, 2025**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

_____

PETER POE, by and through his parents
and next friends, Paula Poe and Patrick
Poe; PAULA POE; PATRICK POE;
DAPHNE DOE, by and through her
guardian and next friend, Donna Doe;
DONNA DOE; BRANDON BOE, by and
through his parents and next friends,
Bethany Boe and Benjamin Boe;
BETHANY BOE; BENJAMIN BOE;
LYDIA LOE, by and through her parent
and next friend, Lauren Loe; LAUREN
LOE; RYAN ROE, by and through his
parents and next friends, Rachel Roe and
Richard Roe; RACHEL ROE; RICHARD
ROE,

     Plaintiffs - Appellants,

No. 23-5110

DR. SHAUNA LAWLIS, on behalf of her
patients,

     Plaintiff.

v.

GENTNER DRUMMOND, in his official
capacity as Attorney General of the State of
Oklahoma; STEVEN KATSIS, M.D., in
his official capacity as President of the
Oklahoma State Board of Medical
Licensure and Supervision; TREVOR
NUTT, in his official capacity as Vice-
President of the Oklahoma State Board of
Medical Licensure and Supervision;
CLAYTON BULLARD, in his official
capacity as a member of the Oklahoma

State Board of Medical Licensure and
Supervision; SUSAN CHAMBERS, M.D.,
in her official capacity as a member of the
Oklahoma State Board of Medical
Licensure and Supervision; LOUIS COX,
M.D., in his official capacity as a member
of the Oklahoma State Board of Medical
Licensure and Supervision; MARK
FIXLEY, M.D., in his official capacity as a
member of the Oklahoma State Board of
Medical Licensure and Supervision;
JEREMY HALL, in his official capacity as
a member of the Oklahoma State Board of
Medical Licensure and Supervision;
TIMOTHY HOLDER, M.D., in his official
capacity as a member of the Oklahoma
State Board of Medical Licensure and
Supervision; ROBERT HOWARD, in his
official capacity as a member of the
Oklahoma State Board of Medical
Licensure and Supervision; ROSS
VANHOOSER, M.D., in his official
capacity as a member of the Oklahoma
State Board of Medical Licensure and
Supervision; DON WILBER, M.D., in his
official capacity as a member of the
Oklahoma State Board of Medical
Licensure and Supervision; KATHERINE
O'DELL, D.N.P., R.N., in her official
capacity as President of the Oklahoma
Board of Nursing; KYLE LEEMASTER,
M.B.A., R.N., in his official capacity as
Vice-President of the Oklahoma Board of
Nursing; SHAWN STACHOVIC, L.P.N.,
in her official capacity as Secretary of the
Oklahoma Board of Nursing; SHELLY
SWALLEY, M.S., R.N., in her official
capacity as a member of the Oklahoma
Board of Nursing; LINDSAY POTTS,
L.P.N., in her official capacity as a member
of the Oklahoma Board of Nursing;
AMBER GARRETSON, APRN-CNS,
C.C.R.N., in her official capacity as a

2

member of the Oklahoma Board of
Nursing; NIKOLE HICKS, Ph.D., R.N.,
CNE, in her official capacity as a member
of the Oklahoma Board of Nursing;
CALLIE RINEHART, M.S.N., R.N.,
C.P.N., in her official capacity as a member
of the Oklahoma Board of Nursing;
SHASTON SALIE, L.P.N., in her official
capacity as a member of the Oklahoma
Board of Nursing; GEORGINA
CALHOUN, in her official capacity as a
member of the Oklahoma Board of
Nursing; MARISA WRAPE, in her official
capacity as a member of the Oklahoma
Board of Nursing; BRET S.
LANGERMAN, D.O., in his official
capacity as President of the Oklahoma
State Board of Osteopathic Examiners;
CATHERINE C. TAYLOR, J.D., in her
official capacity as Vice President of the
Oklahoma State Board of Osteopathic
Examiners; DUANE G. KOEHLER, D.O.,
in his official capacity as Secretary-
Treasurer of the Oklahoma State Board of
Osteopathic Examiners; KATIE LYNN
TEMPLETON, J.D., in her official
capacity as a member of the Oklahoma
State Board of Osteopathic Examiners;
LEROY E. YOUNG, D.O., in his official
capacity as a member of the Oklahoma
State Board of Osteopathic Examiners;
DENNIS J. CARTER, D.O., in his official
capacity as a member of the Oklahoma
State Board of Osteopathic Examiners; C.
MICHAEL OGLE, D.O., in his official
capacity as a member of the Oklahoma
State Board of Osteopathic Examiners;
CHELSEY D. GILBERTSON, D.O., in her
official capacity as a member of the
Oklahoma State Board of Osteopathic
Examiners; UNIVERSITY HOSPITALS
AUTHORITY; UNIVERSITY
HOSPITALS TRUST; RANDY

DOWELL, in his official capacity as Chief
Executive Officer of the University
Hospitals Authority and the University
Hospitals Trust; G. RAINEY WILLIAMS,
in his official capacity as Chair of the
Board of Directors of the University
Hospitals Authority and trustee of the
University Hospitals Trust; JIM
EVEREST, in his official capacity as Vice-
Chair of the Board of Directors of the
University Hospitals Authority and trustee
of the University Hospitals Trust;
ANTHONY F. KEATING, III, in his
official capacity as Secretary of the Board
of Directors of the University Hospitals
Authority and trustee of the University
Hospitals Trust; GARY E. RASKOB, in
his official capacity as member of the
Board of Directors of the University
Hospitals Authority and trustee of the
University Hospitals Trust; KEVIN
CORBETT, in his official capacity as
member of the Board of Directors of the
University Hospitals Authority and trustee
of the University Hospitals Trust; OU
MEDICINE, INC., an Oklahoma not-for-
profit corporation, d/b/a OU Health;
RICHARD LOFGREN, Dr., in his official
capacity as President and Chief Executive
Officer of OU Health,

     Defendants - Appellees.

-------------------------------

STATE OF CALIFORNIA; STATE OF
COLORADO; STATE OF
CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAII;
STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
COMMONWEALTH OF

MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO;
STATE OF OREGON; STATE OF NEW
YORK; STATE OF RHODE ISLAND;
COMMONWEALTH OF
PENNSYLVANIA; STATE OF
WASHINGTON; STATE OF VERMONT;
BIOMEDICAL ETHICS AND PUBLIC
HEALTH SCHOLARS; STONEWALL
EQUALITY LIMITED; SWEDISH
FOUNDATION FOR LESBIAN, GAY,
BISEXUAL, TRANSGENDER, QUEER
AND INTERSEX RIGHTS; RFSL
UNGDOM; TRANSAMMANS; SETA RY
/ SETA LGBTIQ RIGHTS IN FINLAND;
NORWEGIAN ORGANIZATION FOR
SEXUAL AND GENDER DIVERSITY;
AUSTRALIAN PROFESSIONAL
ASSOCIATION FOR TRANS HEALTH;
BUNDESVERBAND TRANS E.V.;
FUNDACION COLECTIVO HOMBRES
XX, AC; PROFESSIONAL
ASSOCIATION FOR TRANSGENDER
HEALTH AOTEAROA NEW ZEALAND;
FEDERACION ESTATAL DE
LESBIANAS, GAIS, TRANS,
BISEXUALES, INTERSEXUALES Y
MAIS; UNITED STATES OF AMERICA;
AMERICAN ACADEMY OF
PEDIATRICS; ACADEMIC PEDIATRIC
ASSOCIATION; AMERICAN
ACADEMY OF CHILD &
ADOLESCENT PSYCHIATRY;
AMERICAN ACADEMY OF FAMILY
PHYSICIANS; AMERICAN ACADEMY
OF NURSING; AMERICAN
ASSOCIATION OF PHYSICIANS FOR
HUMAN RIGHTS, INC., DBA GLMA:
Health Professionals Advancing LGBT
Equality; AMERICAN COLLEGE OF
OBSTETRICIANS AND

GYNECOLOGISTS; AMERICAN
COLLEGE OF OSTEOPATHIC
PEDIATRICIANS; AMERICAN
COLLEGE OF PHYSICIANS;
AMERICAN MEDICAL ASSOCIATION;
AMERICAN PEDIATRIC SOCIETY;
AMERICAN PSYCHIATRIC
ASSOCIATION; ASSOCIATION OF
MEDICAL SCHOOL PEDIATRIC
DEPARTMENT CHAIRS, INC.;
ENDOCRINE SOCIETY; NATIONAL
ASSOCIATION OF PEDIATRIC NURSE
PRACTITIONERS; PEDIATRIC
ENDOCRINE SOCIETY; SOCIETIES
FOR PEDIATRIC UROLOGY; SOCIETY
FOR ADOLESCENT HEALTH AND
MEDICINE; SOCIETY FOR PEDIATRIC
RESEARCH; SOCIETY OF PEDIATRIC
NURSES; WORLD PROFESSIONAL
ASSOCATION FOR TRANSGENDER
HEALTH; GLBTQ LEGAL
ADVOCATES & DEFENDERS;
FREEDOM OKLAHOMA; PRISM
PROJECT; NATIONAL CENTER FOR
LESBIAN RIGHTS; KIM BANTA;
SARAH DAVIS; JORDAN WILLOW
EVANS; CHAD INGELS; ILEANA ROS-
LEHTINEN; CHRIS SANDER; DAN
ZWONITZER; ELLIOT PAGE; AZIZA
AHMED; KHIARA M BRIDGES; DAVID
S. COHEN; I. GLENN COHEN;
CHARLENE GALARNEAU; JOANNA
GROSSMAN; LISA C. IKEMOTO;
MAYA MANIAN; MICHELLE
OBERMAN; DARA PURVIS; RACHEL
REBOUCH; JESSICA SILBEY;
MICHAEL R. ULRICH; FAMILY
RESEARCH COUNCIL; ALLIANCE
DEFENDING FREEDOM; DO NO
HARM; OKLAHOMA COUNCIL OF
PUBLIC AFFAIRS; STATE OF
ALABAMA; STATE OF ARKANSAS;
STATE OF MISSOURI; STATE OF

TENNESSEE; STATE OF ALASKA;
STATE OF FLORIDA; STATE OF
GEORGIA; STATE OF IDAHO; STATE
OF INDIANA; STATE OF LOUISIANA;
STATE OF KANSAS; STATE OF
KENTUCKY; STATE OF MISSISSIPPI;
STATE OF MONTANA; STATE OF
NEBRASKA; STATE OF NORTH
DAKOTA; STATE OF SOUTH
CAROLINA; STATE OF SOUTH
DAKOTA; STATE OF TEXAS; STATE
OF UTAH; STATE OF VIRGINIA;
STATE OF WEST VIRGINIA; STATE
OF IOWA,

     Amici Curiae

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:23-CV-00177-JFH-SH)**

_____

Omar Gonzalez-Pagan, Lambda Legal Defense and Education Fund, Inc., New York, NY (Laura J. Edelstein, Jenner & Block, LLP, San Francisco, CA, Megan Lambert, American Civil Liberties Union of Oklahoma Foundation, Oklahoma City, OK, Harper S. Seldin, and Chase Strangio, American Civil Liberties Union, New York, NY with him on the briefs), for Plaintiffs-Appellants.

Garry Gaskins, Solicitor General (Zach West, Director of Special Litigation, Audrey A. Weaver and Will Flanagan, Assistant Solicitors General, with him on the brief), Office of the Attorney General, State of Oklahoma, Oklahoma City, OK, for Defendants-Appellees.

J. Craig Buchan, McAFee & Taft, A Professional Corporation, Tulsa, OK; Ronald T. Shinn, Jr., and Jennie Mook, McAfee & Taft, A Professional Corporation, Oklahoma City, OK, on the brief for Defendants-Appellees OU Medicine, Inc., and Dr. Richard Lofgren.

Rob Bonta, Attorney General of California, Renu R. George, Senior Attorney General, Kathleen Boergers, Supervising Deputy Attorney General, Stephanie T. Yu, Nimrod Pitskey Ellias, Lily G. Weaver, Natalie Torres, and Sean C. McGuire, Deputy Attorney General, State of California, Oakland, CA, for the State of California; Philip J. Weiser,

Attorney General of Colorado, William Tong, Attorney General of Connecticut, Kathleen Jennings, Attorney General of Delaware, Brian L. Schwalb, Attorney General of District of Columbia, Anne E. Lopez, Attorney General of Hawaii, Kwame Raoul, Attorney General of Illinois, Aaron M. Frey, Attorney General of Maine, Anthony G. Brown, Attorney General of Maryland, Andrea Joy Campbell, Attorney General of Massachusetts, Dana Nessel, Attorney General of Michigan, Keith Ellison, Attorney General of Minnesota, Aaron D. Ford, Attorney General of Nevada, Matthew J. Platkin, Attorney General of New Jersey, Raul Torrez, Attorney General of New Mexico, Ellen F. Rosenblum, Attorney General of Oregon, Letitia James, Attorney General of New York, Peter F. Neronha, Attorney General of Rhode Island, Michelle A. Henry, Attorney General of Pennsylvania, Robert W. Ferguson, Attorney General of Washington, Charity R. Clark, Attorney General of Vermont, filed an amicus curiae brief for the State of California and 20 Other States, in support of Plaintiffs-Appellants.

Katelyn Kang, Cooley LLP, New York, NY, Elizabeth F. Reinhardt, Cooley LLP, Washington, DC, Kathleen Hartnett, Julie Veroff, and Zoe Helstrom, Cooley LLP, San Francisco, CA, filed an amicus curiae brief for BioMedical Ethics and Public Health Scholars, on behalf of Plaintiffs-Appellants.

Andrew Rhys Davies, Charles C. Bridge, Emily Brody-Bizar, Anna Mizzi, Duy Nguyen, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, filed an amicus curiae brief for Foreign Non-Profit Organizations Advocating for the Rights of Transgender People, on behalf of Plaintiffs-Appellants.

Kristen Clarke, Assistant Attorney General, Bonnie I. Robin-Vergeer, and Elizabeth Parr Hecker, Department of Justice, Washington, DC, filed an amicus curiae brief for the United States, on behalf of Plaintiffs-Appellants.

Cortlin H. Lannin, Covington & Burling LLP, San Francisco, CA and D. Jean Veta, William Isasi, and Emily A. Vernon, Covington & Burling LLP, Washington, DC, filed an amicus curiae brief for American Academy of Pediatrics and Additional Medical and Mental Health Organizations, on behalf of Plaintiffs-Appellants.

Jordan D. Hershman, Nathaniel P. Bruhn, Dana N. Bach, and L. Felipe Escobedo, Morgan, Lewis & Bockius LLP, Boston, MA, filed an amicus curiae brief for GLBTQ Legal Advocates & Defenders, Freedom Oklahoma, Prism Project, and National Center for Lesbian Rights, on behalf of Plaintiffs-Appellants.

Brian T. Burgess, Goodwin Procter LLP, Washington, DC, filed an amicus curiae brief for Conservative Legislators, Former Legislators, and Activists, on behalf of Plaintiffs-Appellants.

Carmine D. Boccuzzi, Jr., Cleary Gottlieb Steen & Hamilton LLP, New York, NY, and Sydney Duncan, Transgender Legal Defense & Education Fund, Inc, New York, NY, filed an amicus curiae brief for Elliot Page and Fifty-Six Other Individuals, on behalf of Plaintiffs-Appellants.

Christopher Mills, Spero Law LLC, Charleston, SC, filed an amicus curiae brief for Family Research Council filed an amicus curiae brief on behalf of Defendants-Appellees.

Jacob P. Warner, Alliance Defending Freedom, Scottsdale, AZ, and John J. Bursch and James A. Campbell, Alliance Defending Freedom, Washington, DC, filed an amicus curiae brief for Alliance Defending Freedom, on behalf of Defendants-Appellees.

Ryan Haynie, Oklahoma Council of Public Affairs, Oklahoma City, OK, and David H. Thompson, Peter A. Patterson, Brian W. Barnes, John D. Ramer, Cooper & Kirk, PLLC, Washington, DC, filed an amicus curiae brief for Do No Harm and Oklahoma Council of Public Affairs, on behalf of Defendants-Appellees.

Steve Marshall, Attorney General of Alabama, Edmund G. LaCour Jr., Solicitor General, and A. Barrett Bowdre, Principal Deputy Solicitor General, State of Alabama, Montgomery, AL; Tim Griffin, Attorney General of Arkansas, Nicholas J. Bronni, Solicitor General, and Dylan L. Jacobs, Deputy Solicitor General, State of Arkansas, Little Rock, AR, Jonathan Skrmetti, Attorney General & Reporter of Tennessee, and Whitney D. Hermandorfer, Director of Strategic Litigation Unit & Assistant Solicitor General, State of Tennessee, Nashville, TN; Andrew Bailey, Attorney General of Missouri, and Joshua M. Divine, Solicitor General, State of Missouri, Jefferson City, MO; Treg Taylor, Attorney General of Alaska, Ashley Moody, Attorney General of Florida, Chris Carr, Attorney General of Georgia, Raul R. Labrador, Attorney General of Idaho, Theodore E. Rokita, Attorney General of Indiana, Brenna Bird, Attorney General of Iowa, Jeff Landry, Attorney General of Louisiana, Kris W. Kobach, Attorney General of Kansas, Daniel Cameron, Attorney General of Kentucky, Lynn Fitch, Attorney General of Mississippi, Austin Knudsen, Attorney General of Montana, Michael T. Hilgers, Attorney General of Nebraska, Drew Wrigley, Attorney General of North Dakota, Alan Wilson, Attorney General of South Carolina, Marty Jackley, Attorney General of South Dakota, Ken Paxton, Attorney General of Texas, Sean Reyes, Attorney General of Utah, Jason Miyares, Attorney General of Virginia, Patrick Morrisey, Attorney General of West Virginia, filed an amicus brief for Alabama, Arkansas, Missouri, Tennessee, and 19 Other States, on behalf of Defendants-Appellees.[1]

_____

[1] The attorneys and amici identified above are those whose names appear on the briefs.

Before **HARTZ**, **PHILLIPS**, and **CARSON**, Circuit Judges.

_____

**CARSON**, Circuit Judge.

_____

State statutes that do not discriminate on the basis of a protected class receive a deferential review under the Constitution's Equal Protection Clause. We also review statutes deferentially if they do not implicate a fundamental right under the Due Process Clause.

This case requires us to consider the constitutionality of Oklahoma Senate Bill 613 ("SB 613"), which prohibits certain gender transition procedures for minors. Plaintiffs Peter Poe, Daphne Doe, Brandon Boe, Lydia Loe, and Ryan Roe ("Minor Plaintiffs"), their parents ("Parent Plaintiffs"), and Dr. Shauna Lawlis began this lawsuit, claiming that SB 613 violates their rights under the Constitution.[2] Plaintiffs moved for a preliminary injunction, which the district court denied. We abated Plaintiffs' appeal pending the Supreme Court's United States v. Skrmetti decision. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1) and relying on Skrmetti, we affirm the district court's preliminary injunction denial.

I.

On May 1, 2023, Oklahoma enacted SB 613, which prohibits healthcare providers from "provid[ing] gender transition procedures" to anyone under eighteen

_____

[2] SB 613 prohibits only minors from receiving gender transition procedures, so this suit is moot for Minor Plaintiffs who are eighteen-years old or older at the time we issue this opinion and their Parents.

years old.  Okla. Stat. Ann. tit. 63, § 2607.1 (B).  SB 613 defines gender transition

procedures as:

> medical or surgical services performed for the purpose of attempting to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex:
>
> (1) surgical procedures that alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex, or
>
> (2) puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex.

§ 2607.1 (A)(2)(a)(1)–(2).  But SB 613 does not prohibit mental health

counseling; medication to treat depression, anxiety, precocious puberty, or delayed

puberty; services provided for those born with ambiguous or incomplete genitalia, or

both male and female anatomy; treatments of any infection caused by the

performance of gender transition procedures; and treatments for any injury or illness

that would place the individual in imminent danger of death.  § 2607.1 (A)(2)(b)(1)–

(6).

Minor Plaintiffs are transgender persons, diagnosed with gender dysphoria—

"a medical condition characterized by persistent, clinically significant distress

resulting from an incongruence between gender identity and biological sex."  United

States v. Skrmetti, 605 U.S. ---, 145 S. Ct. 1816, 1824 (2025).  To treat Minor

Plaintiffs' gender dysphoria, healthcare providers prescribed puberty blockers and cross-sex hormones.[3]

Minor Plaintiffs' prescribed medication of puberty blockers and cross-sex hormones fits within SB 613's definition of gender transition procedures. Plaintiffs contend that SB 613 violates their rights under the Equal Protection Clause of the Fourteenth Amendment, and Parent Plaintiffs assert that SB 613 violates their rights under the Due Process Clause of the Fourteenth Amendment. Plaintiffs sought a preliminary injunction to enjoin enforcement of SB 613. The district court denied it, finding that Plaintiffs had not shown a likelihood of success on the merits. For the reasons that follow, we affirm.

II.

"We review a district court's denial of a preliminary injunction for abuse of discretion." Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1065 (10th Cir. 2001) (citing A.C.L.U. v. Johnson, 194 F.3d 1149, 1155 (10th Cir. 1999)). A district court abuses its discretion when it bases its decision on an erroneous conclusion of law or there is no rational evidentiary basis for its ruling. Id. (quoting Hawkins v. City & Cnty. of Denver, 170 F.3d 1281, 1292 (10th Cir. 1999)). We review a district court's factual findings for clear error and its legal conclusions de

---

[3] Healthcare providers prescribed Boe cross-sex hormones, Doe puberty blockers and cross-sex hormones, Loe cross-sex hormones, Poe puberty blockers, and Roe puberty blockers.

novo.  Pryor v. Sch. Dist. No. 1, 99 F.4th 1243, 1249 (10th Cir. 2024) (citing

Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003)).

To obtain a preliminary injunction, Plaintiffs "must demonstrate: (1) a

likelihood of success on the merits; (2) a likelihood that the movant will suffer

irreparable harm in the absence of preliminary relief; (3) that the balance of equities

tips in the movant's favor; and (4) that the injunction is in the public interest." Little

v. Jones, 607 F.3d 1245, 1251 (10th Cir. 2010) (quoting Att'y Gen. of Okla. v. Tyson

Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)).  Preliminary injunctions are

extraordinary remedies, so "the right to relief must be clear and unequivocal."

Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th

Cir. 2009) (quoting Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1256 (10th

Cir. 2003)).

### III.

The district court denied Plaintiffs' request for a preliminary injunction at step

one of the preliminary injunction analysis because Plaintiffs failed to demonstrate a

likelihood of success on the merits.  Plaintiffs contest this holding, arguing that SB

613 violates the Fourteenth Amendment's Equal Protection and Due Process Clauses.

We address these constitutional issues in turn.

### A.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o

State shall . . . deny to any person within its jurisdiction the equal protection of the

laws."  U.S. Const. amend. XIV, § 1.  In essence, states must treat "all persons

13

similarly situated" alike.  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)).  But equal protection "doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations."  SECSYS, LLC v. Vigil, 666 F.3d 678, 685 (10th Cir. 2012) (citing Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 271–73 (1979)).

To establish an Equal Protection claim, the plaintiff must show discriminatory intent either facially or through circumstantial proof.  Ashaheed v. Currington, 7 F.4th 1236, 1250 (10th Cir. 2021) (citing SECSYS, 666 F.3d at 686).  When the face of state law distinguishes between groups of persons, we presume an intent to discriminate, "and no further examination of legislative purpose is required." SECSYS, 666 F.3d at 685 (citing Snowden v. Hughes, 321 U.S. 1, 8 (1944); Shaw v. Reno, 509 U.S. 630, 642 (1993)).  But when the state law is neutral and applies to all persons, no presumption exists and "proof is required."  Id.

Proof of discriminatory intent requires more than the plain results or awareness of the consequences.  Feeney, 442 U.S. at 279 (citing United Jewish Orgs. v. Carey, 430 U.S. 144, 179 (1977) (Stewart, J., concurring)).  The states must have selected "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  Id.  So a state action may cause a discriminatory effect against a group and the effect "may even be a foreseen (or known) consequence of state action."  SECSYS, 666 F.3d at 685 (first citing Feeney, 422 U.S. at 279; then citing Vill. of Arlington Heights v. Metro. Housing Corp., 429

14

U.S. 252 (1977)).  But the discriminatory effect does not violate the Equal Protection Clause unless the state intended the consequence.  Id. (citing Feeney, 422 U.S. at 279).

If we determine the actor possessed discriminatory intent against a specific group, we review the state law under the appropriate level of scrutiny.  Id. at 686. Statutory classifications must be "rationally related to a legitimate governmental purpose."  Clark v. Jeter, 486 U.S. 456, 461 (1988) (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 17 (1973)).  "[M]ore stringent judicial scrutiny attaches to classifications based on certain 'suspect' characteristics."  Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d 792, 799 (10th Cir. 2019) (citing City of Cleburne, 473 U.S. at 440).

Plaintiffs assert that SB 613 triggers intermediate scrutiny because it (1) discriminates based on sex and (2) discriminates based on transgender status. Defendants disagree and argue that SB 613 only discriminates based on age and medical procedure, so rational basis review applies.

1.

In United States v. Skrmetti, the Supreme Court considered the constitutionality of Tennessee's SB1—a law substantially similar in form to SB 613—which prohibited healthcare providers from administering sex transitioning treatments to minors to treat certain conditions.  145 S. Ct. at 1828.  Specifically, SB1 barred providers from "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being," or "[p]rescribing, administering,

15

or dispensing any puberty blocker hormone" to those under eighteen for the purpose of (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Id. at 1826 (first quoting Tenn. Code Ann. § 68–33–102(5); then quoting § 68–33–103(a)(1)).

The Supreme Court subjected Tennessee's SB1 to rational basis review after holding the law denied these gender transition procedures on the basis of age and medical use. Id. at 1835–37. It "reject[ed] the argument that the application of SB1 turns on sex," because SB1 "prohibits healthcare providers from administering puberty blockers or hormones to *minors* for certain *medical uses*, regardless of a minor's sex." Id. at 1829–30. It also declined to find that SB1 discriminated on the basis of transgender status because it "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence— from the range of treatable conditions." Id. at 1833. The Court concluded that Tennessee had a rational basis for SB1's classifications considering the "ongoing debate among medical experts regarding the risks and benefit associated with administering puberty blockers and hormones to treat gender dysphoria" and that "SB1's ban on such treatments responds directly to that uncertainty." Id. at 1836 (first citing City of Cleburne, 473 U.S. at 448; and then citing Romer v. Evans, 517 U.S. 620, 632 (1996)).

16

The Court also clarified that it had not yet considered whether its reasoning in Bostock v. Clayton County, 590 U.S. 644 (2020), applied beyond the Title VII context and declined to do so in Skrmetti because "sex is simply not a but-for cause of SB1's operation." Id. at 1835. Under Bostock, we use the "traditional but-for causation standard, which 'directs us to change one thing at a time and see if the outcome changes'" to determine whether an employer has violated Title VII's prohibition on discharging individuals "because of" their sex. Id. at 1834 (quoting Bostock, 590 U.S. at 656). Using Bostock's logic, an employer offends Title VII when it "has penalized a member of one sex for a trait or action that it tolerates in members of the other." Id. (citing Bostock, 590 U.S. at 662). A "key distinction between the operation of SB1 and the logic of Bostock," the Court reasoned, is that under SB1, "changing a minor's sex or transgender status does not alter the application of SB1." Id. at 1834–35. The Court concluded that Bostock's logic was inapplicable to its constitutional analysis of SB1.

Like Tennessee's SB1, Oklahoma's SB 613's applicability turns on the same two factors: age and medical use. SB 613 facially discriminates based on age because it prohibits certain gender transition procedures for all persons under the age of eighteen. Okla. Stat. Ann. tit. 63, § 2607.1 (B). Age does not trigger heightened scrutiny, Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 83 (2000) (first citing Gregory v. Ashcroft, 501 U.S. 452, 470 (1991); then citing Vance v. Bradley, 440 U.S. 93, 97 (1979); and then citing Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313–14 (1976) (per curiam)), so we subject SB 613 to a rational basis review. Under rational

17

basis review, we must uphold SB 613 "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) (first citing Sullivan v. Stroop, 496 U.S. 478, 485 (1990); then citing Bowen v. Gilliard, 483 U.S. 587, 600–603 (1987); then citing U.S. R.R. Retirement Bd. v. Fritz, 499 U.S. 166, 174–79 (1980); and then citing Dandridge v. Williams, 397 U.S. 471, 484–85, 90 (1970)).  The states have "a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely." Hodgson v. Minnesota, 497 U.S. 417, 444 (1990) (first citing Bellotti v. Baird, 443 U.S. 622, 634–39 (1979); then citing Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944)).  In this continuing and evolving area of medicine, Oklahoma has a legitimate interest in the health and welfare of its children and using age to determine the accessibility of gender transition procedures rationally relates to that legitimate interest.  Kimel, 528 U.S. at 88 ("[T]he Equal Protection Clause does not require States to match age distinction and the legitimate interest they serve with razorlike precision.").

SB 613 also discriminates on the basis of medical procedure or use.  Whether healthcare providers in Oklahoma may administer procedures to "alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex," or administer "puberty-blocking drugs, cross-sex hormones, or other drugs to suppress or delay normal puberty or to promote the development of feminizing or masculinizing features consistent with the opposite biological sex"

18

depends on the minor's medical condition.  Okla. Stat. Ann. tit. 63, § 2607.1

(A)(2)(a)(1)–(2).  Under SB 613, these procedures fall outside the ambit of prohibited

gender transitioning services if used to treat: infections "caused by the performance

of gender transition procedures"; "injur[ies] or illness[es] that would . . . place the

individual in imminent danger of death"; or the presence of "ambiguous genitalia,

incomplete genitalia, or both male or female anatomy, or biochemically verifiable

disorder of sex development."  § 2607.1 (A)(2)(a)(4), (6).  The statute makes clear,

however, that providers may not administer these procedures to "affirm the minor's

perception of his or her gender or biological sex, if that perception is inconsistent

with the minor's biological sex."  § 2607.1 (A)(2)(a).  Thus, whether a provider may

administer these procedures turns on the condition to be treated.

　　　Like classifications based on age, "[c]lassifications that turn on [ ] medical use

are subject to only rational basis review."  Skrmetti, 145 S. Ct. at 1829 (first citing

Murgia, 427 U.S. at 312–314; and then citing Vacco v. Quill, 521 U.S. 793, 799–808

(1997)).  This "relatively relaxed standard reflect[s] the Court's awareness that the

drawing of lines," particularly in the medical context where certain risk accompany

treatments, "is peculiarly a legislative task and an unavoidable one."  Id. at 1835

(quoting Murgia, 427 U.S. at 314).  Here, the district court found that "that there is

no consensus in the medical field about the extent of the risk or benefits of the

Treatment Protocols" to address a minor's gender dysphoria.  Thus, in light of the

ongoing debates among medical professionals, Oklahoma's decision to enact SB 613

rationally relates to its concerns about the safety and efficacy of treating gender

dysphoria with these gender transitioning procedures.  See Skrmetti, 145 S. Ct. at 1835.  So although SB 613 discriminates based on age and medical purpose or use, it does not do so unconstitutionally.

In short, like the law at issue in Skrmetti, SB 613 prohibits healthcare providers from providing gender transition procedures to anyone under eighteen years old "to affirm the minor's perception of his or her gender or biological sex, if that perception is inconsistent with the minor's biological sex," or in other words, to treat the minor's gender dysphoria.  Okla. Stat. Ann. tit. 63, § 2607.1 (A)(2)(a).  The statute's classifications are thus based on age and medical use which requires us to employ a rational basis inquiry.  We conclude that Oklahoma's enactment of SB 613 rationally relates to Oklahoma's interest in safeguarding the physical and psychological well-being of minors in light of the debate among medical experts about the risks and benefits associated with treating a minor's gender dysphoria with gender transitioning procedures.  We thus affirm the district court's ruling as to Plaintiffs' Equal Protection claim.

## 2.

Plaintiffs also assert that SB 613 classifies based on a person's transgender status, which they argue, is a sex-based classification under Bostock v. Clayton County, 590 U.S. 644 (2020).  Plaintiffs maintain that the statute's prohibition turns on a person's transgender status, and that transgender status necessarily is a sex designation because a "transgender person, by definition, is someone whose sex designated at birth is different from their gender identity."

The Supreme Court's <u>Skrmetti</u> decision forecloses Plaintiffs' argument that SB 613 turns on transgender status.  In <u>Skrmetti</u>, the Court analogized SB1's classifications to the those found in <u>Geduldig v. Aiello</u>, 417 U.S. 484 (1974), where it held that "a California insurance program that excluded from coverage certain disabilities resulting from pregnancy did not discriminate on the basis of sex." <u>Skrmetti</u>, 145 S. Ct. at 1833 (citing <u>Geduldig</u>, 417 U.S. at 486).  In <u>Geduldig</u>, the Court divided potential coverage recipients into two groups, pregnant women and nonpregnant persons, and noted the "lack of identity between sex and the excluded pregnancy-related disabilities" because women fell into both groups.  <u>Id.</u> (quoting <u>Geduldig</u>, 417 U.S. at 496 n.20).  Even though the Court concluded that though only biological women can become pregnant, it also stated that "not every legislative classification concerning pregnancy is a sex-based classification" that triggers heightened scrutiny.  <u>Id.</u> (quoting <u>Geduldig</u>, 417 U.S. at 496 n.20).  The program "did not exclude any individual from benefit eligibility because of the individual's sex but rather 'remove[d] one physical condition—pregnancy—from the list of compensable disabilities.'"  <u>Id.</u> (quoting <u>Geduldig</u>, 417 U.S. at 496 n.20).

The <u>Skrmetti</u> Court likewise concluded that Tennessee's SB1 also "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions."  <u>Id.</u>  "SB1 divides minors into two groups: those who might seek puberty blockers or hormones to treat the excluded diagnoses, and those who might seek puberty blockers or hormones to

treat other conditions." Id. (quoting Tenn. Code Ann. § 68–33–103).   Because "[o]nly transgender minors seek puberty blockers and hormones for the excluded diagnoses, the first group includes only transgender individuals," but the "second group, in contrast, encompasses both transgender and nontransgender individuals." Id.  So, the Court concluded, that "although only transgender individuals seek treatment for gender dysphoria, gender identity disorder, and gender incongruence— just as only biological women can become pregnant—there is a 'lack of identity' between transgender status and the excluded medical diagnoses." Id.

Because Tennessee's SB1 and Oklahoma's SB 613 are functionally indistinguishable, Skrmetti controls.  Here, like in Skrmetti, both groups include transgender minors, so there exists a "lack of identity" between transgender status and the medical diagnosis excluded under SB 613.  And like Tennessee's SB1, under SB 613, a minor's ability to receive medical treatment under SB 613 does not turn on the minor's transgender status—it turns on the minor's medical diagnosis.  We thus conclude that SB 613's prohibitions do not discriminate on the basis of transgender status.  And because SB 613 does not discriminate based on transgender status, we, like the Supreme Court, conclude that Plaintiffs' Bostock arguments do not alter our Equal Protection analysis.[4]

---

[4] Using Bostock's reasoning in Fowler v. Stitt, 104 F.4th 770, 784 (10th Cir. 2024), we concluded that an Oklahoma policy prohibiting birth certificate sex designation changes discriminated based on transgender status and, by extension, also discriminated on the basis of sex.  On June 30, 2025, the Supreme Court vacated Fowler and remanded the case for further consideration in light of Skrmetti.  Stitt v.

3.

Plaintiffs also allege that Oklahoma adopted the law as pretext to purposefully discriminate against transgender persons. Plaintiffs argue that lawmakers' contemporary statements reveal an impermissible legislative purpose and that the legislature adopted the law within a broader context of several non-enacted bills targeting transgender persons. Because the legislature enacted SB 613 with "intent to treat transgender minors differently," Plaintiffs argue, we must review it with heightened scrutiny.

"[W]here a law's classifications are neither covertly nor overtly based on sex . . . we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose." Skrmetti, 145 S. Ct. at 1832 (first citing Feeney, 442 U.S. at 271–74; then citing Arlington Heights, 429 U.S. at 264–66).

First, contemporary statements from a few legislators do not persuade us of discriminatory intent.[5] "What motivates one legislator to make a speech about a

_____

Fowler, 2025 WL 1787695, at *1 (U.S. June 30, 2025) (mem). Because SB 613 discriminates only on the basis of age and medical use, we need not discuss Skrmetti's effect on Fowler and whether discrimination on the basis of transgender status in an Equal Protection context equates to sex discrimination thus triggering heightened scrutiny under Bostock.

[5] We also remain unpersuaded after considering the legislators' statements in the context of other legislators' and the Governor's statements about the purpose of SB 613. Representative Kevin West discussed during the floor debate that state lawmakers have important duties to protect their citizens health and safety, "[a]nd that duty is even more important when it comes to protecting children." Statement of Representative Kevin West, House First Regular Floor Session, Day 47 Afternoon Session, Apr. 26, 2023, 6:21:58–6:22:11 PM. Governor Kevin Stitt stated that "I am thrilled to sign [SB 613] into law today and protect our kids." Press Release,

statute is not necessarily what motivates scores of others to enact it." United States v. O'Brien, 391 U.S. 367, 384 (1968); see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State, 66 F.4th 905, 939 (11th Cir. 2023) ("[A] statement or inquiry by a single legislator would constitute little evidence of discriminatory intent on the part of the legislature.") (citing Greater Birmingham Ministries v. Sec'y of State for the State of Ala., 992 F.3d 1299, 1321 (11th Cir. 2021)).  Similarly, legislation not enacted into law does not show discriminatory intent because the legislature's inability to enact that legislation suggests that the legislature and the governor did not agree with it.

Plaintiffs also argue that Senate Bill 3 ("SB 3") and other laws passed in Oklahoma prove that the legislature enacted SB 613 with discriminatory intent.  But pointing to other enacted laws does not establish Plaintiffs' burden.  SB 3, enacted during the 58th Oklahoma Legislature, appropriates funds to the University Hospitals Authority on the condition that University Hospitals Authority not use the funds to perform gender reassignment medical treatments on patients under the age of 18. S.B. 3, 58th Leg., 2nd Ex. Sess. (Okla. 2022).  SB 3 does not target transgender persons but incentivizes medical providers not to perform gender reassignment medical treatments on minors.  Id.  SB 3 does not show that the 59th Oklahoma Legislature enacted SB 613 with the intent to discriminate against transgender

---

Governor Stitt Bans Gender Transition Surgeries and Hormone Therapies for Minors in Oklahoma, Governor Kevin Stitt (May 1, 2023), https://oklahoma.gov/governor/newsroom/newsroom/2023/may2023/governor-stitt-bans-gender-transition-surgeries-and-hormone-ther.html.

persons.  S.B. 613, 59th Leg., 1st Sess. (Okla. 2023).  Plaintiffs fail to cite the other laws they wish us to consider, and we decline to search the Oklahoma's legislative record on Plaintiffs' behalf when they fail to meet their burden.  But we also have doubts that textually different legislation unrelated to SB 613, especially legislation enacted during prior legislatures, shows discriminatory intent because the legislature would have enacted each separate law for different intents and purposes, not necessarily or even remotely related to SB 613.  See Abbott v. Perez, 585 U.S. 579, 604 (2018) (discussing how the 2011 Texas Legislature discriminatory intent does not transfer to the 2013 Texas Legislature even if the enacted law had only small changes from the prior version of the law); see also N.C. State Conf. of the NAACP v. Raymond, 981 F.3d 295, 298 (4th Cir. 2020) ("A legislature's past acts do not condemn the acts of a later legislature, which we must presume acts in good faith.") (citing Abbott, 585 U.S. at 603); Arlington Heights, 429 U.S. at 266–68 (omitting contemporary legislation when explaining how legislative history may provide evidence of discriminatory intent).  "The ultimate question remains whether a discriminatory intent has been prove[n] in [this] *given case*."  City of Mobile v. Bolden, 446 U.S. 55, 74 (1980) (emphasis added).  "More distant instances of official discrimination in other cases are of limited help in resolving that question."  Id.

Plaintiffs failed to prove that the legislature enacted SB 613 for invidious discriminatory purpose.  The statute's text demonstrates that legislature did not enact SB 613 "in part 'because of,' not merely 'in spite of,' its adverse effects upon" transgender persons.  Feeney, 442 U.S. at 279.  SB 613 prohibits gender transition procedures for any

person under the age of eighteen.  If the law truly sought to discriminate against transgender persons, the prohibition would not distinguish based on age.  Instead, the purpose becomes clear: children's welfare.  These novel treatments only recently became available to children, so understandably, "limited data" exist on "the long-term physical, psychological, and neurodevelopmental outcomes in youth."  Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. of Transgender Health S1, S65 (2022).  The legislature passed SB 613, not because of the effects on transgender persons, but to prohibit medical procedures that may have permanent effects on children.  Opposition to gender transition procedures for minors cannot be considered an irrational surrogate to target transgender persons because "it cannot be denied that there are common and respectable reasons for opposing it."  Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 270 (1993) (citing Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 850 (1992)).  "Whether one agrees or disagrees with the goal of preventing [gender transition procedures for children], that goal in itself" does not qualify invidiously discriminatory animus.  Id. at 274.

4.

In sum, SB 613 does not violate the Equal Protection Clause of the Fourteenth Amendment because it discriminates based on age and medical purpose and satisfies rational basis review.  We also need not subject SB 613 to heightened scrutiny based on impermissible legislative purpose because no evidence exists that Oklahoma legislature enacted it as a pretext to invidiously discriminate against transgender minors.  Plaintiffs have thus failed to show a likelihood of success on the merits, and

we affirm the district court's preliminary injunction denial as to Plaintiffs' Equal Protection claim.

B.

Parent Plaintiffs assert a substantive Due Process claim arguing that SB 613 impinges on their fundamental right to make medical decisions for their minor children.  The Due Process Clause of the Fourteenth Amendment provides, "no State shall . . . deprive any person of life, liberty, or property, without due process of the law."  U.S. Const. amend. XIV, § 1.  Substantive rights under the Due Process Clause forbids the government from infringing on a fundamental liberty interest unless the infringement is narrowly tailored to serve a compelling state interest.  Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citing Reno v. Flores, 507 U.S. 292, 301–302 (1993)); see also Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018) ("[W]e apply the fundamental-rights approach when the plaintiff challenges legislative action.") (first citing Browder v. City of Albuquerque, 787 3.d 1076, 1079 (10th Cir. 2015); then citing Dias v. City & Cty. of Denver, 567 F.3d 1169, 1182 (10th Cir. 2009); and then citing Dawson v. Bd. of Cnty. Comm'rs, 732 F. App'x 624, 635–37 (10th Cir. 2018) (Tymkovich, J., concurring)).  But if the government "burdens some lesser right, the infringement is merely required to bear a rational relation to a legitimate government interest."  Dias, 567 F.3d at 1181 (first citing Glucksberg, 521 U.S. at 728; then citing Flores, 507 U.S. at 305).

The Supreme Court has always been hesitant to expand constitutional protections to an asserted right or liberty interest because to do so "place[s] the

matter outside the area of public debate and legislative action." Glucksberg, 521
U.S. at 720.  To determine whether the legislative action violates an individual's
right to substantive due process, we must, first, provide a "'careful description' of the
asserted fundamental liberty interest." Id. at 721 (quoting first Flores, 507 U.S. at
302; then citing Collins v. Harker Heights, 503 U.S. 115, 125 (1992); and then citing
Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261, 277–78 (1990)).  Second, we
must determine whether the liberty interest counts as a fundamental right, partaking
in "a careful analysis of the history of the right at issue," Dobbs v. Jackson Women's
Health Org., 597 U.S. 215, 238 (2022), to determine whether it is so "'deeply rooted
in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,'
such that 'neither liberty nor justice would exist if they were sacrificed,'"
Glucksberg, 521 U.S. at 721 (first quoting Moore v. City of E. Cleveland, 431 U.S.
494, 503 (1977); and then citing Synder v. Massachusetts, 291 U.S. 97, 105 (1934);
and then quoting Palko v. Connecticut, 302 U.S. 319, 325–26 (1937) (internal
quotations removed)).  Third, we ask whether the government has infringed on the
right through direct or substantial interference.  Browder, 787 F.3d at 1078 (quoting
Zablocki v. Redhail, 434 U.S. 374, 387 (1978)).  Finally, we provide the appropriate
standard of review.  Id. at 1078–79.

1.

Parent Plaintiffs' proffered fundamental right does not provide the careful
description needed for our analysis.  Parent Plaintiffs define the asserted right as
parents having a fundamental right to decide their children's medical care.  Parents

28

have the right "to make decisions concerning the care, custody, and control of their children," Troxel v. Granville, 530 U.S. 57, 66 (2000) (collecting cases), which includes "to *some extent,* a more specific right to make decisions about the child's medical care," PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1197 (10th Cir. 2010) (citing Dubbs v. Head Start, Inc., 336 F.3d 1194, 1203 (10th Cir. 2003) (emphasis added) (holding that a parent's right to direct a child's medical care is not clearly established when the state took away the child because parents failed to follow seven doctors' diagnosis of the child life-threatening cancer and recommendation of chemotherapy)).  But we and the Supreme Court have held that parents do not have an absolute "right to direct a child's medical care."  Id. at 1198 (first citing Prince, 321 U.S. at 166; and then citing Parham v. J.R., 442 U.S. 584, 603 (1979)); see also Parham, 442 U.S. at 603 ("[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children in dealing with children when their physical or mental health is jeopardized.") (first citing Wisconsin v. Yoder, 406 U.S. 205, 213 (1972); then citing Prince, 321 U.S. at 166)).  For example, when parents' decisions endanger a child's life or health, "a state may intervene without violating the parents' constitutional rights."  Wagner, 603 F.3d at 1198 (citing Parham, 442 U.S. at 603); see also Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I–L, 135 F.3d 694, 702 (10th Cir. 1998) (holding that parents do not have the right "to dictate that their children will attend public school for only part of the school day").  Because parents have no absolute right to determine their child's medical care, Parent Plaintiffs' asserted right suffers from a high level of

29

generality.[6]  Chavez v. Martinez, 538 U.S. 760, 776 (2003) (quoting Glucksberg, 512 U.S. at 721) (holding that vague generalities will not suffice).

In fact, Parent Plaintiffs' proffered right broadly exceeds the liberty interest before us.  See Glucksberg, 521 U.S. at 724 (holding that the careful description of the liberty interest is the "right to commit suicide with another's assistance" not the "right to die" because the statute prohibited "aiding another person to attempt suicide"); Flores, 507 U.S. at 302 (holding that the liberty interest is not "freedom from physical restraint" but whether a child with no available parents, close relative, or legal guardian, and for whom the government is responsible has the right to be placed in the custody of a private custodian).  SB 613 does not prohibit parents from deciding all medical care for their children.  The law prohibits parents only from accessing certain gender transition procedures for their children.  So the careful

---

[6] Our decision does not conflict with Parham, 442 U.S. at 584.  In Parham, the Supreme Court balanced the competing interests of parents and children to determine whether the procedures for the voluntary commitment of minors to a mental hospital violated the Due Process Clause.  Id. at 588, 602.  First, the Supreme Court resolved the matter on procedural, not substantive, due process grounds.  Id. at 599–600, 620. Second, although the Supreme Court discussed parents' "'high duty' to recognize symptoms of illness and to seek and follow medical advice," id. at 602, it also held "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized," id. at 603.  Thus, Parham embraces what we have confirmed: parents have no absolute right to make decisions directing their children's medical care.  Parent Plaintiffs' proffered fundamental right suffers from the fatal flaw of generality.

description of the liberty interest at stake is whether parents have the right to access

certain gender transition procedures for their children.[7]

2.

We next determine whether the liberty interest—parents' right to access

gender transition procedures for their children—is so deeply rooted in our Nation's

history to establish a fundamental right.  After conducting "a careful analysis of the

---

[7] Parent Plaintiffs argue that we should not define the fundamental right "microscopically."  For comparison, Parent Plaintiffs assert that in Turner v. Safley, 482 U.S. 78, 95 (1987), Zablocki, 434 U.S. at 388, and Loving v. Virginia, 388 U.S. 1, 12 (1967), the Supreme Court defined the fundamental right as a "right to marry in its comprehensive sense," not as a narrow definition of marriage.  But unlike Turner, where the Supreme Court discussed how the right to marry in prison exists within the fundamental right of marriage, Parent Plaintiffs have not shown, and have offered no reasoning or argument, on how the liberty interest at issue—parents' right to have gender transition procedures for their children—falls within the broader sphere of the right for parents to direct their children's medical care.  Compare Dubbs, 336 F.3d at 1203 (discussing how the right for a parent to refuse a medical exam for their children fits within the protected liberty of a competent person right to refuse unwanted medical treatments and the interest of parents in the care, custody, and control of their children); Turner, 482 U.S. at 95 (holding that the important attributes of marriage still exist within the prison, so inmates retain the constitutional right to marry); Griswold v. Connecticut, 381 U.S. 479, 485–86 (1965) (discussing how the right for a married person to have contraceptives fits within the fundamental right to privacy because a husband and wife's marital relations are private intimate affairs of the home in which the state cannot enter) with Dobbs, 597 U.S. at 255–56 (discussing how the right to abortion does not fit within the broader right to autonomy because abortion involves critical moral question about potential life).  Additionally, a state's prohibition on gender transition procedures for minors does not infringe on parents' right to direct their children's medical care because children and parents do not have a right to affirmative access of medical care that the government reasonably prohibited.  Rutherford v. United States, 616 F.2d 455, 457 (10th Cir. 1980); see also Abdi v. Wray, 942 F.3d 1019, 1030–31 (10th Cir. 2019) (discussing how placement on the Selectee List would not infringe the plaintiff's right to travel); Zablocki, 434 U.S. at 386 (discussing whether a statute prohibiting fathers with unpaid child support duties from marriage significantly interferes with the right to marry).

history of the right at issue," <u>Dobbs</u>, 597 U.S. at 238, we conclude there is no deeply rooted tradition in parents' right to access gender transition procedures for their children.

State and federal governments have long played a critical role in regulating health and welfare, and for this reason, health and welfare laws have a "strong presumption of validity." <u>Dobbs</u>, 597 U.S. at 301 (quoting <u>Heller v. Doe</u>, 509 U.S. 312, 319 (1993)).  We also have consistently held that individuals do not have an affirmative right to specific medical treatments the government reasonably prohibits. <u>Abigail All. for Better Access to Dev. Drugs v. von Eschenbach</u>, 495 F.3d 695, 710 n.18 (D.C. Cir. 2007) (collecting cases); <u>see also</u> <u>Watson v. Maryland</u>, 218 U.S. 173, 176 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health.").  We have held that although patients have a fundamental right to refuse treatment, the "selection of a particular treatment . . . is within the area of governmental interest in protecting public health." <u>Rutherford v. United States</u>, 616 F.2d 455, 457 (10th Cir. 1980); <u>see also</u> <u>Glucksberg</u>, 521 U.S. at 725 (discussing how patients have a right to refuse medication but not a right to physician assisted suicide).  Thus, the government has the "authority to limit the patient's choice of medication," whether the patient is an adult or a child. <u>Rutherford</u>, 616 F.2d at 457; <u>Planned Parenthood of Cent. Mo. v. Danforth</u>, 428 U.S. 52, 74 (1976) ("[T]he State has somewhat broader authority to

regulate the activities of children than of adults.") (citing <u>Prince</u>, 321 U.S. at 170; <u>Ginsberg v. New York</u>, 390 U.S. 629 (1968)).

The parent-child relationship does not change our reasoning, and to conclude otherwise would allow parents to "veto legislative and regulatory polices about drugs and surgeries permitted for children." <u>L.W. ex rel. Williams v. Skrmetti</u>, 83 F.4th 460, 475 (6th Cir.), <u>aff'd sub nom.</u> <u>United States v. Skrmetti</u>, 145 S. Ct. 1816 (2025). Although parents have authority over their children's medical care, no case law "support[s] the extension of this right to a right of parents to demand that the State make available a particular form of treatment." <u>Doe ex rel. Doe v. New Jersey</u>, 783 F.3d 150, 156 (3d Cir. 2015); <u>see also</u> <u>Cruzan</u>, 497 U.S. 261, 286 (1990) (holding that states have no constitutional requirement to rely on parents' decision-making). In fact, the state's interest in a child's health may "constrain[] a parent's liberty interest in the custody, care, and management of her children." <u>Hollingsworth v. Hill</u>, 110 F.3d 733, 739 (10th Cir. 1997). So our Nation does not have a deeply rooted history of affirmative access to medical treatment the government reasonably prohibited, regardless of the parent-child relationship.

As for gender transition procedures specifically, healthcare providers only recently began providing gender transition procedures for minors. The medical community traditionally limited gender transition treatments to adults. <u>See</u> <u>Skrmetti</u>, 145 S. Ct. at 1825 (citing P. Walker et al., <u>Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons</u> (1st ed. 1979), reprinted in 14 Archives of Sexual Behavior 79 (1985)). In 1979, the World Professional

33

Association for Transgender Health ("WPATH") published the first standard of care ("Standard") for treating gender dysphoria and recommended that healthcare providers only administer hormone and surgical procedures on legal adults.  See Walker, Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons § 4.14.4.  In 1998, WPATH revised their Standard to include puberty blockers and hormones to those older than 16 if the patient met certain criteria but still recommended that "the administration of hormones to adolescents younger than age 18 should rarely be done."  Skrmetti, 145 S. Ct. at 1825 (citing S. Levine et al., The Standards of Care for Gender Identity Disorders (5th ed. 1998), reprinted in 11 J. Psychology & Human Sexuality 1, 20 (1999)).

Not until 2001 did WPATH revise their Standard to allow for puberty blockers as soon as pubertal changes began but still recommended that hormone therapy not occur until the age of 16.  W. Meyer et. al., Standard of Care for Gender Identity Disorders 10 (6th Ed. 2001).  In 2012, WPATH revised their Standards to permit puberty blockers and hormonal therapy from the early stages of puberty.  World Pro. Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People 19–20 (7th ed. 2012).  This recent development in the medical field regarding gender transition procedures for minors shows that our Nation does not have a deeply rooted tradition in providing gender transition procedures to minors.  The right for parents to access gender transition procedure for their children is not a fundamental one, and Oklahoma's prohibition on gender transition procedures for minors infringes on a lesser right.

3.

Without a fundamental right, we apply rational basis review. <u>Flores</u>, 507 U.S. at 305. A law withstands rational basis review if the law's means and goals rationally relate to a legitimate state interest. <u>Dobbs</u>, 597 U.S. at 301 (first citing <u>Heller</u>, 509 U.S. at 320; then citing <u>Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313 (1993); then citing <u>New Orleans v. Dukes</u>, 427 U.S. 297, 303 (1976) (per curiam); and then citing <u>Williamson v. Lee Optical of Okla., Inc.</u>, 348 U.S. 483, 491 (1955)). The impairment demands "no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose." <u>Flores</u>, 507 U.S. at 305. "Our rational basis review is highly deferential toward the government's actions," and the plaintiff has the burden "to show the governmental act complained of does not further a legitimate state purpose by rational means." <u>Seegmiller v. LaVerkin City</u>, 528 F.3d 762, 772 (10th Cir. 2008) (citing <u>Powers v. Harris</u>, 379 F.3d 1208, 1215 (10th Cir. 2004)).

Oklahoma has a legitimate state interest in the health and welfare of its minor citizens. State governments have a particular interest in the health of minors, <u>Aid for Women v. Foulston</u>, 441 F.3d 1101, 1119 (10th Cir. 2006) (citing <u>Clark v. City of Draper</u>, 168 F.3d 1185, 1189 (10th Cir. 1999)), and a compelling interest in "safeguarding the physical and psychological well-being of a minor," <u>New York v. Ferber</u>, 458 U.S. 747, 756–57 (1982) (quoting <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 607 (1982)). Indeed, the state "has a duty of the highest order to protect the interest of minor children," <u>Palmore v. Sidoti</u>, 466 U.S. 429, 433

35

(1984), because "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." Prince, 321 U.S. at 168.

The potential health risks related to gender transition procedures provides a rational basis for Oklahoma's decision to enact SB 613. The district court found gender transition procedures for minors may result in permanent health risks to children including impaired brain development, poor educational development, impact to bone density, underdeveloped genitalia, and infertility.[8] Medical and scientific uncertainty also support that Oklahoma has "wide discretion to pass legislation" in this area of healthcare. Skrmetti, 145 S. Ct. at 1836 (quoting Gonzales

---

[8] Plaintiffs argue that we should not defer to the district court's factual findings because it constitutes dicta, the district court failed to consider Plaintiffs' evidence, and the district court's findings are clearly erroneous. We disagree. We review a district court's "factual findings for clear error." Fish v. Kobach, 840 F.3d 710, 723 (2016) (citing Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003)). A factual finding is clearly erroneous when it lacks "factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. Craig, 808 F.3d 1249, 1255 (10th Cir. 2015) (quoting United States v. Mullins, 613 F.3d 1273, 1292 (10th Cir. 2010)). The district court's factual findings do not constitute dicta because the factual findings necessarily involved the determination of whether SB 613 is rationally related to a legitimate purpose. See, e.g., Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1184 (10th Cir. 1995). The district court also properly considered Plaintiffs' evidence and referenced Plaintiffs' evidence within its decision. Finally, the record supports the district court's factual findings, so the factual findings are not clearly erroneous. Plaintiffs request us to reweigh the validity of expert testimonies, but to do so would turn appellate review on its head. Where two permissible views of the evidence exist, "the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985) (first citing United States v. Yellow Cab Co., 338 U.S. 338, 342 (1949); and then citing Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc., 456 U.S. 844 (1982)).

v. Carhart, 550 U.S. 124, 163 (2007)).  The district court found the medical community offers no consensus about the extent of the risk and benefits of gender transition procedures for minors.  We recognize the importance of this issue to all involved.  But this remains a novel issue with disagreement on how to assure children's health and welfare.  We will not usurp the legislature's judgment when it engages in "earnest and profound debate about the morality, legality, and practicality" of gender transition procedures for minors.  Glucksberg, 521 U.S. at 735.  "That respect for a legislature's judgment applies even when the laws at issue concern matters of great social significance and moral substance."  Dobbs, 597 U.S. at 300 (collecting cases).  While we respect that Plaintiffs disagree with the legislature assessment of such procedures' risks, that alone does not invalidate a democratically enacted law on rational-basis grounds.  See Skrmetti, 145 S. Ct. at 1828 ("We generally afford such laws 'wide latitude' under this rational basis review, acknowledging that 'the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.'") (quoting City of Cleburne, 473 U.S. at 440).  Parent Plaintiffs have thus failed to show a likelihood of success on the merits, and we affirm the district court's preliminary injunction denial as to Plaintiffs' Due Process Claim.

C.

For these reasons, Plaintiffs failed to show a likelihood of success on the merits.  Because Plaintiffs lack a "clear showing" that they will succeed on the merits, Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A.

37

Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed.

1995)), we decline to consider the remaining factors for a preliminary injunction,

<u>Colorado v. U.S. Env't Prot. Agency</u>, 989 F.3d 874, 890 (10th Cir. 2021) (citing

<u>N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior</u>, 854 F.3d 1236, 1255 (10th

Cir. 2017)).  We hold that the district court did not abuse its discretion when denying

Plaintiffs' motion for a preliminary injunction.

AFFIRMED.